efi global

21 Father Devalles Blvd.
Fall River, MA 02723
508-997-4900

# Fire Origin & Cause Report

EFI Global File No.: 012.01201
May 6, 2021

## Commercial Structure Fire

300 Crown Colony Drive Office Building
300 Crown Colony Drive
Quincy, MA 02169

Date of Loss: April 25,
2017 Claim No. 141826400

.

Report prepared for:
John Brosnan, O'Malley and Harvey, LLP
400 Fifth Avenue
Waltham, MA 02451

Insured: 300 Crown Colony Drive Office Building
EFI Global File #: 012.01201

## ASSIGNMENT

The assignment was received by EFI Global Inc. (EFI), on April 28, 2017 from Jill Reisner, Liberty Mutual, Los Angeles, CA to investigate a commercial structure fire at 300 Crown Colony Drive, Quincy, MA 02169.

**The scope of this assignment and subsequent instructions were to:**
- Determine the origin and cause of the fire.
- Prepare a report of the investigation. This report is being generated for John Brosnan, O'Malley and Harvey, LLP, 400 Fifth Avenue, Waltham, MA 02451.
- Testify, if needed.

## SUMMARY OF OPINIONS/CONCLUSIONS

- The fire originated on an office cubicle desktop within the Hewlett Packard (HP) LaserJet printer model 4250n.
- The HP LaserJet printer model 4250n was plugged in and operational the night before the fire.
- The HP LaserJet printer model 4250n was installed in the subject office cubicle on the night before the fire.
- No electrical abnormalities were found with the current electrical circuit that fed power to the office cubicle and this printer.
- All other possible fire causation scenarios were examined and have been ruled out.
- This was an accidental fire.

## BACKGROUND

On April 28, 2017, I began an investigation to determine the origin and cause of a fire that occurred at 300 Crown Colony Drive, Quincy, MA. 300 Crown Colony Drive is a five-story commercial office building.[1] This commercial office building was built in 1987 and is comprised of approximately 122,331 square feet of office space.[2] Onex York Holdings Corp. d/b/a Careworks Managed Care Services, Inc. f/k/a MCMC LLC occupied offices on the second and fifth floors on the date of the fire.[3]

On April 25, 2017, at 00:54 hours, an alarm of fire was received by Quincy Fire Department via the municipal fire alarm notification system.[4] Box 3322 was transmitted for a fifth-floor sprinkler waterflow and smoke detector activation at 300 Crown Colony Drive, Quincy, MA.[5] Upon arrival at the building, Quincy Fire Department was able to gain entry

---

[1] Exhibit 1, City of Quincy Assessor's Office property record.
[2] Exhibit 1, City of Quincy Assessor's Office property record.
[3] Exhibit 2, Deposition of Jin Lem at 7:3-9.
[4] Exhibit 3, City of Quincy Fire Department Incident Report at 2-4; Exhibit 4, Deposition of Keith Lentini at 10:11; Exhibit 5, Deposition of Christopher Barry at 12.
[5] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4; Exhibit; Deposition of Keith Lentini at 10:13-16; Exhibit 6, Deposition of Michael Palaza at 10.

Insured: 300 Crown Colony Drive Office Building
EFI Global File #: 012.01201

to the office building and proceed to the fifth floor.[6] Quincy Fire had to force entry into the fifth-floor office occupied by Onex York Holdings Corp.[7] Once inside the office Quincy Fire was met with a significant smoke condition and waterflow from a sprinkler head.[8] Only one sprinkler head had activated, which kept the fire from spreading to adjoining areas.[9] It was necessary for Quincy Fire to breach a nearby window to allow for ventilation of the smoke.[10]

Jin Lem was employed by Onex York Holdings Corp. as a Tier 1 IT tech on the date of the fire.[11] Mr. Lem worked on the fifth floor.[12] Mr. Lem started working for Onex York Holdings Corp. in June 2014.[13] Mr. Lem testified that the April 25, 2017 fire started in a cubicle in the middle of the room by the windows in Onex York Holdings Corp.'s premises on the fifth floor.[14] There were only two electronic devices in that cubicle: (1) an HP 4250n LaserJet printer, and (2) an HP 3015n LaserJet printer.[15] Those printers were plugged into the power outlet on the baseboard of the cubicle.[16] The HP 3015n LaserJet printer was used as a check printer.[17] Mr. Lem had moved the HP LaserJet 4250n printer to that cubicle on the night of April 24, 2017 at approximately 8:00 p.m.[18] There was a sprinkler directly above the printer area in the cubicle.[19] The HP 4250n LaserJet printer had been located in an spare office used by visitors since 2016.[20] Between 2016 and the date of the fire, the HP 4250n LaserJet printer was lightly used.[21] Mr. Lem moved the HP 4250n LaserJet printer to the cubicle on the night of April 24, 2017 because the accounting department needed it.[22] Mr. Lem plugged the networking cable into the HP 4250n LaserJet printer to connect it to the company network and he plugged the printer into the outlet on the baseboard of the cubicle.[23] Mr. Lem then sent a test print to the HP 4250n LaserJet printer and it printed fine.[24] Mr. Lem also added paper to the HP 4250n LaserJet printer.[25] No work had been done on either the HP 4250n LaserJet printer or the HP 3015n LaserJet printer since Mr. Lem started working for Onex York Holdings Corp.[26]

---

[6] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4; Exhibit 4, Deposition of Keith Lentini at 15-18; Exhibit 6, Deposition of Michael Palaza at 11; Exhibit 7, Deposition of James Leonard at 9.

[7] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4; Exhibit 4, Deposition of Keith Lentini at 17; Exhibit 6, Deposition of Michael Palaza at 13; Exhibit 7, Deposition of James Leonard at 10.

[8] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4; Exhibit 4, Deposition of Keith Lentini at 17-18; Exhibit 6, Deposition of Michael Palaza at 12-13; Exhibit 5, Deposition of Christopher Barry at 19.

[9] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4; Exhibit 4, Deposition of Keith Lentini at 17-18; Exhibit 6, Deposition of Michael Palaza at 12-14; Exhibit 5, Deposition of Christopher Barry at 20.

[10] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4; Exhibit 4, Deposition of Keith Lentini at 33-34; Exhibit 5, Deposition of Christopher Barry at 22, Exhibit 7, Deposition of James Leonard at 14.

[11] Exhibit 2, Deposition of Jin Lem at 5-6.

[12] Exhibit 2, Deposition of Jin Lem at 33-34.

[13] Exhibit 2, Deposition of Jin Lem at 5-6.

[14] Exhibit 2, Deposition of Jin Lem at 10-11, 17.

[15] Exhibit 2, Deposition of Jim Lem at 13-17.

[16] Exhibit 2, Deposition of Jin Lem at 12, 17:7-10, 31; Exhibit 4, Deposition of Keith Lentini at 18:12-14, 20:14-15, 23:17-18, 30:1-4; 39:8-10, 46:1-4.

[17] Exhibit 2, Deposition of Jim Lem at 17.

[18] Exhibit 2, Deposition of Jin Lem at 11, 28-29.

[19] Exhibit 2, Deposition of Jin Lem at 33.

[20] Exhibit 2, Deposition of Jin Lem at 28.

[21] Exhibit 2, Deposition of Jin Lem at 28.

[22] Exhibit 2, Deposition of Jin Lem at 11.

[23] Exhibit 2, Deposition of Jin Lem at 11-12.

[24] Exhibit 2, Deposition of Jin Lem at 11-12.

[25] Exhibit 2, Deposition of Jin Lem at 12.

[26] Exhibit 2, Deposition of Jin Lem at 17, 35

Insured: 300 Crown Colony Drive Office Building
EFI Global File #: 012.01201

There were no servicing or maintenance agreements for those two printers and Mr. Lem had no difficulties with either printer during the year before the fire.[27] Mr. Lem had no issues with either of those two printers before the fire.[28] He testified both printers were functional.[29] No parts had been replaced in either printer before the fire.[30] There was no furniture in the cubicle; there may have been a box of paper or checks on the desktop and a few spare toner cartridges under the desk.[31] Mr. Lem left work at 9:00 p.m. on the night of April 24, 2017.[32] He was the last one to leave Onex York Holdings Corp.'s premises on the fifth floor that night.[33] Nobody was permitted to smoke in Onex York Holdings Corp.'s offices and Mr. Lem was not aware of any coworkers who smoked.[34]

The orange circled area in Exhibit 4 to Mr. Lem's deposition fairly and accurately depicts the area in the cubicle where the HP 4250n LaserJet printer was located before the fire.[35] The blue circled area in Exhibit 5 to Mr. Lem's deposition fairly and accurately depicts where the HP 3015n LaserJet printer was located before the fire.[36] The orange circled area in Exhibit 5 to Mr. Lem's deposition also fairly and accurately depicts the area in the cubicle where the HP 4250n LaserJet printer was located before the fire.[37]

Quincy Fire Department Lieutenant Keith Lentini was the first officer to respond to the April 25, 2017 fire at 300 Crown Colony Drive.[38] Lieutenant Lentini was initially in charge of the fire.[39] He was with the Engine Company  No. 5, which included himself, Firefighter Christopher Barry and Firefighter David Taylor.[40] Ladder Company No.  1, consisting of Lieutenant Michael Palaza, Firefighter James Leonard and Firefighter Stephen Wells, also responded to the fire.[41] When he arrived at the fire scene, Lieutenant Lentini proceeded inside the building to the first-floor fire alarm panel.[42] The first-floor fire alarm panel indicated two things: (1) a smoke detector on the fifth floor had activated, and (2) the sprinkler system was running.[43] Nobody was inside the building when  Officer Lentini arrived.[44]  Ladder Company No. 1 arrived at the fire scene about one minute after Lieutenant Lentini inspected the first-floor fire alarm panel.[45]

---

[27] Exhibit 2, Deposition of Jin Lem at 18, 37.
[28] Exhibit 2, Deposition of Jin Lem at 18.
[29] Exhibit 2, Deposition of Jin Lem at 18.
[30] Exhibit 2, Deposition of Jin Lem at 37.
[31] Exhibit 2, Deposition of Jin Lem at 32.
[32] Exhibit 2, Deposition of Jin Lem at 29-30.
[33] Exhibit 2, Deposition of Jin Lem at 30.
[34] Exhibit 2, Deposition of Jim Lem at 37-38.
[35] Exhibit 8, Deposition Exhibit 4 from the Deposition of Jin Lem; Exhibit 2, Deposition of Jin Lem at 22, 24.
[36] Exhibit 9, Deposition Exhibit 5 from the Deposition of Jin Lem; Exhibit 2, Deposition of Jin Lem at 19-21, 24-25.
[37] Exhibit 9, Deposition Exhibit 5 from the Deposition of Jin Lem; Exhibit 2, Deposition of Jin Lem at 19-21, 24-25.
[38] Exhibit 4, Deposition of Keith Lentini at 9-10.
[39] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4, 11, 13; Deposition of Keith Lentini at 10.
[40] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4, 11, 13; Exhibit 4, Deposition of Keith Lentini at 10-11.
[41] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4, 10, 13; Exhibit 4, Deposition of Keith Lentini at 10-11.
[42] Exhibit 4, Deposition of Keith Lentini at 15-16.
[43] Exhibit 4, Deposition of Keith Lentini at 15.
[44] Exhibit 4, Deposition of Keith Lentini at 46.
[45] Exhibit 4, Deposition of Keith Lentini at 15.

Insured: 300 Crown Colony Drive Office Building
EFI Global File #: 012.01201

Lieutenant Palaza and Firefighter James Leonard entered the building and proceeded to the fifth floor to investigate the source of the alarm.[46]

When he arrived on the fifth floor, Lieutenant Palaza observed smoke and could hear water running.[47] Lieutenant Palaza then "struck the box," which indicates that this was a fire condition that required additional Fire Department assets.[48] When Lieutenant Palaza and Firefighter Leonard headed to the fifth floor, Lieutenant Lentini and Firefighter Barry headed to the sprinkler room.[49] After Lieutenant Palaza struck the box, Lieutenant Lentini and Firefighter Barry went back to Engine No. 5 to retrieve a fire hose.[50] Lieutenant Lentini and Firefighter Barry then proceeded to the fifth floor where they connected the fire hose to a standpipe in the stairwell.[51] Lieutenant Lentini and Firefighter Barry left the stairwell with the fire hose and met up with Lieutenant Palaza and Firefighter Leonard on the fifth floor.[52] Lieutenant Palaza and Firefighter Leonard then broke open the office door to the office from which the smoke was emanating.[53] Thereafter, Lieutenant Lentini and Firefighter Barry entered the office with the hose line.[54] Lieutenant Lentini advised Firefighter Barry to stay by the door because Lieutenant Lentini did not know where the fire was or its source.[55] Lieutenant Lentini described the office as very smoky.[56] He observed rows of cubicles.[57] Lieutenant Lentini also observed that the sprinkler system had activated and was discharging water.[58] As he moved into the office, Lieutenant Lentini noticed some vertical blinds that were distorted or melted from heat.[59] He headed toward that area.[60] When he arrived in that area, Lieutenant Lentini found a printer that was still actively on fire.[61] The distorted blinds were approximately six to eight feet away from the printer.[62] Lieutenant Lentini did not observe anything else on fire in that area.[63] Lieutenant Lentini yelled to Firefighter Barry to stay by the door.[64] Lieutenant Lentini then unplugged the printer and carried it back toward Firefighter Barry.[65] Firefighter Barry opened the fire hose and extinguished the fire.[66] In the incident report he authored, Lieutenant Lentini wrote: "L1 forced office door where smoldering fire in a computer printer was extinguished. Fire mostly contained by 1 sprinkler head but heavy water damage to affected office."[67]

---

[46] Exhibit 4, Deposition of Keith Lentini at 15-16; Exhibit 6, Deposition of Michael Palaza at 10-11.

[47] Exhibit 6, Deposition of Michael Palaza at 11.

[48] Exhibit 6, Deposition of Michael Palaza at 11.

[49] Exhibit 4, Deposition of Keith Lentini at 16.

[50] Exhibit 4, Deposition of Keith Lentini at 16-17.

[51] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 5, Deposition of Christopher Barry at pg. 17.

[52] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 5, Deposition of Christopher Barry at pg. 18.

[53] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 6, Deposition of Michael Palaza at 11; Exhibit 7, Deposition of James Leonard at 9.

[54] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 5, Deposition of Christopher Barry at pg. 19.

[55] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 5, Deposition of Christopher Barry at pg. 20.

[56] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 6, Deposition of Michael Palaza at 12-13; Exhibit 5, Deposition of Christopher Barry at 19.

[57] Exhibit 4, Deposition of Keith Lentini at 17.

[58] Exhibit 4, Deposition of Keith Lentini at 18, Exhibit 5, Deposition of Christopher Barry at pg. 20.

[59] Exhibit 4, Deposition of Keith Lentini at 17.

[60] Exhibit 4, Deposition of Keith Lentini at 17-18.

[61] Exhibit 4, Deposition of Keith Lentini at 18, Exhibit 7, Deposition of James Leonard at pg. 11.

[62] Exhibit 4, Deposition of Keith Lentini at 18.

[63] Exhibit 4, Deposition of Keith Lentini at 29.

[64] Exhibit 4, Deposition of Keith Lentini at 18.

[65] Exhibit 4, Deposition of Keith Lentini at 18.

[66] Exhibit 4, Deposition of Keith Lentini at 18, Exhibit 5, Deposition of Christopher Barry at pg. 20.

[67] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4.

Insured: 300 Crown Colony Drive Office Building
EFI Global File #: 012.01201

Lieutenant Lentini concluded that the fire originated in the printer that was on fire when he was in the immediate vicinity of the smoke.[68] In his incident report, Lieutenant Lentini identified the printer as the cause of ignition.[69] Lieutenant Lentini testified that he believed that there was an electrical issue that caused heat within the printer to ignite the components.[70] Lieutenant Lentini ruled out arson as a possible cause of the fire.[71] In his incident report, Lieutenant Lentini ruled out various human factors as causes contributing to ignition. [72] Lieutenant Lentini did not observe any evidence that somebody had been smoking in the office.[73]

Lieutenant Lentini testified that the printer that he found on fire was in the same position on the desktop in the cubicle as Mr. Lem had indicated.[74] Based upon the char pattern, Lieutenant Lentini determined that the printer was located in the blue circled area on Exhibit 6 from his deposition.[75]

I am informed that Michael Weber, property manager NAI Hunneman, has advised that there were no electrical problems or electrical work performed on the fifth-floor of the property, in the one-year  period, preceding  the fire.

## PROCEDURES

The assignment was conducted utilizing a systematic approach identified as the scientific method. The scientific method is a principle of inquiry that forms a basis for legitimate scientific and engineering processes. The scientific method is the recommended methodology provided by the National Fire Protection Association 921, Guide for Fire and Explosion Investigations, 2017 Edition. The opinions and conclusions expressed in this report are based upon the following:

1.  My fire scene examination on April 28, 2017. My investigation originated on the fifth-floor office suite of Onex Holdings LLC. I met with Mr. Jin Lem of Onex York Holdings Corp. in this fifth-floor office.

2.  A brief interview of Mr. Lem. During that interview, Mr. Lem stated that he placed the HP LaserJet printer model 4250n on the office cubicle desk on the previous night.

3.  My inspection of the damaged printers at the outside  trailer.

4.  My attendance at the September 13, 2017 evidence inspection at GAI Engineers, Stoughton,   MA.

5.  My review of the deposition testimony of City of Quincy Fire Department Captain Keith Lentini, City of Quincy Fire Department Firefighter Christopher Barry, City of Quincy Fire Department Firefighter James

---

[68] Exhibit 4, Deposition of Keith Lentini at  15.
[69] Exhibit 4, Deposition of Keith Lentini at  19-21.
[70] Exhibit 4, Deposition Testimony of Keith Lentini at  38-39.
[71] Exhibit 4, Deposition Testimony of Keith Lentini at  45-46.
[72] Exhibit 4, Deposition Testimony of Keith Lentini at 49; Exhibit 3, City of Quincy Fire Department Incident Report at 5.
[73] Exhibit 4, Deposition Testimony of Keith Lentini at  46.
[74] Exhibit 4, Deposition Testimony of Keith Lentini at 25-26, 50; Exhibit 10, Exhibit 6 from the Deposition of Keith Lentini.
[75] Exhibit 4, Deposition Testimony of Keith Lentini at 25-26, 50; Exhibit 10, Exhibit 6 from the Deposition of Keith Lentini.

Insured: 300 Crown Colony Drive Office  Building
EFI Global File #: 012.01201

Leonard, City of Quincy Fire Department Captain Michael Palaza and Jin Lem and the deposition exhibits from those depositions, including the Quincy Fire Department incident report marked as Exhibit 2 at Captain Lentini's deposition.

**6.** My experience, training, and knowledge.

# DATA COLLECTION

## Site Examination Observations

I made the following observations at my scene examination on April 28, 2017.

The structure was identified as a five-story, commercial property. The front of the structure was referenced to face south. The exterior walls were steel framed and finished on the outside with metal siding. The roof was covered with typical rubber for a flat roof.

Electrical service entered the structure via underground service lateral to the main electrical room on the first floor. The electrical load center for the fifth-floor Onex York Holdings Corp's. office was located within  a utility closet in Onex York Holdings Corp's. office.

Smoke alarms were identified within the structure. The smoke alarms detectors are a typical commercial fire alarm system which consists of hard-wired smoke detectors with battery backup and are monitored. The sprinkler system is also monitored. It was both the water flow for the sprinkler system, and a smoke detector activation that notified Quincy Fire Department.

Upon my investigation, I observed that a fire had occurred within a typical office cubicle.[76] Specifically, a burn pattern was evident on the top of the desk and a section of the corresponding office partition.[77] I observed melted vertical window blinds, in direct relation to the office cubicle.[78] The sprinkler head above this area had already been replaced.[79] The sprinkler that had activated was within the cubicle desk area, and photographed.[80] Prior to my arrival, property management had secured 2 printers that were located on the desk where the fire originated.

Before proceeding to the area where the printers were stored, I examined the electrical outlet that the printer was plugged into.[81] This electrical receptacle is integrated into the office partition.[82] Nothing remarkable was visible on the face of the receptacle.[83] Further inspection of the wiring connection and the terminals on the electrical receptacle did not reveal any deficiencies.[84] I then proceeded to the main electrical room for this office area, which is located on the

---

[76] Noonan photos LMIC1880, LMIC1910, LMIC1911, LMIC1923.
[77] Noonan photos LMIC1880, LMIC1884, LMIC1910, LMIC1911.
[78] Noonan photo LMIC1911.
[79] Noonan photo LMIC1925, LMIC1926.
[80] Noonan photo LMIC1925.
[81] Noonan photo LMIC1882-LMIC1884.
[82] Noonan photo LMIC1882-LMIC1884.
[83] Noonan photo LMIC1882-LMIC1884.
[84] Noonan photo LMIC1882-LMIC1884.

Insured: 300 Crown Colony Drive Office  Building
EFI Global File #: 012.01201

fifth floor, and did a visual inspection of the circuit breaker panel.[85] Nothing remarkable was noticed with either the electrical service feeding this office, or the individual circuit breakers for the branch circuit wiring.[86]

The only items left on the office cubicle desk were two power cords, and a data cord.[87] The two electrical cords were for two computer printers.[88] The sprinkler head that activated was also in the area of the damaged desk.[89] An ink cartridge was also in this area.[90] All 5 items were bagged and secured as evidence.[91]

I observed burn damage to both printers.[92] The two printers consisted of one HP LaserJet printer model 4250n, and one HP LaserJet printer model 3015n.[93] While there was fire damage to both printers, the HP model 4250n was more significantly damaged.[94] Photographs were taken and the two printers were secured as evidence.[95]

Captioned photographs from my site investigation are attached at Addendum A.

## Evidence

The below evidence was initially placed in an evidence storage facility at EFI Global. On September 13, 2017, I transferred this evidence to GAI Engineering, Stoughton, MA.

| Item Number | Description |
|---|---|
| 1 | HP LaserJet Printer Model 4250n, HP LaserJet Printer Model 3015n, and ink cartridge |
| 2 | 2 electrical cords and data cord |
| 3 | Sprinkler head |

## ANALYSIS

I        **Fire Origin Analysis**

As fire develops, the production of heat and smoke create various fire effects, including mass loss, charring, deformation, lines of demarcation, arc sites on electrical wiring, and many others.[96] These effects create

---

[85] Noonan photo LMIC1898-LMIC1902.
[86] Noonan photo LMIC1898-LMIC1902.
[87] Noonan photo LMIC1923.
[88] Noonan photo LMIC1923.
[89] Noonan photo LMIC1925.
[90] Noonan photo LMIC1920.
[91] Noonan photo LMIC1954.
[92] Noonan photo LMIC1934-LMIC1951.
[93] Noonan photo LMIC1934-LMIC1951.
[94] Noonan photo LMIC1947.
[95] Noonan photo LMIC1952-LMIC1954.
[96] NFPA 921 Guide for Fire and Explosion Investigations, 2017 edition, § 6.2 Fire Effects.

Insured: 300 Crown Colony Drive Office  Building
EFI Global File #: 012.01201

recognizable patterns that are utilized with fire dynamics to identify the spread of fire throughout a structure. Observations of the fire by witnesses and first responders provide additional data for analysis and understanding of the fire's development.

The analysis of these fire effects and the resulting movement and intensity patterns formed during the progression of the fire establish the spread of fire. [97]

### A. The fire originated on the office cubicle desktop within the HP LaserJet printer model 4250n, which was plugged in and operational before the fire, after being installed in the office cubicle on the night prior to the fire.

I concluded the fire originated at the office cubicle desktop within the HP LaserJet printer model 4250n. The only burn pattern I observed was on the office cubicle desktop and partition. An overview of the office revealed that vertical window blinds, in close relation to this office cubicle were melted. This indicates that significant heat resulted in this melting of the blinds. Further, the sprinkler head that is closest to this desktop activated, which resulted in the extinguishment of this fire.

My conclusion that the fire originated on the office cubicle desktop within the HP LaserJet 4250n is also supported by the testimony of Mr. Lem. Mr. Lem testified that there were only two electronic devices in that cubicle: (1) an HP 4250n LaserJet printer, and (2) an HP 3015n LaserJet printer.[98] Those printers were plugged into the power outlet on the baseboard of the cubicle.[99] The HP 3015n LaserJet printer was used as a check printer.[100] Mr. Lem had moved the HP LaserJet 4250n printer to that cubicle on the night of April 24, 2017 at approximately 8:00 p.m.[101] There was a sprinkler head directly above the printer area in the cubicle.

The HP 4250n LaserJet printer had been located in an spare office used by visitors since 2016.[102] Between 2016 and the date of the fire, the HP 4250n LaserJet printer was lightly used.[103] Mr. Lem moved the HP 4250n LaserJet printer to the cubicle on the night of April 24, 2017 because the accounting department needed it.[104] Mr. Lem plugged the networking cable into the HP 4250n LaserJet printer to connect it to the company network and he plugged the printer into the outlet on the baseboard of the cubicle.[105] Mr. Lem then sent a test print to the HP 4250n LaserJet printer and it printed fine.[106] Mr. Lem also added paper to the HP 4250n LaserJet printer.[107] No  work has been done on either the HP 4250n LaserJet printer or the HP 3015n LaserJet printer since Mr. Lem  started working for Onex York Holdings Corp.[108] There were no servicing or maintenance agreements for those two printers and Mr. Lem had no

---

[97] NFPA 921 Guide for Fire and Explosion Investigations, 2017 edition, § 6.4 Fire Pattern Analysis.
[98] Exhibit 2, Deposition of Jim Lem at 13-17.
[99] Exhibit 2, Deposition of Jin Lem at 12, 17:7-10, 31; Exhibit 4, Deposition of Keith Lentini at 18:12-14, 20:1415, 23:17-18, 30:1-4; 39:8-10, 46:1-4.
[100] Exhibit 2, Deposition of Jim Lem at 17.
[101] Exhibit 2, Deposition of Jin Lem at 11, 28-29.
[102] Exhibit 2, Deposition of Jin Lem at 28.
[103] Exhibit 2, Deposition of Jin Lem at 28.
[104] Exhibit 2, Deposition of Jin Lem at 11.
[105] Exhibit 2, Deposition of Jin Lem at 11-12.
[106] Exhibit 2, Deposition of Jin Lem at 11-12.
[107] Exhibit 2, Deposition of Jin Lem at 12.
[108] Exhibit 2, Deposition of Jin Lem at 17, 35.

Insured: 300 Crown Colony Drive Office  Building
EFI Global File #: 012.01201

difficulties with either printer during the year before the fire.[109] Mr. Lem had no issues with either of those two printers before the fire.[110] He testified both printers were functional.[111]  No parts had been replaced in either printer before the fire.[112] There was no furniture in the cubicle; there may have been a box of paper or checks on the desktop and a few spare toner cartridges under the desk.[113] Mr. Lem left work at 9:00 p.m. on the night of April 24, 2017.[114] He was the last one to leave Onex York Holdings Corp.'s premises on the fifth floor that night.[115] Nobody was permitted to smoke in Onex York Holdings Corp.'s offices and Mr. Lem was not aware of any coworkers who smoked.[116]

The orange circled area in Exhibit 4 to Mr. Lem's deposition fairly and accurately depicts the area in the cubicle where the HP 4250n LaserJet printer was located before the fire.[117] The blue circled area in Exhibit 5 to Mr.  Lem's deposition fairly and accurately depicts where the HP 3015n LaserJet printer was located before the  fire.[118] The orange circled area in Exhibit 5 to Mr. Lem's deposition also fairly and accurately depicts the area in the cubicle where the HP 4250n LaserJet printer was located before the fire.[119]

This establishes the fact that there existed a competent heat source within the area of fire origin. These photos also establish that this competent heat source consists of the HP LaserJet printer model 4250n. The HP LaserJet printer model 4250n was the closest electronic device to the office cubicle partition.[120] There were no other competent heat sources within this office cubicle, apart from the HP LaserJet printer model 3015n. However,  the fire damage to the HP LaserJet printer model 3015n indicates that the fire damage to this unit resulted from its close proximity to the HP LaserJet printer model 4250n.

My conclusion the fire originated on the desktop of the office cubicle within the HP LaserJet 4250n is further supported by the eyewitness testimony of Lieutenant Keith Lentini. Lieutenant Lentini testified that as he moved into the office, he noticed some vertical blinds that were distorted or melted from heat.[121] He headed toward that area.[122] When he arrived in that area, Lieutenant Lentini found a printer that was still actively on fire.[123] The distorted blinds were approximately six to eight feet away from the printer.[124] Lieutenant Lentini did not observe anything else on fire in that area.[125] Lieutenant Lentini yelled to Firefighter Barry to stay by the door.[126]

---

[109] Exhibit 2, Deposition of Jin Lem at 18, 37.
[110] Exhibit 2, Deposition of Jin Lem at 18.
[111] Exhibit 2, Deposition of Jin Lem at 18.
[112] Exhibit 2, Deposition of Jin Lem at 37.
[113] Exhibit 2, Deposition of Jin Lem at 32.
[114] Exhibit 2, Deposition of Jin Lem at 29-30.
[115] Exhibit 2, Deposition of Jin Lem at 30.
[116] Exhibit 2, Deposition of Jim Lem at 37-38.
[117] Exhibit 8, Deposition Exhibit 4 from the Deposition of Jin Lem; Exhibit 2, Deposition of Jin Lem at 22, 24.
[118] Exhibit 9, Deposition Exhibit 5 from the Deposition of Jin Lem; Exhibit 2, Deposition of Jin Lem at 19-21, 24-25.
[119] Exhibit 9, Deposition Exhibit 5 from the Deposition of Jin Lem; Exhibit 2, Deposition of Jin Lem at 19-21, 24-25.
[120] Exhibit 8, Deposition Exhibit 4 from the Deposition of Jin Lem, Exhibit 2, Deposition of Jin Lem at 22, 24.
[121] Exhibit 4, Deposition of Keith Lentini at 17.
[122] Exhibit 4, Deposition of Keith Lentini at 17-18.
[123] Exhibit 4, Deposition of Keith Lentini at 18, Exhibit 7, Deposition of James Leonard at pg. 11.
[124] Exhibit 4, Deposition of Keith Lentini at 18.
[125] Exhibit 4, Deposition of Keith Lentini at 29.
[126] Exhibit 4, Deposition of Keith Lentini at 18.

Insured: 300 Crown Colony Drive Office  Building
EFI Global File #: 012.01201

Lieutenant Lentini then unplugged the printer and carried it back toward Firefighter Barry.[127] Firefighter Barry opened the fire hose and extinguished the fire.[128] In the incident report he authored, Lieutenant Lentini wrote: "L1 forced office door where smoldering fire in a computer printer was extinguished. Fire mostly contained by 1 sprinkler head but heavy water damage to affected office."[129]

Lieutenant Lentini concluded that the fire originated in the printer that was on fire when he was in the immediate vicinity of the smoke.[130] In his incident report, Lieutenant Lentini identified the printer as the cause of ignition.[131] Lieutenant Lentini testified that he believed that there was an electrical issue that caused heat within the printer to ignite the components.[132] Lieutenant Lentini ruled out arson as a possible cause of the fire.[133] In his incident report, Lieutenant Lentini ruled out various human factors as causes contributing to ignition.[134] Lieutenant Lentini did not observe any evidence that somebody had been smoking in the office.[135]

Lieutenant Lentini testified that the printer that he found on fire was in the same position on the desktop in the cubicle as Mr. Lem had indicated.[136] Based upon the char pattern, Lieutenant Lentini determined that the printer was located in the blue circled area on Exhibit 6 from his deposition.[137]

## II.    Fire Cause Analysis

The analysis of a fire to determine cause involves consideration of the factors necessary for the fire to occur. These factors include an examination of potential ignition sources, potential fuels, and the circumstances that allowed those factors to come together and start the fire.[138]

### B. This was an accidental fire that originated on the desktop of the office cubicle within the HP LaserJet printer model 4250n.

In the course of my investigation into the cause of this fire, I was able to rule out the possibility that this was an incendiary fire. Jin Lem testified that he was the last one to leave Onex York Holdings Corp.'s premises on the fifth floor that night.[139] Additionally, Lieutenant Lentini testified nobody was inside 300 Crown Colony Drive when Lieutenant Lentini arrived.[140] Lieutenant Palaza and Firefighter Leonard had to break into the fifth-floor office of Onex York Holdings Corp. from which the smoke was emanating.[141] Lieutenant Lentini ruled out arson as a possible cause of the fire.[142]

---

[127] Exhibit 4, Deposition of Keith Lentini at 18.
[128] Exhibit 4, Deposition of Keith Lentini at 18, Exhibit 5, Deposition of Christopher Barry at pg. 20.
[129] Exhibit 3, City of Quincy Fire Department Incident Report at 3-4.
[130] Exhibit 4, Deposition of Keith Lentini at 15.
[131] Exhibit 4, Deposition of Keith Lentini at 19-21.
[132] Exhibit 4, Deposition Testimony of Keith Lentini at 38-39.
[133] Exhibit 4, Deposition Testimony of Keith Lentini at 45-46.
[134] Exhibit 4, Deposition Testimony of Keith Lentini at 49; Exhibit 3, City of Quincy Fire Department Incident Report at 5.
[135] Exhibit 4, Deposition Testimony of Keith Lentini at 46.
[136] Exhibit 4, Deposition Testimony of Keith Lentini at 25-26, 50; Exhibit 10, Exhibit 6 from the Deposition of Keith Lentini.
[137] Exhibit 4, Deposition Testimony of Keith Lentini at 25-26, 50; Exhibit 10, Exhibit 6 from the Deposition of Keith Lentini
[138] NFPA 921 Guide for Fire and Explosion Investigations, 2017 edition, § 19.1
[139] Exhibit 2, Deposition of Jin Lem at 30.
[140] Exhibit 4, Deposition of Keith Lentini at 46
[141] Exhibit 4, Deposition of Keith Lentini at 17, Exhibit 6, Deposition of Michael Palaza at 11; Exhibit 7, Deposition of James Leonard at 9.
[142] Exhibit 4, Deposition Testimony of Keith Lentini at 45-46.

Insured: 300 Crown Colony Drive Office  Building
EFI Global File #: 012.01201

In his incident report, Lieutenant Lentini also ruled out various human factors as causes contributing to ignition.[143] My review of Quincy Police Department report for the morning of April 25, 2017 indicated that no intrusion alarms had tripped prior to Quincy Fire Department gaining entry into the entry fifth-floor office of Onex York Holdings Corp. at approximately 01:16 a.m.[144]

Improper disposal of smoking material was also ruled out as I did not see any indication of smoking materials. Nobody was permitted to smoke in Onex York Holdings Corp.'s offices and Mr. Lem was not aware of any coworkers who smoked.[145] Lieutenant Lentini did not observe any evidence that somebody had been smoking in the office.[146]

Electrical abnormalities within the branch circuit wiring for the office cubicle and the electrical receptacle that fed power to the HP printers on the office cubicle desk were ruled out as possible fire causes. Further, no electrical abnormalities were discovered when the main electrical power for the office of Onex Holdings was examined.

There was no evidence of electrical space heaters within the subject office cubicle. There was no evidence of extension cords being utilized within the subject office cubicle. Overhead office lighting was present, but ruled out as possible causation, as the lights within the area of the office cubicle were still intact. There was no evidence of open flame such as a candle. The only competent heat sources at the point of fire origin were the HP printers.

All of my opinions and conclusions expressed in this report are held to a reasonable degree of scientific certainty, based upon my expertise as a fire origin and cause investigator.

**List of cases in which I have provided expert testimony.**

I have not testified as an expert in the last four years at either deposition or trial.

**Compensation.**

My hourly rate at EFI Global is $175.00 p/hr.

EFI has invoiced $5018.05 to date.

**Curriculum Vitae.**

My Curriculum Vitae is attached at Addendum B.

---

[143] Exhibit 4, Deposition Testimony of Keith Lentini at 49; Exhibit 3, City of Quincy Fire Department Incident Report at 5
[144] Exhibit 11, Quincy Police report; LMIC 3932 (911 tape recording)
[145] Exhibit 2, Deposition of Jim Lem at 37-38.
[146] Exhibit 4, Deposition Testimony of Keith Lentini at 46.

Insured: 300 Crown Colony Drive Office
Building EFI Global File #: 012.01201

## Supplementation

Should additional information or evidence become known, the author reserves the right to supplement
the report as necessary.

Technical Review by:

Investigator's Name   Edward Noonan
Title                 MA Certified Fire Investigator,
License #             Master Electrician
                      License No. E34110

Investigator's Name   Sean P. Sullivan
Title                 IAAI-CFI, IAMI-CMI
License #

## ADDENDA

A.      Photographs with captions.
B.      Curriculum Vitae.





Photo No. 1:     Entry into Onex Holdings.  Fifth-floor 300 Colony Drive, Quincy, MA



Photo No. 2:     Remaining items left on office cubicle desktop.  2 power cords and data cable.

**File No.:**  012.01201          Page 1 of 5

**Insured:**  Onex Holdings          **Claim No.: 141826400**





Photo No. 3:    Cords and cable collected as evidence.



Photo No. 4:    Electrical receptacle inspected.  No deficiencies.





Photo No. 5:    Electrical circuit breaker panel inspected, nothing remarkable found.



Photo No. 6:    Sprinkler head that activated.  Head replaced prior to arrival.

---

**File No.:**  012.01201         Page 3 of 5

**Insured:**  Onex Holdings      **Claim No.: 141826400**





Photo No. 7:     Hewlett Packard ("HP") printers stored in outside container.



Photo No. 8:     Side view of HP Laser Jet model 4250n





Photo No. 9:    Front view of HP Laser Jet Printer model 4250n



Photo No. 10:    Top view of HP Printers.  Model 3015n to the left.  Model 4250n to the right.



B



## Edward Noonan | Fire Investigator/Master Electrician

*21 Father DeValles Blvd., Fall River, MA  02723*                    *508-997-4900*
*Edward.Noonan@efiglobal.com*

### Professional Summary:

Combining 20 years of fire inspections, suppression, and investigations, along with 20 years of electrical installations and service in residential, commercial, and industrial settings.  Expertise in the fire investigation field in origin and cause.  Expertise in electrical investigations relating to fire loss and personal injury.  Court certified expert in both areas.

### Licenses and Certifications:

Journeyman Electrical License E34110, received 1990

Master Electrical License A16411, received 1998

Hazardous Materials Technician, received 1995

Massachusetts State Certified Fire Investigator received 2000

### Project Experience:

2006-Multi million dollar loss of 150 year old church.  Thorough investigation into the fire's origin, resulted in extensive electrical  investigation, revealing design flaw with prominent manufacturer of electrical panel and main breaker.

2011-Typical origin and cause investigation resulted in thorough electrical investigation into a fatal fire.  Electrical Investigation results led to an arrest and murder charge of an individual.   Person of interest tried to make fire look accidental.   Thorough electrical investigation, including arc mapping, resulted in what appeared to be an accidental fire being determined an intentionally fire.

### Professional Experience:

EFI Global Investigations, Origin and Cause/Electrical Investigator, Fall River, MA 2009-present

Foxborough Fire and Rescue, Fire Captain 1986 - present

Noonan Electric, Owner/Operator, 1987 – present

Commonwealth of Massachusetts, District One Hazardous Materials Response Team,
Certified Hazardous Materials Technician 1995-present

Commonwealth of Massachusetts, State Fire Marshals Office 1999-2020, Electrical Investigator



Foxborough Fire and Rescue, Fire Alarm Supervisor, 2009-present

## Specialized Education:

NFPA 921 2008 edition review, Quincy, MA   2010

Advanced Cause and Origin/Courtroom Techniques, Dept. of Justice ATF, Glenco, GA 2006

Fire Investigation, National Fire Academy, Emmitsburg, MD 1987

Numerous State and Federal certificates of attendance in Fire Investigation, Electrical Code, Fire Suppression Tactics

## Education

Anna Maria College, Master Public Administration, 2020

Providence College, Fire Science, Bachelor of Science 1991

Associate of Science, Law Enforcement, Massasoit College 1986

## Affiliations:

International Association of Arson Investigators (IAAI)

International Association of Electrical Inspectors.

** Litigation CV available upon request.

# EXHIBIT 1

# 300 CROWN COLONY DR

| | | | |
|---|---|---|---|
| **Location** | 300 CROWN COLONY DR | **Mblu** | 4033/ 1/ 2A/ / |
| **Acct#** | 03124801 | **Owner** | GCP CROWN COLONY II LLC |
| **Assessment** | $18,505,500 | **PID** | 24860 |
| **Building Count** | 1 | **Assessing District** | |

### Current Value

| Assessment | | | |
|---|---|---|---|
| Valuation Year | Improvements | Land | Total |
| 2021 | $14,606,500 | $3,899,000 | $18,505,500 |

### Owner of Record

| | | | |
|---|---|---|---|
| **Owner** | GCP CROWN COLONY II LLC | **Sale Price** | $17,950,000 |
| **Co-Owner** | C/O GCP MANAGEMENT LLC | **Book & Page** | 38620/121 |
| **Care Of** | | **Sale Date** | 11/17/2020 |
| **Address** | 313 WASHINGTON ST SUITE 301 | **Instrument** | 00 |
| | NEWTON, MA 02458 | | |

### Ownership History

| Ownership History | | | | |
|---|---|---|---|---|
| Owner | Sale Price | Book & Page | Instrument | Sale Date |
| GCP CROWN COLONY II LLC | $17,950,000 | 38620/121 | 00 | 11/17/2020 |
| MF CROWN COLONY 1031 LLC | $0 | 37929/254 | 1F | 06/01/2020 |
| GCP CROWN COLONY LLC | $16,080,000 | 31975/0423 | 00 | 12/19/2013 |

### Building Information

#### Building 1 : Section 1

| | |
|---|---|
| **Year Built:** | 1987 |
| **Living Area:** | 122,331 |
| **Replacement Cost:** | $19,898,114 |
| **Building Percent Good:** | 86 |
| **Replacement Cost Less Depreciation:** | $17,112,400 |

| Building Attributes | |
|---|---|
| **Field** | **Description** |

| Style: | Profess. Bldg |
|---|---|
| Model | Commercial |
| Grade | VERY GOOD |
| Stories: | 5 |
| Occupancy | 27.00 |
| Exterior Wall 1 | Brick/Masonry |
| Exterior Wall 2 | Glass/Thermo. |
| Roof Structure | Flat |
| Roof Cover | Rubber Membran |
| Interior Wall 1 | Drywall/Sheet |
| Interior Wall 2 | |
| Interior Floor 1 | Carpet |
| Interior Floor 2 | |
| Heating Fuel | Gas |
| Heating Type | Forced Air-Duc |
| AC Type | Central |
| Struct Class | |
| Bldg Use | PROF OFFC |
| Total Rooms | 10 |
| Total Bedrms | 0 |
| Total Baths | 10 |
| 1st Floor Use: | 3430 |
| Heat/AC | HEAT/AC PKGS |
| Frame Type | FIREPRF STEEL |
| Baths/Plumbing | AVERAGE |
| Ceiling | SUSP CLNG+WL |
| Rooms/Prtns | AVERAGE |
| Wall Height | 12.00 |
| % Comn Wall | |

**Building Photo**



(http://images.vgsi.com/photos/QuincyMAPhotos//\0079\CAROL07252019(

**Building Layout**



(ParcelSketch.ashx?pid=24860&bid=24860)

| Building Sub-Areas (sq ft) | | | Legend |
|---|---|---|---|
| Code | Description | Gross Area | Living Area |
| FUS | Upper Story, Finished | 97,112 | 97,112 |
| BAS | First Floor | 25,219 | 25,219 |
| CTH | Cathedral | 625 | 0 |
| FOP | Porch, Open, Finished | 900 | 0 |
| | | 123,856 | 122,331 |

## Extra Features

| Extra Features | | | | Legend |
|---|---|---|---|---|
| Code | Description | Size | Assessed Value | Bldg # |
| PE | PASSNGR ELEV | 5.00 EA | $430,000 | 1 |
| CLR1 | FREEZER/COOLER | 1.00 UNITS | $10,300 | 1 |
| ATM1 | AUTOMATC TELLR | 1.00 UNITS | $34,400 | 1 |
| SPR1 | SPRINKLERS-WET | 125836.00 S.F. | $108,200 | 1 |

## Land

| Land Use | Land Line Valuation |
|---|---|

| | | | | |
|---|---|---|---|---|
| **Use Code** | 3430 | | **Size (Sqr Feet)** | 272250 |
| **Description** | PROF OFFC | | **Assessed Value** | $3,899,000 |
| **Neighborhood** | CC | | | |

## Outbuildings

| Outbuildings | | | | | | Legend |
|---|---|---|---|---|---|---|
| **Code** | **Description** | **Sub Code** | **Sub Description** | **Size** | **Assessed Value** | **Bldg #** |
| SGN2 | DOUBLE SIDED | | | 40.00 S.F.&HGT | $1,200 | 1 |
| LT1 | LIGHTS-IN W/PL | | | 25.00 UNITS | $12,500 | 1 |
| LT10 | W/DOUBLE LIGHT | | | 8.00 UNITS | $8,800 | 1 |
| PAV1 | PAVING-ASPHALT | | | 177056.00 S.F. | $199,200 | 1 |

## Valuation History

| Assessment | | | |
|---|---|---|---|
| **Valuation Year** | **Improvements** | **Land** | **Total** |
| 2020 | $14,200,100 | $3,860,400 | $18,060,500 |
| 2019 | $15,802,500 | $3,822,100 | $19,624,600 |
| 2018 | $15,651,600 | $3,784,300 | $19,435,900 |

(c) 2021 Vision Government Solutions, Inc. All rights reserved.

# EXHIBIT 2

**In the Matter Of:**

The Netherlands Insurance Company, et al. vs HP Inc., et al.

**JIN LEM, VOL. I**

*November 30, 2020*

*Job Number: 690120-B*

Page 5

1  Q.  Okay.  Have you ever testified before?

2  A.  I have not.

3  Q.  Could you give us your educational background?

4  A.  So, I have a Bachelor's in Computer Networking at

5     Wentworth Institute Technology in Boston, as far

6     as my educational has gone.

7  Q.  Okay.  When did you obtain that degree?

8  A.  That was in 2013.

9  Q.  Where are you currently employed?

10  A.  So, we are in the process of -- well, actually,

11     we got sold again since this fire happened.  But

12     I currently work for Sedgwick, but we still

13     reside at 300 Crown Colony Drive, Suite 203 in

14     Quincy, Massachusetts.

15  Q.  What's your job position or title at Sedgwick?

16  A.  I'm an IT tech, Tier 2.

17  Q.  What was the name of the company on April 25 of

18     2017 when the fire occurred?

19  A.  So, that was also between mergers.  So,

20     originally, we were MCMC, LLC, and then that was

21     acquired by York Risk Services Group.  And yeah,

22     as of recently, within the last year, we were

23     acquired by Sedgwick.

24  Q.  How long have you worked with this company

Page 7

1    so much these days.  But at the time, we were at

2    about 100 users.

3  Q.  And how many floors did you occupy in that

4    building, the building at 300 Crown Colony Drive

5    in Quincy?

6  A.  We have two floors.  The main group of users are

7    on the 2nd floor, and the rest were on the 5th

8    floor where the fire happened.  And the 5th floor

9    is the top floor of the building.

10  Q.  Where did you work before joining what's now

11    Sedgwick?

12  A.  So, before MCMC, whatnot, I was a contractor for

13    Bank of America, and SAIT Services was the

14    company that hired me to be the contractor for

15    Bank of America.  And then prior to that, I was

16    at college and also working at Kaspersky Labs in

17    Woburn.

18  Q.  When did you first learn about the fire that

19    occurred at 300 Crown Colony Drive in Quincy,

20    Massachusetts on April 25th of 2017?

21  A.  So, I was notified early in the morning of the

22    fire.  I would say around 7 o'clock, I was given

23    a call.  And it was --

24  Q.  -- who called you?

JIN LEM, VOL. I - 11/30/2020

Page 10

1  A.  I believe that was what the CFO told me at the

2     time, because I think she was the one that spoke

3     to the investigator that was on the scene.  I did

4     not speak -- I don't think I spoke to the

5     investigator that day.

6  Q.  Did you speak with an investigator at some point

7     later?

8  A.  Yes, I did.  I don't remember their names, but

9     they were the ones that took the evidence that

10     day to, I guess, look into it.

11  Q.  If I said the name Ed Noonan, does that refresh

12     your recollection as to who you might have talked

13     with?

14  A.  No, I -- I can't remember their names, but I

15     think it may have been a John.

16  Q.  Okay.  And when was this in relation to the fire,

17     how many days later?

18  A.  My guess, that would be maybe either a day or two

19     after that.  It was the same week that that

20     happened, but it's been --

21  Q.  Where were the printers located that were

22     involved in the fire?

23  A.  So, they were in the 5th floor office in the

24     middle of the room by the windows.  They were

Page 11

1     sitting on the desktop of one of the cubicles by

2     the windows.

3  Q.  For how long have the printers been on the

4     desktop?

5  A.  So, those were actually moved there the night

6     before.  They were sitting -- or the one that had

7     the most damage was the one that was moved there

8     the night before in a separate office in the

9     building.  It was being repurposed for another

10     accounting department, which is why it was moved.

11  Q.  Okay.  And where was it moved from?

12  A.  So, there were three offices in that office space

13     in the back of the -- the back office, so it was

14     a spare office at the time that we let any

15     visitors come in that needed to print.  It was

16     moved from that office by me to that cubicle that

17     night as it was going to be re-used by the next

18     accounting department that needed it.

19  Q.  Did you test that printer to see if it worked

20     after you moved it?

21  A.  I did.  In terms of testing, I do what I normally

22     do.  I had to -- you know, I plugged it in.  I

23     plugged the networking cable into it and

24     connected it to the company network.  I sent a

Page 12

1    test print to it.  Everything printed fine, and

2    that completed my check, added printer.  I mean,

3    added paper to it, and that was it.

4  Q.  And how and where was it plugged in, the printer

5    that you moved?

6  A.  The printer was plugged into the baseboard of the

7    cubicle in terms of power.  I did not have any

8    surge protectors available at the time, so it was

9    just plugged directly into the baseboard.

10        AARON BROSNAN: I'm just going to pull up

11     the purchase orders.

12  Q.  Mr. Lem, this is a three-page document.  Can you

13     see it?

14  A.  I can.

15  Q.  All right.  This is an MCMC Purchase Order, is

16     that correct?

17  A.  That is correct.

18  Q.  And it's Purchase Order No. 1322, the upper right

19     side, is that --

20  A.  That's correct.

21  Q.  What's the purchase order date?

22  A.  It looks like October 7 -- oh, no, October 30th

23     of 2007.

24  Q.  And this is for an HP LaserJet 4250n B/W laser

Page 13

1    printer, is that correct?

2    A.  It looks like it's 4250tn B/W laser printer.

3    Q.  And this is not one of the printers that was

4        involved in the fire, is that correct?

5    A.  So, this PO, I'm not sure if it was for the

6        printer of the fire; however, it is, I believe,

7        the same model as the one in the fire.

8    Q.  If we go to the next page, this one is the final

9        page, third page.  There's another purchase

10       order, Mr. Lem, on the third page of this Exhibit

11       1.  That's also for an HP LaserJet 425n laser

12       printer?

13   A.  That's correct.

14   Q.  Do you see where it has a part number

15       identification?

16   A.  Yes.

17   Q.  It says Q5401A, do you see that?

18   A.  Yup.

19   Q.  What's that a reference to?

20   A.  I believe that's just the part number off of the

21       Global Insight's website at the time.

22   Q.  We are going to pull up a photo real quick here.

23           (Purchase Orders marked as Exhibit 1 for

24       Identification.)

Page 14

1              (Photograph marked as Exhibit 2 for

2        Identification.)

3    Q.  All right.  Mr. Lem, we're going to mark this as

4        Exhibit 2.  This is a photo that was taken after

5        the fire.  And do you recognize what that

6        depicts?

7    A.  Yes, I do.

8    Q.  And what does it depict?

9    A.  I will say this is the first time I'm seeing this

10       photo, but that is a picture of one of the main

11       printers that caught on fire.

12   Q.  And is this the one that was more damaged than

13       the other one?

14   A.  Yes, I believe so.

15   Q.  And you see there's a white tag on the left-hand

16       corner side?

17   A.  Yes.

18   Q.  All right.  And you see that identification

19       number?

20   A.  I do.

21   Q.  So, that's Q5401A?

22   A.  That is correct.

23   Q.  Based on that photo and the purchase order that

24       we've marked as Exhibit 1, the third page of

Page 15

1    that -- we're going to go back to that exhibit.

2    All right.  Going back to the Purchase Order No.

3    1257, which was Page 3 of Exhibit 1, is this the

4    purchase order for the HP LaserJet 425n printer

5    that was involved in the fire?

6  A.  Based on the part number, I would say --

7  Q.  -- yes?

8  A.  -- that would be correct.

9  Q.  And at the top of the purchase order, it

10    identifies a gentleman named Dan Skeirlk, do you

11    see that?

12  A.  Yes.

13  Q.  Is he still with the company?

14  A.  Yes, he is.

15  Q.  Is he based out of the Quincy headquarters?

16  A.  I believe he works primarily at home now, but his

17    title is different compared to when he was part

18    of the office listed on this invoice.

19    So, the address on this invoice was from the

20    prior MCMC building before they moved to the

21    Crown Colony location, which was before my time.

22    But I believe Dan Steirlk was the help desk tech

23    that was working back when this purchase order

24    was made.

JIN LEM, VOL. I - 11/30/2020

Page 16

1   Q.  And who is Maria Aubrey?  She's identified as the

2       PO originator and buyer.

3   A.  That, I can't say.  I'm not sure.  Her name

4       sounds familiar, but I am not sure what

5       department she's in.  But normally a -- I would

6       -- my guess would be, she was part of the

7       accounting department, because accounting has to

8       approve the purchase order.

9   Q.  Under department name, it says Burlington, do you

10      know what that's a reference to?

11  A.  So, Burlington was an MCMC office back in the day

12      that no longer exists.  My assumption was, this

13      printer was originally purchased for that office;

14      but because it was closed down, I would say the

15      hardware made its way from that office to the

16      Black Falcon office after the closure.

17  Q.  Okay.  Could we go up to -- and the date of that

18      purchase order, that's July 26 of 2007, is that

19      right?

20  A.  That's correct.

21  Q.  Could we go up to Page 2.  Do you know if Page 2

22      of Exhibit 1 is the other printer that was --

23      it's a purchase order for the other printer that

24      was involved in the fire, Mr. Lem?

Page 17

1   A.  Based on the model number, I would say it is.  I

2       cannot confirm the part number.

3   Q.  Can you tell me -- strike that.  The fire started

4       in a cubicle in the middle of the room on the 5th

5       floor of MCMC's premises, is that correct?

6   A.  That is correct.

7   Q.  What electronic devices were in that cubicle?

8   A.  At the time, it was only those two printers,

9       which were both plugged in the power on the

10      baseboard of that cubicle.

11  Q.  Do you know if there was ever any work done on

12      the HP4250n LaserJet printer before the fire and

13      -- after its purchase and before the fire?

14  A.  During my time at the company, I have not had any

15      work done on those printers, no.

16  Q.  Does that include -- that's the same answer for

17      the 3015n LaserJet printer?

18  A.  Yes, that is correct.

19  Q.  Were any reports scheduled to run on either of

20      those printers at night?

21  A.  No.  As they -- so, the smaller printer, the

22      P3015 was used as a check printer.  And the other

23      printer was just installed.  So, no one had it

24      installed at that time.

Page 18

1   Q.  And did those printers both shut down

2      automatically?

3   A.  They had the default settings, which I think they

4      go into power saver mode, but I can't confirm;

5      because we don't manually turn them off, any of

6      our printers off.  So, if they go into standby,

7      then it's what I assume they would do.

8   Q.  Did any outside vender perform any services or

9      work on the 4250n printer before the April 25th,

10      2017 fire?

11   A.  No.  There's no maintenance done on that printer.

12   Q.  And how about for the 3015n?

13   A.  That is also a no, no maintenance.

14   Q.  Was there any servicing agreement for the 4250n

15      printer?

16   A.  I do not believe so, no.

17   Q.  How about for the 3015n?

18   A.  Same.  There's no -- we had no service or

19      agreements for any of those printers.

20   Q.  Were you aware of any issues or problems with

21      either of those printers before the fire

22      occurred?

23   A.  No.  As far as I'm aware, they were both

24      functional.

Page 19

1          MR. BROSNAN: I'm going to mark these five

2      photos as the next exhibit.

3          (Photographs marked as Exhibit 3 for

4      Identification.)

5   Q.  Did you take these photographs, Mr. Lem?

6   A.  I did.  I did take this photograph.

7   Q.  And this is the day, the morning of the incident

8      when you came to work?

9   A.  That is correct.

10  Q.  And what does the first photograph at the top of

11     Exhibit 3 depict?

12  A.  So, I believe the first one is the P3015 printer,

13     and the one below it is the 4250.

14  Q.  Okay.  Does this photo fairly and accurately

15     depict the printers as they looked when you

16     observed them that morning?

17  A.  Yes.

18  Q.  Let's go to the second photo on Exhibit 3.  Can

19     you tell us what the second photo in Exhibit 3

20     depicts, Mr. Lem?

21  A.  So, that is the cubicle of where those printers

22     resided.

23  Q.  Can you show us where on the -- where in that

24     cubicle those printers were located?  Aaron can

Page 20

1    send you a drawing implement.

2         AARON BROSNAN: Mr. Lem, you may be able to

3    draw on that right now.  Will you let me know if

4    that's the case?

5         THE DEPONENT: I am unable to draw.

6         AARON BROSNAN: Let me see if I can -- I'm

7    sorry, I am not as familiar with this as I am

8    with Zoom.  I just tried to pass the presentation

9    over to you.  I don't know if that did anything,

10    Mr. Lem.

11         THE DEPONENT: I don't think so.

12         (Discussion off the record.)

13         MS. DOUBLEDAY: If you try holding the

14    cursor so far to the left side of the screen,

15    there will be a little kind of gray menu items

16    that pop up.  And when you hover over it, it will

17    give you options.

18         THE DEPONENT: I can request annotate.

19    Okay.  Witness has control.  No one is color

20    blind, right?  I will pick red.

21    BY MR. BROSNAN:

22    A.  I'm sorry, what would you like me to annotate?

23    Q.  I just want you to identify where the printers

24    were in that cubicle.

Page 21

1   A.  Okay.  So, where this was, those, the 4250 -- I

2       lost my annotate.  There, as far as the 4250 was.

3       And then right next to this -- I probably should

4       have done a different color, but right there

5       would have been where the 3015 was.

6   Q.  And we've circled where the 4250 printer was.

7       There's a hole in the board behind it, and

8       there's like char on that board, can you see

9       that?

10  A.  Yes.

11  Q.  Was this the area that sustained the most char

12      during the fire?

13  A.  Yes.

14          MS. DOUBLEDAY: Objection.  Sorry.

15  Q.  And it looks like -- you see the blinds behind

16      the cubicle?

17  A.  Yes.

18  Q.  Did those melt as a result of the fire?

19          MS. DOUBLEDAY: Objection.

20  Q.  You can go ahead.

21  A.  Yes.  Those blinds did melt from the heat.

22  Q.  Does this photo fairly and accurately depict what

23      you observed on the morning of April 25th, 2017

24      when you came into the office?

JIN LEM, VOL. I - 11/30/2020

Page 22

1   A.  Yes.

2   Q.  Go to the next photo.  This is another similar

3       photograph of the cubicle area that was involved

4       in the fire, is that right?

5   A.  That is correct.

6   Q.  Let's scroll down to the next.  This is another

7       photo of the two printers that were involved in

8       the fire on April 25th of 2017?

9   A.  That is correct.

10  Q.  And what's the next one?  What does this, the

11      last, the 5th photo on Exhibit 3 depict?

12  A.  So, this is depicting the, basically, the ground

13      zero of where it was most concentrated, and just

14      to show more of the desk space.

15  Q.  Can you identify in this photo for us where the

16      4250 printer was located?

17          (Photograph with red marking marked as

18      Exhibit 4 for Identification.)

19  A.  Right there.

20  Q.  Did your company, Mr. Lem, conduct any

21      investigation into the cause of the fire?

22  A.  I would say not specifically.  No, we did not

23      hire anyone else besides the investigators that

24      came.  I don't know who actually hired them, if

Page 24

1    which is, you know, more of how the printer got

2    there, and, you know, who installed it and if it

3    was functional.

4         AARON BROSNAN: We might have to reget him

5    to draw them.  I don't see that they did save.

6    Sorry, guys.

7    BY MR. BROSNAN:

8  Q.  We're on the 5th photo to Exhibit 3,

9    and I just asked you previously to identify where

10    in that photo the 4250n printer was located.

11  A.  That's correct.

12  Q.  If you could do it again?  I'm sorry for the

13    inconvenience.

14  A.  That's where the 4250 printer was.

15         AARON BROSNAN: It's saved.

16         (Photograph with markings remarked as

17    Exhibit 4 for Identification.)

18  Q.  And now, let's go back to Photo No. 2.  This is

19    the second photo on Exhibit No. 3, and I asked

20    you previously, Mr. Lem, to identify where the

21    two printers are located in this photo.

22  A.  4250 was there, and the 3015 was sitting on the

23    desk right there.

24         (Photograph with markings marked as Exhibit

JIN LEM, VOL. I - 11/30/2020

Page 25

1    5 for Identification.)

2   Q.  I will see if I can get another photo, but I'm

3       going to let Attorney Doubleday ask you some

4       questions now, Mr. Lem.  I'm going to pull up a

5       photo for the 3015 showing the part number from

6       the interior, but I will get that after.  I just

7       want to keep this thing moving.

8   A.  Okay.

9

10          CROSS EXAMINATION BY MS. DOUBLEDAY

11  Q.  Mr. Lem, my name is Elizabeth Doubleday, and I

12      represent HP in this matter and Insight Direct

13      USA as well.  I'm probably going to jump around a

14      little bit in my questions, because Mr. Brosnan

15      already asked you all the questions that I was

16      planning on asking.  So, if there's anything that

17      I ask you that you don't understand, just let me

18      know and I'll rephrase; otherwise I'm going to

19      assume that you understood me.  Okay?

20  A.  Okay.  No problem.

21  Q.  Okay.  Thanks.  You said earlier you were talking

22      about these investigators that you had spoken

23      with, I think you said several times over the

24      years.  Were investigators already at the office

Page 28

1    is MCMC.  I'll use that name right now.  When you

2    started working for MCMC, were you already

3    located at the Crown Colony location, or did you

4    start off at a different location?

5  A.  That is correct.  I started off at the Crown

6    Colony location.

7  Q.  Was the printer, the two printers that were as

8    you described as ground zero, were those already

9    in operation at Crown Colony?

10  A.  The 3015 was.  The 4250, I believe, was just

11    idle.  It wasn't quite in use at that time.

12  Q.  When did the 4250 go into operation?

13  A.  So, in terms of being used as a spare, it was

14    moved into a spare office maybe a year or two

15    after I was hired.  So, that was apparently 2016,

16    which was used lightly.  It was just a spare

17    printer that we had that we let outsiders use.

18    But going into production again in the office was

19    that -- the day before the fire was when I -- or

20    the night before the fire was when I moved it so

21    that it could be used in production again.

22  Q.  When the 4250 was being used as the spare printer

23    for visitors, was it in standby mode when it

24    wasn't in use, or did it actually get powered

Page 29

1    down?

2    A.  It was in standby, yes.

3    Q.  And when --

4    A.  -- but not --

5    Q.  -- I'm sorry.

6    A.  I was gonna say it was not on the network.  It

7        was just being used as a USB printer, so anyone

8        could just plug into it.

9    Q.  And when you moved it to the cubicle on the day

10       before the fire, did you put it onto the network?

11   A.  I did.

12   Q.  And then you said you did a test print; but other

13       than that, do you know if the computer -- or I'm

14       sorry, if the printer was used before the fire?

15   A.  No.  Prior to, you know, me doing the test print

16       and installing it, no one had used that printer

17       that day.

18   Q.  Do you recall what time of day it is that you

19       moved the printer to the cubicle?

20   A.  It was roughly 8 p.m. Eastern, so I worked until

21       9 p.m. Eastern, so I did it right before -- you

22       know, 8 o'clock is usually when most people are

23       out of the building, and I did it during down

24       time before I left for the day.

Page 30

1  Q.  Was anybody else still working in the office when

2     you left that evening?

3  A.  No.  I was the last one.

4  Q.  And did you leave at 9 o'clock?

5  A.  Yes.

6  Q.  Did you get any business cards from any of these

7     investigators who took the printer away?

8  A.  Me personally, I don't believe so.

9  Q.  Did anybody else at your company get a business

10    card from an investigator?

11  A.  At the time as the CFO was handling the

12    situation, I would say she may have.

13  Q.  And that's Pam?

14  A.  That's correct.

15  Q.  Is she still with the company?

16  A.  No, she's not.

17  Q.  Do you know where she is now?

18  A.  I do not.

19  Q.  And I know you said that when you plugged in the

20    printer, that you did not have a surge protector.

21    Were you planning to get one the following day

22    for these printers?

23  A.  No, that wasn't something that came across my

24    mind.

JIN LEM, VOL. I - 11/30/2020

Page 31

1  Q.  Was there a surge protector in place when the

2      printer was in the visitor's office?

3  A.  There was not.

4  Q.  And the other printer, the one that I believe has

5      been referred to as the P3015, do I have that

6      correct?

7  A.  Yes.

8  Q.  That other printer, was that also in the visitor

9      office prior to the fire?

10  A.  That was not.  That was outside of that visitor

11      office on a table with all the other printers in

12      that office.

13  Q.  And was it plugged in?

14  A.  It was plugged into the wall.

15  Q.  And actually, that brings me to another question.

16      The printers that were in the cubicle at the time

17      of the fire, where was the electrical outlet; was

18      it on the floor level or at the level of the

19      desk, or somewhere else?

20  A.  So, when I mentioned the baseboard, the baseboard

21      is the bottom strip of the cubicle.  So, these

22      outlets were built into the cubicles.  So, at the

23      very bottom of the cubicles is where it was

24      plugged in.

JIN LEM, VOL. I - 11/30/2020

Page 32

1  Q.  So, right above the floor level?

2  A.  Right.

3  Q.  Was there any furniture in that cubicle on the

4     night before the fire?

5  A.  No.

6  Q.  How about boxes?

7  A.  There may have been a box of paper or checks

8     sitting on the desktop.  And I think we had a few

9     spare toner cartridges under the desk.

10  Q.  Did you observe whether the box of paper or

11     checks was damaged in the fire?

12  A.  So, when I got there and I took those photos, I

13     don't know if anything was moved at that time.

14     So, there may have been, you know, paper on the

15     desk.  You know, based on the photos, they were

16     damaged because of the fire; but I can't say for

17     certain, you know, that, you know, the papers

18     were where they originally were based on the

19     photos.

20  Q.  And you said there was some spare toner

21     cartridges, I think you said on the floor, did I

22     have that right?

23  A.  Yes.

24  Q.  Do you know if they sustained any damage from the

JIN LEM, VOL. I - 11/30/2020

Page 33

1    fire?

2    A.  I don't think the fire damaged them, but I think

3        water damaged them.   So luckily -- so, when the

4        fire happened, there was only one fire sprinkler

5        that went off, which was above the printer area.

6        Luckily, it didn't trigger all of them, but there

7        was a lot of water damage, because the windows

8        don't open and, you know, we're on the top floor.

9        So, all the water was, like, falling through the

10       floor to the other units.

11   Q.  Did you go down to the, I assume would be the 4th

12       floor and observe what the condition was there

13       after the fire?

14   A.  I did not observe any of the other units.  So, I

15       don't know what they looked like.  Ironically, I

16       did hear that the 3rd floor, since it was

17       remodeled, did not suffer that big of water

18       damage; so I don't know what they did, but, you

19       know, they weren't that affected.

20   Q.  At the time of the fire, where did you typically

21       work?  I know you said that the business had a

22       2nd floor and 5th floor offices.  Where was your

23       office?

24   A.  So, at that time, I actually, I was on the 5th

Page 34

1    floor, and my cubicle was on the left side.  So,

2    on the -- where we saw the back board of where

3    the charred -- the back board was for that desk,

4    I was on the other side of that cubicle, but not

5    right across.  Like, I was on the other side, but

6    against the wall, not directly on the other side

7    of the desk.

8  Q.  What type of ceilings did the 5th floor offices

9    have at the time of the fire?

10  A.  Um, I don't know what they're called.  They're

11    just standard, you know, the ones with the rails

12    and have like the foam inserts, I guess.

13  Q.  Like a dropped ceiling?

14  A.  Yeah, I guess they would be called a dropped

15    ceiling.

16  Q.  And was the flooring in the 5th floor carpeted?

17  A.  Yes.

18  Q.  Did the printers that were on the desk in this

19    cubicle, were they plugged directly into the

20    outlet, or was there an extension cord that ran

21    from the printer's cord to the outlet?

22  A.  They were directly plugged into the outlet.  I

23    can't say -- I'm not too sure how the cubicles

24    are wired, because I know every row of cubicles

Page 35

1    had outlets wired, just I'm not sure how they

2    feed back to the circuit breaker.

3  Q.  Were you at all involved in wiring those cubicles

4    for the Crown Colony offices?

5  A.  I was not, no.  They were there prior to my

6    employment.

7  Q.  I believe you testified earlier that the 4250 did

8    not have any maintenance done on it between the

9    time that you started working for MCMC to the

10    time of the fire, do I have that correct?

11  A.  That is correct.

12  Q.  Did you have to do any maintenance on it?

13  A.  No.  I did not have to do any maintenance to it,

14    since it was operational when I installed it.

15  Q.  Did anybody else in the company, say in the IT

16    Department, do any maintenance on that printer

17    prior to the fire?

18  A.  I don't know.  I would say from the time I was

19    employed to the fire, there was none; and I was

20    the only IT person at that time.

21  Q.  As part of the insurance claim for this fire

22    loss, did you prepare an inventory of items that

23    were damaged by either the smoke or fire or

24    water?

Page 37

1   A.  That, I'm not sure of.  I, you know, I

2        questioned, you know, did the circuit breakers go

3        off, you know, did, you know --

4   Q.  When you said that there was still firefighters

5        at the scene, do you recall whether there were

6        actually fire trucks still at the office

7        building?

8   A.  There may have been one, but I don't remember.

9   Q.  Do you know where the printers were brought after

10       they were removed from the property?

11  A.  I do not.

12  Q.  And with respect to the P3015 printer, did you

13       have any difficulties with that printer in, say,

14       the year prior to the fire?

15  A.  No.

16  Q.  Did you have any difficulties with the 4250 in

17       the year prior to the fire?

18  A.  No.

19  Q.  Were any parts replaced in either of the two

20       printers prior to the fire?

21  A.  No.

22  Q.  Now, I'm assuming that probably you're not

23       supposed to smoke in your office, but do you know

24       if any of your colleagues who worked on the 5th

Page 38

1    floor at the time of the fire were smokers and if

2    so, whether or not they smoked in the office?

3    A.  Not that I'm aware of any smokers, but no, no one

4    smoked in the office.

5         MS. DOUBLEDAY: And hold on one second, if

6    we can take a quick break.

7         (Short break taken.)

8    Q.  Mr. Lem, when you arrived at the office on the

9    morning of the fire, approximately 7:30 a.m., had

10   any clean-up work begun at the building?

11   A.  So, when I arrived, the first thing I noticed was

12   one of the windows missing.  So, apparently, that

13   was one of the first things that happened when

14   the firefighters came, because the windows don't

15   open.  They had to break a window open to let the

16   smoke out.  But other than that, besides, you

17   know, people coming in for the day and going

18   "what's going on," you know that initial shock

19   reaction from everyone, but --

20   Q.  So, I was going to ask you who else was -- which

21   of your colleagues had arrived that morning, but

22   it sounds like people were just arriving as they

23   normally do to start work at 7:30 a.m., do I have

24   that right?

# EXHIBIT 3

**Quincy Fire Department**
**Fire Prevention Bureau**
**Tel. 617-376-1015**

# FAX

**Date: July 20, 2020**

**To: O'Malley and Harvey Attn: Aron**
**Fax; 617-204-3477**

**From:**

**No. of Pages: 14 (including cover)**

**Message: Report Requested.**

      **Captain Roger Kineavy**

**A**

| 21243 | MA | 04 | 25 | 2017 | E5 | 17-0003082 | 000 |
|---|---|---|---|---|---|---|---|
| FDID ★ | State ★ | MM Incident Date ★ | DD | YYYY | Station | Incident Number ★ | Exposure ★ |

☐ Check this box to indicate that the address for this incident is provided on the Wildland Fire Module in Section B "Alternative Location Specification". Use only for Wildland fires.

☐ Delete
☐ Change
☐ No Activity

**NFIRS -1 Basic**

**B** **Location ★**

Census Tract 4180 - 00

☒ Street address
☐ Intersection
☐ In front of
☐ Rear of
☐ Adjacent to
☐ Directions

| 300 | | CROWN COLONY | | DR | |
|---|---|---|---|---|---|
| Number/Milepost | Prefix | Street or Highway | | Street Type | Suffix |

| Floor 5 | QUINCY | MA | 02169 - |
|---|---|---|---|
| Apt./Suite/Room | City | State | Zip Code |

Cross street or directions, as applicable

**C** **Incident Type ★**

| 111 | Building fire |
|---|---|
| Incident Type | |

**E1** **Date & Times**

Midnight is 0000

Check boxes if dates are the same as Alarm Date.

ALARM always required

| | Month | Day | Year | Hr Min Sec |
|---|---|---|---|---|
| Alarm ★ | 04 | 25 | 2017 | 00:54:00 |

ARRIVAL required, unless canceled or did not arrive

| ☒ Arrival ★ | 04 | 25 | 2017 | 00:59:00 |

CONTROLLED Optional, Except for wildland fires

☐ Controlled

LAST UNIT CLEARED, required except for wildland fires

| ☒ Last Unit Cleared | 04 | 25 | 2017 | 03:04:00 |

**E2** **Shift & Alarms**

Local Option

| 1 | 01 | 5 |
|---|---|---|
| Shift or Platoon | Alarms | District |

**E3** **Special Studies**

Local Option

| Special Study ID# | Special Study Value |
|---|---|

**D** **Aid Given or Received ★**

| 1 | ☐ Mutual aid received |
| 2 | ☐ Automatic aid recv. |
| 3 | ☐ Mutual aid given |
| 4 | ☐ Automatic aid given |
| 5 | ☐ Other aid given |
| N | ☒ None |

| Their FDID | Their State |
|---|---|
| | |
| Their Incident Number | |

**F** **Actions Taken ★**

| 11 | Extinguishment by fire |
|---|---|
| Primary Action Taken (1) | |

| 51 | Ventilate |
|---|---|
| Additional Action Taken (2) | |

| 52 | Forcible entry |
|---|---|
| Additional Action Taken (3) | |

**G1** **Resources ★**

☒ Check this box and skip this section if an Apparatus or Personnel form is used.

| | Apparatus | Personnel |
|---|---|---|
| Suppression | 0007 | 0018 |
| EMS | | |
| Other | | |

☐ Check box if resource counts include aid received resources.

**G2** **Estimated Dollar Losses & Values**

LOSSES: Required for all fires if known. Optional for non fires.

| | | | | None |
|---|---|---|---|---|
| Property $ | | 020 | 000 | ☐ |
| Contents $ | | 050 | 000 | ☐ |

PRE-INCIDENT VALUE: Optional

| Property $ | 010 | 000 | ☐ |
| Contents $ | 010 | 000 | ☐ |

**Completed Modules**

☒ Fire-2
☒ Structure-3
☐ Civil Fire Cas.-4
☐ Fire Serv. Cas.-5
☐ EMS-6
☐ HazMat-7
☐ Wildland Fire-8
☒ Apparatus-9
☒ Personnel-10
☐ Arson-11

**H1 ★ Casualties** ☐ None

| | Deaths | Injuries |
|---|---|---|
| Fire Service | | |
| Civilian | | |

**H2** **Detector**

Required for Confined Fires.

1 ☐ Detector alerted occupants

2 ☐ Detector did not alert them

U ☐ Unknown

**H3** **Hazardous Materials Release**

| N | ☒ None |
| 1 | ☐ Natural Gas: slow leak, no evacuation or HazMat actions |
| 2 | ☐ Propane gas: <21 lb. tank (as in home BBQ grill) |
| 3 | ☐ Gasoline: vehicle fuel tank or portable container |
| 4 | ☐ Kerosene: fuel burning equipment or portable storage |
| 5 | ☐ Diesel fuel/fuel oil: vehicle fuel tank or portable |
| 6 | ☐ Household solvents: home/office spill, cleanup only |
| 7 | ☐ Motor oil: from engine or portable container |
| 8 | ☐ Paint: from paint cans totaling < 55 gallons |
| 0 | ☐ Other: Special HazMat actions required or spill > 55gal. Please complete the HazMat form |

**I** **Mixed Use Property**

| NN | ☐ Not Mixed |
| 10 | ☐ Assembly use |
| 20 | ☐ Education use |
| 33 | ☐ Medical use |
| 40 | ☐ Residential use |
| 51 | ☐ Row of stores |
| 53 | ☐ Enclosed mall |
| 58 | ☐ Bus. & Residential |
| 59 | ☐ Office use |
| 60 | ☐ Industrial use |
| 63 | ☐ Military use |
| 65 | ☐ Farm use |
| 00 | ☐ Other mixed use |

**J** **Property Use ★** **Structures**

| 131 | ☐ Church, place of worship |
| 161 | ☐ Restaurant or cafeteria |
| 162 | ☐ Bar/Tavern or nightclub |
| 213 | ☐ Elementary school or kindergarten |
| 215 | ☐ High school or junior high |
| 241 | ☐ College, adult education |
| 311 | ☐ Care facility for the aged |
| 331 | ☐ Hospital |

**Outside**

| 124 | ☐ Playground or park |
| 655 | ☐ Crops or orchard |
| 669 | ☐ Forest (timberland) |
| 807 | ☐ Outdoor storage area |
| 919 | ☐ Dump or sanitary landfill |
| 931 | ☐ Open land or field |

| 341 | ☐ Clinic, clinic type infirmary |
| 342 | ☐ Doctor/dentist office |
| 361 | ☐ Prison or jail, not juvenile |
| 419 | ☐ 1-or 2-family dwelling |
| 429 | ☐ Multi-family dwelling |
| 439 | ☐ Rooming/boarding house |
| 449 | ☐ Commercial hotel or motel |
| 459 | ☐ Residential, board and care |
| 464 | ☐ Dormitory/barracks |
| 519 | ☐ Food and beverage sales |

| 936 | ☐ Vacant lot |
| 938 | ☐ Graded/care for plot of land |
| 946 | ☐ Lake, river, stream |
| 951 | ☐ Railroad right of way |
| 960 | ☐ Other street |
| 961 | ☐ Highway/divided highway |
| 962 | ☐ Residential street/driveway |

| 539 | ☐ Household goods, sales, repairs |
| 579 | ☐ Motor vehicle/boat sales/repair |
| 571 | ☐ Gas or service station |
| 599 | ☒ Business office |
| 615 | ☐ Electric generating plant |
| 629 | ☐ Laboratory/science lab |
| 700 | ☐ Manufacturing plant |
| 819 | ☐ Livestock/poultry storage (barn) |
| 882 | ☐ Non-residential parking garage |
| 891 | ☐ Warehouse |

| 981 | ☐ Construction site |
| 984 | ☐ Industrial plant yard |

Lookup and enter a Property Use code only if you have NOT checked a Property Use box:

Property Use 599

Business office

NFIRS-1 Revision 03/11/99

## K1 Person/Entity Involved
Local Option

Business name (if applicable) — Area Code — Phone Number

☐ Check This Box if same address as incident location. Then skip the three duplicate address lines.

Mr.,Ms., Mrs. First Name — MI — Last Name — Suffix

Number — Prefix Street or Highway — Street Type — Suffix

Post Office Box — Apt./Suite/Room — City

State — Zip Code

☐ More people involved? Check this box and attach Supplemental Forms (NFIRS-1S) as necessary

## K2 Owner ☐ Same as person involved? Then check this box and skip the rest of this section.
Local Option

Business name (if Applicable) — Area Code — Phone Number

☐ Check this box if same address as incident location. Then skip the three duplicate address lines.

Mr.,Ms., Mrs. First Name — MI — Last Name — Suffix

Number — Prefix Street or Highway — Street Type — Suffix

Post Office Box — Apt./Suite/Room — City

State — Zip Code

## L Remarks
Local Option

E5 and L1 responded to Inv Box 3322 where panel indicated sprinkler flow and Floor 5 detector activation.  Upon reaching floor 5, L1 struck Box 3322 for smoke on that floor.  E5 stretched the high rise pack and L1 forced office door where smoldering fire in a computer printer was extinguished.  Fire mostly contained by 1 sprinkler head but heavy water damage to affected office.  Window near fire origin was broken and removed for ventilation of moderate to heavy smoke condition.  Property mgmt responded and building was turned over to mgmt with the sprinkler system isolated on floor 5 and Box 3322 left OOS.

## L Authorization

| 105 | Fenby, Edward W | DC | 18 | 04 | 26 | 2017 |
|---|---|---|---|---|---|---|
| Officer in charge ID | Signature | Position or rank | Assignment | Month | Day | Year |

Check Box if ☐ same as Officer in charge.

| 369 | Lentini, Keith L | LT | 5 | 04 | 26 | 2017 |
|---|---|---|---|---|---|---|
| Member making report ID | Signature | Position or rank | Assignment | Month | Day | Year |

| 21243 | MA | MM DD YYYY 4 25 2017 | E5 | 17-0003082 | 000 | Complete Narrative |
|---|---|---|---|---|---|---|
| PDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | |

**Narrative:**

E5 and L1 responded to Inv Box 3322 where panel indicated sprinkler flow and Floor 5 detector activation.  Upon reaching floor 5, L1 struck Box 3322 for smoke on that floor.  E5 stretched the high rise pack and L1 forced office door where smoldering fire in a computer printer was extinguished.  Fire mostly contained by 1 sprinkler head but heavy water damage to affected office.  Window near fire origin was broken and removed for ventilation of moderate to heavy smoke condition.  Property mgmt responded and building was turned over to mgmt with the sprinkler system isolated on floor 5 and Box 3322 left OOS.

**A**

| 21243 | MA | MM 04 DD 25 YYYY 2017 | E5 | 17-0003082 | 000 | ☐ Delete ☐ Change ☐ No Activity | NFIRS -2 Fire |
| FDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | | |

---

**B  Property Details**

**B1** |_____| ☒ Not Residential

*Estimated Number of residential living units in building of origin whether or not all units became involved*

**B2** |___001___| ☐ Buildings not involved
Number of buildings involved

**B3** |_____| ☐ None
Acres burned
(outside fires)   ☐ Less than one acre

**C  On-Site Materials ☐ None or Products**

Enter up to three codes.  Check one or more boxes for each code entered.

Complete if there were any significant amounts of commercial, industrial, energy or agricultural products or materials on the property, whether or not they became involved

| 712 | Electronic parts, | 1 ☐ Bulk storage or warehousing |
| On-site material (1) | | 2 ☐ Processing or manufacturing |
| | | 3 ☐ Packaged goods for sale |
| | | 4 ☐ Repair or service |

| |_____| | 1 ☐ Bulk storage or warehousing |
| On-site material (2) | | 2 ☐ Processing or manufacturing |
| | | 3 ☐ Packaged goods for sale |
| | | 4 ☐ Repair or service |

| |_____| | 1 ☐ Bulk storage or warehousing |
| On-site material (3) | | 2 ☐ Processing or manufacturing |
| | | 3 ☐ Packaged goods for sale |
| | | 4 ☐ Repair or service |

---

**D  Ignition**

**D1** |__27__| Office
Area of fire origin ★

**D2** |__13__| Electrical arcing
Heat source ★

**D3** |__00__| Item First Ignited,
Item first ignited ★   1 ☐ Check Box if fire spread was confined to object of origin

**D4** |__41__| Plastic
Type of material first ignited

Required only if item first ignited code is 00 or <70

**E₁  Cause of Ignition**

☐ Check box if this is an exposure report.
Skip to section G

1 ☐ Intentional
2 ☐ Unintentional
3 ☒ Failure of equipment or heat source
4 ☐ Act of nature
5 ☐ Cause under investigation
U ☐ Cause undetermined after investigation

**E₂  Factors Contributing To Ignition**

| 36 | Arc, spark from | ☐ None |
| Factor Contributing To Ignition (1) | | |

| |_____| |
| Factor Contributing To Ignition (2) | |

**E₃ Human Factors Contributing To Ignition**

Check all applicable boxes

1 ☐ Asleep        ☒ None
2 ☐ Possibly impaired by alcohol or drugs
3 ☐ Unattended person
4 ☐ Possibly mental disabled
5 ☐ Physically Disabled
6 ☐ Multiple persons involved
7 ☐ Age was a factor

Estimated age of person envolved |_____|

1 ☐ Male        2 ☐ Female

---

**F₁  Equipment Involved In Ignition**

☐ None If Equipment was not involved, Skip to Section G

|_____|
Equipment Involved

Brand |_____|
Model |_____|
Serial # |_____|
Year |_____|

**F₂  Equipment Power**

|_____|
Equipment Power Source

**F₃ Equipment Portability**

1 ☐ Portable
2 ☐ Stationary

Portable equipment normally can be moved by one person, is designed to be use in multiple locations, and requires no tools to install.

**G  Fire Suppression Factors**

Enter up to three codes.   ☐ None

|_____|
Fire suppression factor (1)

|_____|
Fire suppression factor (2)

|_____|
Fire suppression factor (3)

---

**H₁  Mobile Property Involved**

☐ None

1 ☐ Not involved in ignition, but burned
2 ☐ Involved in ignition, but did not burn
3 ☐ Involved in ignition and burned

|_____|
Moblie property model

|_____| |___| |_____|
License Plate Number   State   VIN Number

**H₂ Mobile Property Type & Make**

|_____|
Mobile property type

|_____|
Mobile property make

|_____|
Year

**Local Use**

☐ Pre-Fire Plan Available
Some of the information presented in this report may be based upon reports from other Agencies

☐ Arson report attached
☐ Police report attached
☐ Coroner report attached
☐ Other reports attached

**NFIRS-2 Revision 01/19/99**

---

**I1 Structure Type ★**
If fire was in enclosed building or a portable/mobile structure complete the rest of this form

1 [X] Enclosed Building
2 [ ] Portable/mobile structure
3 [ ] Open structure
4 [ ] Air supported structure
5 [ ] Tent
6 [ ] Open platform (e.g. piers)
7 [ ] Underground structure (work areas)
8 [ ] Connective structure (e.g. fences)
0 [ ] Other type of structure

**I2 Building Status ★**

1 [ ] Under construction
2 [X] Occupied & operating
3 [ ] Idle, not routinely used
4 [ ] Under major renovation
5 [ ] Vacant and secured
6 [ ] Vacant and unsecured
7 [ ] Being demolished
0 [ ] Other
U [ ] Undetermined

**I3 Building Height**
Count the ROOF as part of the highest story

| 005 |
Total number of stories at or above grade

| ___ |
Total number of stories below grade

**I4 Main Floor Size★**

| ___ , | 007 | , | 000 |
Total square feet

OR

| ___ , | 100 | BY | ___ , | 070 |
Lenght in feet    Width in feet

**NFIRS-3 Structure Fire**

---

**J1 Fire Origin ★**

| 005 |    [ ] Below Grade
Story of fire origin

**J2 Fire Spread ★**

1 [ ] Confined to object of origin
2 [X] Confined to room of origin
3 [ ] Confined to floor of origin
4 [ ] Confined to building of origin
5 [ ] Beyond building of origin

**J3 Number of Stories Damaged By Flame**
Count the ROOF as part of the highest story

| 001 | Number of stories w/ minor damage (1 to 24% flame damage)

| ___ | Number of stories w/ significant damage (25 to 49% flame damage)

| ___ | Number of stories w/ heavy damage (50 to 74% flame damage)

| ___ | Number of stories w/ extreme damage (75 to 100% flame damage)

**K Material Contributing Most To Flame Spread**

[ ] Check if no flame spread OR same as material first ignited OR unable to determine   Skip To Section L

**K1** | 99 | Multiple items first
Item contributing most to flame spread

**K2** | 41 | Plastic
Type of material contributing most of flame spread   Required only if item contributing code is 00 or<70

---

**L1 Presence of Detectors ★**
(In area of the fire)

N [ ] None Present   Skip to section M
1 [X] Present
U [ ] Undetermined

**L2 Detector Type**

1 [X] Smoke
2 [ ] Heat
3 [ ] Combination smoke - heat
4 [ ] Sprinkler, water flow detection
5 [ ] More than 1 type present
0 [ ] Other _____
U [ ] Undetermined

**L3 Detector Power Supply**

1 [ ] Battery only
2 [X] Hardwire only
3 [ ] Plug in
4 [ ] Hardwire with battery
5 [ ] Plug in with battery
6 [ ] Mechanical
7 [ ] Multple detectors & power supplies
0 [ ] Other _____
U [ ] Undetermined

**L4 Detector Operation**

1 [ ] Fire too small to activate
2 [X] Operated (Complete Section L5)
3 [ ] Failed to Operate (Complete Section L6)
U [ ] Undetermined

**L5 Detector Effectiveness**
Required if detector operated

1 [ ] Alerted Occupants, occupants responded
2 [ ] Occupants failed to respond
3 [X] There were no occupants
4 [ ] Failed to alert occupants
U [ ] Undetermined

**L6 Detector Failure Reason**
Required if detector failed to operate

1 [ ] Power failure, shutoff or disconnect
2 [ ] Improper installation or placement
3 [ ] Defective
4 [ ] Lack of maintenance, includes cleaning
5 [ ] Battery missing or disconnected
6 [ ] Battery discharged or dead
0 [ ] Other _____
U [ ] Undetermined

---

**M1 Presence of Automatic Extinguishment System ★**

N [ ] None Present
1 [X] Present   Complete rest of Section M

**M2 Type of Automatic Extinguishment System ★**
Required if fire was within designed range of AES

1 [X] Wet pipe sprinkler
2 [ ] Dry pipe sprinkler
3 [ ] Other sprinkler system
4 [ ] Dry chemical system
5 [ ] Foam system
6 [ ] Halogen type system
7 [ ] Carbon dioxide ($CO_2$) system
0 [ ] Other special hazard system
U [ ] Undetermined

**M3 Automatic Extinguishment System Operation**
Required if fire was within designed range

1 [X] Operated & effective (Go to M4)
2 [ ] Operated & not effective (M4)
3 [ ] Fire too small to activate
4 [ ] Failed to operate (Go to M5)
0 [ ] Other
U [ ] Undetermined

**M4 Number of Sprinkler Heads Operating**
Required if system operated

| 001 |
Number of sprinkler heads operating

**M5 Automatic Extinguishment System Failure Reason**
Required if system failed

1 [ ] System shut off
2 [ ] Not enough agent discharged
3 [ ] Agent discharged but did not reach fire
4 [ ] Wrong type of system
5 [ ] Fire not in area protected
6 [ ] System components damaged
7 [ ] Lack of maintenance
8 [ ] Manual Intervention
0 [ ] Other _____
U [ ] Undetermined
NFIRS-3 Revision 01/19/99

---

**A**

| FDID | State | Incident Date | Station | Incident Number | Exposure | | NFIRS - 9 |
|---|---|---|---|---|---|---|---|
| 21243 | MA | MM 4 DD 25 YYYY 2017 | E5 | 17-0003082 | 000 | ☐ Delete ☐ Change | Apparatus or Resources |

**B**

| Apparatus or Resource ★ | Date and Times (Check if same as alarm date ☒) Dispatch/Arrival/Clear — Month Day Year Hour Min | Sent ☒ | Number of People ★ | Use (Check ONE box for each apparatus to indicate its main use at the incident.) | Actions Taken |
|---|---|---|---|---|---|
| **1** ID 1 · Type 11 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☒ 4 25 2017 00:59 / Clear ☒ 4 25 2017 03:04 | ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **2** ID 12 · Type 12 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☒ 4 25 2017 00:59 / Clear ☒ 4 25 2017 03:04 | ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **3** ID 13 · Type 13 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☒ 4 25 2017 00:59 / Clear ☒ 4 25 2017 03:04 | ☒ | 2 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **4** ID 16 · Type 71 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☒ 4 25 2017 00:59 / Clear ☒ 4 25 2017 03:04 | ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **5** ID 18 · Type 92 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☐ 4 25 2017 00:59 / Clear ☐ 4 25 2017 03:04 | ☒ | 1 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **6** ID 4 · Type 11 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☒ 4 25 2017 00:59 / Clear ☒ 4 25 2017 03:04 | ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **7** ID 5 · Type 11 | Dispatch ☒ 4 25 2017 00:54 / Arrival ☒ 4 25 2017 00:59 / Clear ☒ 4 25 2017 03:04 | ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **8** ID · Type | Dispatch ☐ / Arrival ☐ / Clear ☐ | ☐ | | ☐ Suppression ☐ EMS ☐ Other | ☐ ☐ |
| **9** ID · Type | Dispatch ☐ / Arrival ☐ / Clear ☐ | ☐ | | ☐ Suppression ☐ EMS ☐ Other | ☐ ☐ |

**Type of Apparatus or Resources**

**Ground Fire Suppression**
11 Engine
12 Truck or aerial
13 Quint
14 Tanker & pumper combination
16 Brush truck
17 ARF (Aircraft Rescue and Firefighting)
10 Ground fire suppression, other

**Heavy Ground Equipment**
21 Dozer or plow
22 Tractor
24 Tanker or tender
20 Heavy equipment, other

**Aircraft**
41 Aircraft: fixed wing tanker
42 Helitanker
43 Helicopter
40 Aircraft, other

**Marine Equipment**
51 Fire boat with pump
52 Boat, no pump
50 Marine apparatus, other

**Support Equipment**
61 Breathing apparatus support
62 Light and air unit
60 Support apparatus, other

**Medical & Rescue**
71 Rescue unit
72 Urban Search & rescue unit
73 High angle rescue unit
75 BLS unit
76 ALS unit
70 Medical and rescue unit, other

**Other**
91 Mobile command post
92 Chief officer car
93 Hazmat unit
94 Type 1 hand crew
95 Type 2 hand crew
99 Privately owned vehicle
00 Other apparatus/resource

NN None
UU Undetermined

More Apparatus?
Use Additional
Sheets

NFIRS-9 Revision 11/17/98

**A**

| 21243 | MA | MM 4 | DD 25 | YYYY 2017 | E5 | 17-0003082 | 000 | ☐ Delete ☐ Change | NFIRS - 10 Personnel |
|---|---|---|---|---|---|---|---|---|---|
| FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | | |

**B**

| Apparatus or Resource Use codes listed below ★ | Date and Times Check if same as alarm date | | Sent | Number of People ★ | Use Check ONE box for each apparatus to indicate its main use at the incident. | Actions Taken List up to 4 actions for each apparatus and each personnel. |
|---|---|---|---|---|---|---|
| | | Month Day Year Hours/mins | ☒ | | | |

| 1 | ID 5 | Dispatch ☒ | 4 | 25 | 2017 | 00:54 | Sent | | ☒ Suppression | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Type 11 | Arrival ☒ | 4 | 25 | 2017 | 00:59 | ☒ | 3 | ☐ EMS | | |
| | | Clear ☒ | 4 | 25 | 2017 | 03:04 | | | ☐ Other | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 312 | Barry, Christopher | PT | X | | | | |
| 369 | Lentini, Keith | LT | X | | | | |
| 68 | Taylor, David | PT | X | | | | |

| 2 | ID | Dispatch ☐ | | | | | Sent | | ☐ Suppression | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Type | Arrival ☐ | | | | | ☐ | | ☐ EMS | | |
| | | Clear ☐ | | | | | | | ☐ Other | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |

| 3 | ID | Dispatch ☐ | | | | | Sent | | ☐ Suppression | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Type | Arrival ☐ | | | | | ☐ | | ☐ EMS | | |
| | | Clear ☐ | | | | | | | ☐ Other | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |

**A** | 21243 FDID ★ | MA State ★ | MM 4 | DD 25 | YYYY 2017 Incident Date ★ | E5 Station | 17-0003082 Incident Number ★ | 000 Exposure ★ | ☐ Delete ☐ Change | NFIRS - 10 Personnel

**B** Apparatus or Resource

Use codes listed below

Date and Times — Check if same as alarm date — Month Day Year Hours/mins

| | Sent | Number of People ★ | Use — Check ONE box for each apparatus to indicate its main use at the incident. | Actions Taken — List up to 4 actions for each apparatus and each personnel. |

---

### 1

ID 16   Type 71

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 4 | 25 | 2017 | 00:54 |
| Arrival ☒ | 4 | 25 | 2017 | 00:59 |
| Clear ☒ | 4 | 25 | 2017 | 03:04 |

Sent ☒   Sent ☒   Number of People: 3

Use: ☒ Suppression  ☐ EMS  ☐ Other

Actions Taken: ☐ ☐ / ☐ ☐

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 383 | Walsh, Matthew | LT | X | | | | |
| 392 | Murphy, Christopher | PT | X | | | | |
| 394 | Doyle, Glen | LT | X | | | | |

---

### 2

ID 18   Type 92

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 4 | 25 | 2017 | 00:54 |
| Arrival ☒ | 4 | 25 | 2017 | 00:59 |
| Clear ☒ | 4 | 25 | 2017 | 03:04 |

Sent ☒   Number of People: 1

Use: ☒ Suppression  ☐ EMS  ☐ Other

Actions Taken: ☐ ☐ / ☐ ☐

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 105 | Fenby, Edward | DC | X | | | | |

---

### 3

ID 4   Type 11

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 4 | 25 | 2017 | 00:54 |
| Arrival ☒ | 4 | 25 | 2017 | 00:59 |
| Clear ☒ | 4 | 25 | 2017 | 03:04 |

Sent ☒   Number of People: 3

Use: ☒ Suppression  ☐ EMS  ☐ Other

Actions Taken: ☐ ☐ / ☐ ☐

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 336 | Kocerha, Kenneth | LT | X | | | | |
| 399 | Crosta, John | PT | X | | | | |
| 405 | Fitzpatrick, Michael | PT | X | | | | |

---

**A** | 21243 (FDID) ★ | MA (State) ★ | MM 4 DD 25 YYYY 2017 Incident Date ★ | E5 (Station) | 17-0003082 Incident Number ★ | 000 Exposure ★ | ☐ Delete ☐ Change | NFIRS – 10 Personnel

**B** Apparatus or Resource ★ — Use codes listed below

| Date and Times | Check if same as alarm date | Month Day Year | Hours/mins | Sent | Number of People ★ | Use | Actions Taken |

---

### 1  ID 1   Type 11

| | Check | Month | Day | Year | Hours/mins | Sent | Number of People | Use |
|---|---|---|---|---|---|---|---|---|
| Dispatch | ☒ | 4 | 25 | 2017 | 00:54 | Sent ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other |
| Arrival | ☒ | 4 | 25 | 2017 | 00:59 | | | |
| Clear | ☒ | 4 | 25 | 2017 | 03:04 | | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 314 | Dee, Patrick | CT | X | | | | |
| 341 | Jeffers, Paul | LT | X | | | | |
| 368 | Murphy, Gerald | PT | X | | | | |

---

### 2  ID 12   Type 12

| | Check | Month | Day | Year | Hours/mins | Sent | Number of People | Use |
|---|---|---|---|---|---|---|---|---|
| Dispatch | ☒ | 4 | 25 | 2017 | 00:54 | Sent ☒ | 3 | ☒ Suppression ☐ EMS ☐ Other |
| Arrival | ☒ | 4 | 25 | 2017 | 00:59 | | | |
| Clear | ☒ | 4 | 25 | 2017 | 03:04 | | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 225 | Wells, Stephen | PT | X | | | | |
| 316 | Leonard, James | PT | X | | | | |
| 374 | Palaza, Michael | LT | X | | | | |

---

### 3  ID 13   Type 13

| | Check | Month | Day | Year | Hours/mins | Sent | Number of People | Use |
|---|---|---|---|---|---|---|---|---|
| Dispatch | ☒ | 4 | 25 | 2017 | 00:54 | Sent ☒ | 2 | ☒ Suppression ☐ EMS ☐ Other |
| Arrival | ☒ | 4 | 25 | 2017 | 00:59 | | | |
| Clear | ☒ | 4 | 25 | 2017 | 03:04 | | | |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 303 | Stanton, Stephen | NR | X | | | | |
| 386 | Whouley, Mark | PT | X | | | | |

---

**NFIRS-10 Revision 11/17/98**

Quincy Fire Department

21243     04/25/2017     17-0003082

| 21243 FDID | MA State | 4 25 Incident Date | 2017 | E5 Station | 17-0003082 Incident Number | 000 Exposure | Responding Units/Personnel |
|---|---|---|---|---|---|---|---|

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 4 Engine 4 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |

| Staff ID\Staff Name | Activity | Rank | Position | Role |
|---|---|---|---|---|

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 5 Engine 5 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 312 | Barry, Christopher A | 100-173 | Fires | Private | | |
| 369 | Lentini, Keith L | 100-173 | Fires | Lieutenant | | |
| 68 | Taylor, David J | 100-173 | Fires | Private | | |

Mar 04 2000 04:58 Quincy Fire Prevention 617-376-1027   page 11

| 21243 | MA | 4 | 25 | 2017 | E5 | 17-0003082 | 000 | **Responding Units/Personnel** |
|---|---|---|---|---|---|---|---|---|
| FDID | State | Incident Date | | | Station | Incident Number | Exposure | |

| Unit | Notify Time | Enroute Time | Arrival Time | Cleared Time |
|---|---|---|---|---|
| 1 Engine 1 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 314 | Dee, Patrick T | 100-173 | Fires | Captain | | |
| 341 | Jeffers, Paul D | 100-173 | Fires | Lieutenant | | |
| 368 | Murphy, Gerald E. | 100-173 | Fires | Private | | |

| 12 Ladder 1 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |
|---|---|---|---|---|

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 225 | Wells, Stephen H | 100-173 | Fires | Private | | |
| 316 | Leonard, James A | 100-173 | Fires | Private | | |
| 374 | Palaza, Michael R | 100-173 | Fires | Lieutenant | | |

| 13 Ladder 2 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |
|---|---|---|---|---|

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 303 | Stanton, Stephen A | 100-173 | Fires | No Rank (Ci | | |
| 386 | Whouley, Mark J | 100-173 | Fires | Private | | |

| 16 Rescue1 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |
|---|---|---|---|---|

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 383 | Walsh, Matthew J | 100-173 | Fires | Lieutenant | | |
| 392 | Murphy, Christopher E | 100-173 | Fires | Private | | |
| 394 | Doyle, Glen K | 100-173 | Fires | Lieutenant | | |

| 18 Car 2 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |
|---|---|---|---|---|

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 105 | Fenby, Edward W | 100-173 | Fires | Deputy Chie | | |

| 4 Engine 4 | 00:54:00 | 00:54:00 | 00:59:00 | 03:04:00 |
|---|---|---|---|---|

| Staff ID\Staff Name | | Activity | | Rank | Position | Role |
|---|---|---|---|---|---|---|
| 336 | Kocerha, Kenneth J | 100-173 | Fires | Lieutenant | | |
| 399 | Crosta, John E | 100-173 | Fires | Private | | |
| 405 | Fitzpatrick, Michael J | 100-173 | Fires | Private | | |

Mar 04 2000 04:58 Quincy Fire Prevention 617-376-1027        page 12

| A | 21243 | MA | MM 4 DD 25 YYYY 2017 | E5 | 17-0003082 | 000 | ☐ Delete ☐ Change | Insurance and $Loss |
|---|---|---|---|---|---|---|---|---|
| | FDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | | |

| 21243 | MA | MM 4 DD 25 YYYY 2017 | E5 | 17-0003082 | 000 | Responding Personnel |
|---|---|---|---|---|---|---|
| FDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | |

| Staff ID\Staff Name | Unit | Activity | | Position | Rank | PayScl | Hrs | HrsPd | Pts |
|---|---|---|---|---|---|---|---|---|---|
| 314 Dee, Patrick T | 1 | 1 100-173 | Fires | | CT | | 2.17 | 0.00 | 0.00 |
| 341 Jeffers, Paul D | 1 | 1 100-173 | Fires | | LT | | 2.17 | 0.00 | 0.00 |
| 368 Murphy, Gerald E. | 1 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 225 Wells, Stephen H | 12 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 316 Leonard, James A | 12 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 374 Palaza, Michael R | 12 | 1 100-173 | Fires | | LT | | 2.17 | 0.00 | 0.00 |
| 303 Stanton, Stephen A | 13 | 1 100-173 | Fires | | NR | | 2.17 | 0.00 | 0.00 |
| 386 Whouley, Mark J | 13 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 383 Walsh, Matthew J | 16 | 1 100-173 | Fires | | LT | | 2.17 | 0.00 | 0.00 |
| 392 Murphy, Christopher E | 16 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 394 Doyle, Glen K | 16 | 1 100-173 | Fires | | LT | | 2.17 | 0.00 | 0.00 |
| 105 Fenby, Edward W | 18 | 1 100-173 | Fires | | DC | | 2.17 | 0.00 | 0.00 |
| 336 Kocerha, Kenneth J | 4 | 1 100-173 | Fires | | LT | | 2.17 | 0.00 | 0.00 |
| 399 Crosta, John E | 4 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 405 Fitzpatrick, Michael | 4 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 312 Barry, Christopher A | 5 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |
| 369 Lentini, Keith L | 5 | 1 100-173 | Fires | | LT | | 2.17 | 0.00 | 0.00 |
| 69 Taylor, David J | 5 | 1 100-173 | Fires | | PT | | 2.17 | 0.00 | 0.00 |

**Total Participants:** 18                     **Total Personnel Hours:** 39.06

**An 'X' next to the unit denotes driver.**

Quincy Fire Department

21243    04/25/2017    17-0003082

Mar 04 2000 04:58 Quincy Fire Prevention 617-376-1027

# EXHIBIT 4

```
 1                                Volume:  1

 2

 3
           UNITED STATES DISTRICT COURT
 4            DISTRICT OF MASSACHUSETTS

 5  DOCKET NO.  1:18-CV-1216WORKS

 6  ********************************

 7  THE NETHERLANDS INSURANCE
    COMPANY, as subrogee of GCP CROWN
 8  COLONY, LLC and LIBERTY MUTUAL
    FIRE INSURANCE COMPANY as subrogee
 9  of ONEX YORK HOLDINGS CORP., d/b/a
    MANAGED CARE SERVICES f/k/a
10  MCMC LLC,
              Plaintiff,
11
    V.
12
    HP INC. and INSIGHT ENTERPRISES,
13  INC.,
              Defendants.
14
    ********************************
15

16          DEPOSITION OF KEITH LENTINI
             Monday, November 30, 2020
17                  VIA ZOOM

18          Commencing at 10:00 a.m.

19

20

21    Taken on behalf of the Plaintiff before

22      Isolde von Handorf-Choquet, a

23      Professional Shorthand Reporter

24  Job No. 690120-A
```

Page 9

1   A.   I mean, the NFPA, there's a lot of regulations.

2        I probably have had some NFPA training; but

3        specific to what, I can't really say.

4   Q.   **Okay.  What did your job duties entail when you**

5        **were a lieutenant for the City of Quincy Fire**

6        **Department?**

7   A.   So, mostly very similar to those as a captain.

8        When I was at work, I was in charge of the crew

9        of men that I worked with, either two or three

10       other people.  I was in charge of them in and

11       around the station, out on emergency calls.  The

12       only difference between the lieutenant and the

13       captain is, as a lieutenant, I didn't really have

14       any administrative responsibility when it came to

15       the building or the truck.

16  Q.   **During your tenure as a member of the City of**

17       **Quincy Fire Department, how many fire**

18       **investigations have you been involved with?**

19  A.   Fire investigations?  I would say as a fire

20       officer, when I responded as the first officer to

21       a fire, there is some role in trying to determine

22       where I think the fire began.  So, I've probably

23       done that a handful of times, five or six.

24  Q.   **Was the fire on April 25th of 2017 at 300 Crown**

Page 10

1       Colony Drive one of those occasions?

2    A.  Yes.

3    Q.  So, you were the first person out to that fire,

4        is that correct?

5    A.  Yes.

6    Q.  Were you in charge of the fire scene?

7    A.  I was initially in charge of the fire scene until

8        the deputy chief arrived, which --

9    Q.  -- okay.  Do you remember the call coming in to

10       respond to this fire at 300 Crown Colony Drive?

11   A.  Yes.  It was after midnight, you know, so it woke

12       us from being asleep.  The call came in as an

13       investigation.  And what that means for us is,

14       that an alarm was going off that we received; but

15       we had no other reports that there was any smoke

16       or fire.  So, in that instance, our standard

17       procedure is to send two trucks, an engine

18       company and a ladder company.

19   Q.  All right.  Were you with the engine company or

20       the ladder company?

21   A.  Yes, sorry.  I was with the engine company.

22   Q.  Who was with you?

23   A.  I had two firefighters with me, a guy by the name

24       of Dave Taylor was driving, and Firefighter

Page 15

```
 1    A.   On the report, it says the last unit cleared at

 2         3:04 a.m., so, you know, probably shortly after

 3         that.

 4    Q.   Okay.  Did you reach any conclusion about the

 5         origin of the fire?

 6    A.   Yes.

 7    Q.   What was your conclusion about the origin of the

 8         fire?

 9    A.   That there was a printer on fire when I got in

10         the immediate vicinity of the smoke.

11    Q.   Did you reach any conclusion about the cause of

12         the fire?

13    A.   No.

14    Q.   Can you tell us what you did upon arriving at 300

15         Crown Colony Drive in Quincy?

16    A.   Yeah.  So, as the first officer to arrive, it's

17         standard procedure to go to the fire alarm panel,

18         which indicates where in that building an alarm

19         was received.  So, the fire alarm panel indicated

20         two things; that there was a smoke detector

21         activated on the 5th floor.  It also indicated

22         that the sprinkler system was running.

23              Probably within a minute or so of me being

24         at the panel, the ladder truck arrived.  And
```

Page 16

1   again, standard procedure for us, the officer and

2   one firefighter from the ladder truck went to the

3   5th floor to investigate the source of the alarm.

4   We stayed down on the first floor, and I found

5   the sprinkler room.  I went to the sprinkler room

6   anticipating that in most instances a sprinkler

7   is activated due to a malfunction or an accident.

8   So, we went to the sprinkler room in case

9   Lieutenant Palaza on the ladder got up to the 5th

10  floor and said, yeah, there's a broken sprinkler

11  pipe, we need to shut that system down

12  immediately.

13          Instead, when Lieutenant Palaza reached the

14  5th floor, he observed smoke.  And what he did,

15  according to our procedures, is he stated to our

16  dispatch that he was striking the box.  That's

17  the term we use for a fire.  So, when he struck

18  the box to our dispatch, that indicated to them

19  that we needed more trucks to respond to the

20  scene, because we now confirmed that there was a

21  fire.

22          So, when he struck the box, myself and

23  Firefighter Barry left the sprinkler room, went

24  back to Engine 5, which was right out front, and

Page 17

1    we retrieved our hose that we need for buildings

2    like this that have standpipes in the stairwells.

3    So, we retrieved the hose.  Myself and

4    Firefighter Barry went to the 5th floor; and in

5    the stairwell on the 5th floor, we connected the

6    hose to the standpipe.

7            We came out of the stairwell with the hose,

8    and Lieutenant Palaza and Firefighter Leonard

9    broke open the office door to the office where

10   the smoke was coming from.

11 **Q.  What did you observe after they broke down the**

12     **door?**

13 A.  So, myself and Firefighter Barry entered the

14   office with the hose line.  It was charged with

15   water at this point.  And as I went into the

16   office, it was quite smokey.  And I could tell

17   that it was kind of set up as a typical office

18   with cubicles arranged, kind of, in rows.

19           I told Firefighter Barry to just stay put

20   at the door, because I didn't know exactly where

21   the fire was, what the source of the fire was.

22           As I moved into the office, I could see

23   that there was some vertical blinds that looked

24   like they were distorted or melted from heat.  So

Page 18

1      that kind of directed me to the area of where the

2      source of the smoke was.

3            So, as I got to that area, I found a

4      printer that it was still actively on fire.

5      There were like flames coming from it.  I should

6      backtrack to say that when we went into the

7      office, in addition to the smoke, I observed that

8      the sprinkler system was activated and

9      discharging water.

10           So, as I got to where this printer was, it

11     was still on fire.  I yelled back to Firefighter

12     Barry just to stay where he was.  I unplugged the

13     printer, and I carried it back to him where he

14     had the hose.  And then he just was able to open

15     the hose, discharge the water on it to fully

16     extinguish it.

17  Q.  **Where was the printer located in relation to the**

18      **blinds that you saw that were distorted?**

19  A.  It was probably -- as I was like oriented in the

20      room, it was probably within 8 feet.  If the

21      printer was in front of me, the blinds were

22      probably within 6 to 8 feet to my right.

23  Q.  **Did you notice any smells when you entered that**

24      **room?**

Page 19

```
 1   A.   I didn't, because when we observed smoke, we put

 2        on our, you know, SCBA, our breathing tank and

 3        our breathing mask.

 4   Q.   On the remark section of your report on the

 5        second page --

 6   A.   -- yup.

 7   Q.   -- you indicate in the last sentence, the

 8        property management, mgmt, responded.  Do you

 9        recall who responded from the property

10        management?

11   A.   I don't recall his name.  I could tell you it was

12        a white male, I remember that.

13   Q.   If you go to Exhibit 2, Page 5.

14             AARON BROSNAN: Just give me a second.  I'll

15        pull it up for everybody.

16   Q.   Okay.  Captain Lentini, we're looking at Page 5

17        from the full report that was marked as Exhibit

18        2.  Do you see a box that's D and E where it says

19        "ignition" and "cause of ignition" on this

20        report?

21   A.   I do, yes.

22   Q.   Do you know who filled this section of the report

23        out?

24   A.   Yeah, now that I'm looking at it -- and I said a
```

Page 20

1     few minutes ago that I had not seen this before,

2     this -- I filled it out.  That's the answer to

3     your question, yeah.

4  Q.  Okay.  And starting with that Column D, Ignition,

5     D1, it says "area of fire origin, 27, office," do

6     you see that?

7  A.  Yes.

8  Q.  And is 27 just a code number for an office?

9  A.  Yes.

10  Q.  On D2, you identify the heat source as electrical

11     arcing, do you see that?

12  A.  Yes.

13  Q.  What was the basis for that determination?

14  A.  That it was a powered piece of equipment.  You

15     know, it was plugged in to a plug.

16  Q.  And then on D3 and D4, you indicate the item that

17     first ignited was plastic, is that --

18  A.  -- yes.

19  Q.  -- correct?  All right.  And when you say that,

20     you're referring to the printer plastic?

21  A.  Yes.

22  Q.  Going over to Box E1, that's where you identify

23     the cause of ignition.  What was the cause of

24     ignition that you identified?

Page 21

1   A.   Failure of equipment or heat source.

2   Q.   **Are you referring to the printer?**

3   A.   Yes.

4   Q.   **And then on Paragraph E2, you have a heading**

5       **called Factors Contributing to Ignition.  What**

6       **were the factors contributing to ignition that**

7       **you identified?**

8   A.   Again, 36 is a code and "arc, spark from," that's

9       where the code ends.  I mean, in my mind, I'm

10      assuming that's from the equipment itself.

11  Q.   **And when you say "equipment," you're referring to**

12      **the printer?**

13  A.   Yes.

14  Q.   **Do you know what type of printer it was?**

15  A.   I don't.

16  Q.   **Let's go to the next page.  Is this something you**

17      **also filled out, Captain Lentini?**

18  A.   Yes.

19  Q.   **And you've got a Box K that talks about material**

20      **contributing most to fire spread, do you see**

21      **that?**

22  A.   Yes.

23  Q.   **Can you tell us what you indicated on your report**

24      **for that?**

Page 30

1   Q.   And you said that you unplugged the printer and

2        then carried it over to your colleague who had

3        the hose, do I have that correct?

4   A.   Yes.

5   Q.   About how far away from the desk did you move the

6        printer?

7   A.   You know, I had to go back to my left out of that

8        cubicle area, and then a left back to the door,

9        probably a total of 20 to 30 feet.

10  Q.   And after -- and I assume your colleague

11       extinguished the fire at that point?

12  A.   Yes.

13  Q.   And then, what did you do with the printer?

14  A.   Based on the pictures that I saw -- I didn't

15       remember until seeing the pictures.  At some

16       point, we put it on an office chair, took it down

17       in the elevator and put it outside.  I shouldn't

18       say I personally did that; but as the fire

19       department, we did that.

20  Q.   Do you have a specific memory of the printer

21       being removed from the building on the office

22       chair?

23  A.   I have a memory of it being put into the

24       elevator.  And I think I remember I stayed up on

KEITH LENTINI, VOL. I - 11/30/2020

Page 23

1       cubicle that I observed.

2   Q.  Are the distortion on the blinds, is that what

3       you were referring to earlier?  You see how the

4       blinds are bent, kind of melted?

5   A.  That's correct.

6   Q.  That is what you were referring to earlier?

7   A.  Yes.

8   Q.  Does this photograph fairly and accurately depict

9       what you observed at the fire scene on April 25th

10      of 2017?

11  A.  Mostly, yes.  With the exception that there was

12      like a desk in front of where that char mark is.

13  Q.  Yup.  We moved up to the 4th photo on this

14      exhibit, Captain Lentini.  Do you recognize what

15      that depicts?

16  A.  Yeah, I think that was like the printer that

17      still had a little bit of active flame, and I

18      unplugged it and carried it back to the hose.

19  Q.  Does that fairly and accurately depict the

20      printer as you observed it on April 25th of 2017?

21  A.  Yes.

22  Q.  Looking at the second photo on this exhibit,

23      Captain Lentini, can you tell us what that

24      depicts?

Page 25

1        5 for Identification.)

2  Q.  **Captain Lentini, we are going to show you one**

3      **more photo.  And I'd ask you if you can identify**

4      **the area where the printer was on that photo?**

5  A.  Okay.

6  Q.  **Thank you.**

7           AARON BROSNAN:  You should be all set on

8      your end to do that again.

9  A.  Okay.  So, I should say, you know, looking at

10     this picture changes my opinion of where it was.

11 Q.  **Okay.**

12 A.  You know, like I said, it oriented in the room, I

13     remember the blinds were to the right, and I was

14     in this -- you know, I was left of the window.  I

15     thought I recalled it, like I said a few minutes

16     ago, I thought it was on the floor.  Looking at

17     this picture, I'm not so sure.  Just the way the

18     char mark is makes me think that, you know, it

19     was in this vicinity.

20          AARON BROSNAN: If you go to the top of the

21     screen, you should see a bar that says

22     "annotate".  Do you see that?  Let me pull this

23     up for you.

24 A.  You know, based on the picture, I would say it

Page 26

1  was in that vicinity.

2 Q. **Based on the char pattern you see behind it?**

3 A. Yeah.  And going back to a few minutes, the first

4  picture I looked at, I think had this -- I think

5  the desk was removed, unless I was looking at the

6  picture differently, unless that was just like a

7  close-up of that area.  But, yeah, based on the

8  char pattern, I would say it was there.

9 Q. **Does this photo fairly and accurately depict what**

10  **you observed upon entering the scene of the fire**

11  **on April 25th, 2017?**

12 A. Yes, absent that there was equipment on that desk

13  area, and I thought under the desk, too.

14    MR. BROSNAN: Let's mark that as the next

15  exhibit.

16    (Photograph with marking marked as Exhibit

17  6 for Identification.)

18 Q. **That is all the questions I have for you,**

19  **Captain Lentini.**

20    MS. DOUBLEDAY: I do have questions.

21  Mr. Lentini, I can either take a break if you

22  want it, or we can just move on from here.  It's

23  up to you.

24 A. I'm good.

Page 29

1  Q.  Well, that was going to be my question, if you
2      knew what 921 is?
3  A.  I don't.  From like studying for exams and, you
4      know, getting my fire science degree, there's a
5      ton of NFPA standards that I would not know what
6      they are based on the number.
7  Q.  Do you have any education or training in the
8      field of electronics?
9  A.  No.
10 Q.  Have you ever testified as an expert witness in
11     court?
12 A.  No.
13 Q.  And I think you said this is your first
14     deposition.  I assume you have never given
15     deposition testimony as an expert, correct?
16 A.  Correct.
17 Q.  When you arrived at the scene of the fire at
18     Crown Colony and you located, I think you said, a
19     printer that you saw had some flames on it, is
20     that correct?
21 A.  Yes.
22 Q.  Was anything else on fire in that area besides
23     the printer?
24 A.  Not that I observed, no.

Page 33

1    Q.   Do you agree that in investigating a fire, that

2         you shouldn't change or alter the scene until

3         it's been investigated and documented fully?

4              MR. BROSNAN: Objection.

5    A.   Yes.

6    Q.   After moving the printer away from the desk, I

7         think you said that you may or may not have been

8         the one who specifically put it in the elevator,

9         do I have that right?

10   A.   Correct.

11   Q.   So, what did you do next?

12   A.   We spent some time -- we shut down the sprinkler

13        system.  From one of the photos, I could tell we

14        arranged those kind of wastebaskets to try to

15        collect some of the water that was still draining

16        from the system.  And then we spent a bit of time

17        trying to figure out how to ventilate the space.

18        There was another door in the back with a

19        stairwell, went up to the roof.  We spent some

20        time trying to create a channel to use a fan to

21        blow the smoke through that stairwell and up

22        through the roof.  It wasn't working.  We weren't

23        able to clear the smoke.  So, eventually -- and

24        this wasn't my decision, but the deputy decided

Page 34

```
 1        to take out one of the windows in a closer
 2        vicinity to where that cubicle was to clear the
 3        smoke out the window.
 4   Q.   You're using the word "we," who is we besides
 5        you?
 6   A.   When I say "we," I think I mean all the guys from
 7        the fire department who were there were kind of
 8        collectively working to try to figure out the
 9        best way to clear the smoke.  Ultimately,
10        Deputy Fenby, he was in charge at that point.
11   Q.   When did Deputy Fenby take charge of the scene?
12   A.   He took charge as soon as he arrived, which based
13        on my testimony earlier, Engine 5 and Ladder 1
14        were probably there for a few minutes.  Ladder 1
15        reached the 5th floor at that point, notified
16        dispatch to strike the box.  That's when the
17        deputy chief and the other trucks got the
18        notification to respond to where we were.  It
19        probably took him another 5 minutes or so before
20        he arrived; but as soon as he arrived, our
21        standard procedure is, he will declare that he's
22        in command of the situation.
23   Q.   When you were at the -- well, let me ask you this
24        first; you testified earlier about the report
```

KEITH LENTINI, VOL. I - 11/30/2020

Page 38

```
 1   A.   Yeah, toxic smoke, yes.

 2   Q.   Was the computer -- I'm sorry, was the printer

 3        smoking when you brought it down the elevator?

 4   A.   I don't recall.

 5   Q.   Did you conduct any inspection of the printer?

 6   A.   I did not.

 7   Q.   Did anybody else from the fire department conduct

 8        an inspection of the printer?

 9   A.   I do not know.

10   Q.   Earlier you testified -- and I want to make sure

11        I have this correct, that you will determine the

12        origin of the fire, but not the cause of the

13        fire; do you recall saying that?

14   A.   Yes.

15   Q.   Okay.  And I think I understand what you mean by

16        that; but just for the record, can you, please,

17        explain what the difference is?

18   A.   In my mind, the origin is the physical object

19        that first ignited.  And the cause would be, why

20        exactly did that object ignite, so that's the

21        differentiation in my mind.

22   Q.   And would the fire at Crown Colony that you're

23        testifying about today, did you view the

24        determination as to the cause of the fire?
```

Page 39

```
 1   A.   Based on my report, you know, I did enter

 2        judgments as to what I thought caused the fire.

 3   Q.   What do you think caused the fire?

 4   A.   I felt that there was some sort of electrical

 5        issue that, you know, caused heat within that

 6        printer to ignite the components.

 7   Q.   How did you arrive at that conclusion?

 8   A.   Based on the fact that the printer was actively

 9        -- had flames within it when I arrived to it, and

10        it was plugged into an electrical source.

11   Q.   Did anything else cause you to arrive at that

12        conclusion, other than the fact that there was a

13        fire and that it was plugged in?

14   A.   No.

15   Q.   Did you take any measurements at the scene of the

16        fire?

17   A.   No.

18   Q.   Did you take any video?

19   A.   No, and -- no to measurements and no to video,

20        that's me personally.  I don't know if anyone

21        else did.

22   Q.   That was going to be my next question.  So,

23        you're not aware if anyone from the fire

24        department took any measurements or videos?
```

Page 45

```
 1   A.   Can you repeat that question?
 2   Q.   Sure.  Were you aware that the printer that was
 3        involved in the fire had been moved from one
 4        location in the building to that particular
 5        cubicle on the day before the fire?
 6   A.   No.
 7   Q.   Does that seem like a strange coincidence to you
 8        that that fire occurs after the printer is moved
 9        to a new location?
10             MR. BROSNAN: Objection.
11   A.   I don't know.
12   Q.   Did you observe any evidence of electrical arcing
13        at the scene of the fire?
14   A.   No.
15   Q.   Did you inspect any of the electrical outlets in
16        the vicinity of the fire?
17   A.   I did not.
18   Q.   Did you inspect any wires in the vicinity of the
19        fire?
20   A.   No.
21   Q.   Did your investigation rule out the potential for
22        arson?
23   A.   I'm not sure.  I would say -- I would say yes.
24   Q.   And why would you say yes?
```

Page 46

```
 1   A.  If we're talking about my investigation, just

 2       observing the printer on fire, it being plugged

 3       in and what I put in the report, at no time did I

 4       personally consider arson to be a factor.

 5   Q.  Well, were you able to rule out forced entry into

 6       the premises?

 7   A.  In the door we entered, we had to use our

 8       forcible entry tools to access the office space,

 9       so the door was locked.

10   Q.  I assume I know the answer to this question, but

11       I -- for completeness, there was nobody in the

12       building when you arrived there, is that correct?

13   A.  That's correct.

14   Q.  Did you notice what the ceiling was made out of

15       in this particular office where the fire

16       occurred?

17   A.  I did not.

18   Q.  Did you see any indication that somebody had been

19       smoking in the office?

20   A.  I did not.

21   Q.  In your report that you prepared after the fire,

22       you indicated the item first ignited was plastic,

23       do you recall that?

24   A.  Yes.
```

Page 49

1          MS. DOUBLEDAY: That's all I have.  Thank

2      you so much.

3          THE DEPONENT: Thank you.

4          MR. BROSNAN: Just want to do a quick

5      5-minute break.

6          (Short break taken.)

7

8      REDIRECT EXAMINATION BY MR. BROSNAN

9   Q.  Captain Lentini, I direct your attention to Page

10      5 of Exhibit 2, the full report.

11  A.  Yup.

12          AARON BROSNAN:  I will pull that up for

13      everyone as well.

14  Q.  And there is a column on the far right in the E

15      section, E3, human factors, do you see that?

16  A.  Yes.

17  Q.  And you ruled out human factors as a contributing

18      ignition of this fire, correct?

19  A.  Yes.

20  Q.  You said you believe you traced the cord back --

21      the printer cord back to the outlet where it was

22      plugged in, do you recall that testimony?

23  A.  I recall the testimony, yes.

24  Q.  Okay.  Did you observe anything when you traced

1      the cord back specifically about the condition of

2      the outlet?

3  A.  No.

4  Q.  And I guess we have a little technical difficulty

5      with Exhibit 6, so we just need to pull that up

6      again and have you redraw the area where the

7      printer was.  For some reason, that did not get

8      saved.

9          AARON BROSNAN: I think it was my fault.

10     Sorry about that, Captain Lentini.  I am going to

11     go ahead and give you control again,

12     Captain Lentini.  Just one moment here.

13         THE DEPONENT: Okay.

14         AARON BROSNAN:  You should be able to draw

15     now.  I pulled up the pen.  Let me know if that

16     is not the case.

17         THE DEPONENT: I've got it.

18         AARON BROSNAN: Perfect.  Let me just make

19     sure I save this the right way now.

20  Q.  That is all the questions I have for you,

21      Captain Lentini.  Thank you very much.

22         MS. DOUBLEDAY: Thank you.

23         (Whereupon the deposition concluded at 11:27

24     a.m.)

# EXHIBIT 5

```
                              Volume:  1
                              Pages:  1-28
                              Exhibits: See Index


              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS

                              DOCKET NO.  1:18-CV-12136

     **********************************

      THE NETHERLANDS INSURANCE
      COMPANY, as subrogee of GCP CROWN
      COLONY 1031 LLC and
      MF CROWN COLONY 1031 LLC, and
      LIBERTY MUTUAL FIRE INSURANCE COMPANY
      as subrogee of ONEX YORK HOLDINGS
      CORP., d/b/a CARE WORKS MANAGED CARE
      SERVICES f/k/a MCMC LLC,
                Plaintiffs,

      V.

      HP INC. and INSIGHT DIRECT USA,
      INC.,
                Defendants.

     **********************************


       DEPOSITION OF FIREFIGHTER CHRISTOPHER BARRY
              Wednesday, February 3, 2021
                     VIA ZOOM
              Commencing at 10:01 a.m.



           Taken on behalf of the Plaintiff before
           Isolde von Handorf-Choquet, a
           Professional Shorthand Reporter
```

Lieutenant Lentini to head up in the building.

Shortly after I exited the building, it, perhaps, could have been as quick as when I was on the return in, I did hear Lieutenant Palaza from Ladder 1 ask Fire Alarm to strike the box to send additional help, that they had a smoke condition on Floor No. 5.

Q.   What did you do when you arrived on the 5th floor, you and Lieutenant Lentini?

A.   We had a quick face-to-face with the ladder company crew of Lieutenant Palaza and Firefighter Leonard confirming that there was a smoke condition.  We then began to connect to the firefighter -- the firefighter's standpipe system, which is part of the building suppression system with our equipment.  And I was focused on doing that.  And I completed that task.

Q.   What did you do next after you got the fire hose hooked up to the standpipe system?

A.   I charged the fire hose at the standpipe by opening a hand wheel on it to make sure that we had a positive water flow before we went anywhere.  It's just customary to make sure that we have water available at the nozzle before we

advance when we have a known smoke or fire
condition, and that's what I did.

Q.  Where was the smoke or fire condition located on
the 5th floor?

A.  When I exited the stairwell and stretched the
hand line, I met the crew of Ladder 1, again
Lieutenant Palaza and Firefighter Leonard.  They
had opened the door where they had ascertained
that there was smoke in that area.

        So, I exited from the stairwell in a
fashion that went straight to an open atrium
area, as I recall, and then in through another
set of doors.  There was a large office
occupancy.

Q.  The crew from Ladder 1, did they have to break
down the door to get into that room?

A.  They may have had to force entry at that time.  I
was not with them.  I did hear after, that they
did; but I don't know that to be fact.  I didn't
witness it.  I had other duties while they were
doing that.

        Some things were going on simultaneously
during the course of a fire investigation, and
there are different duties, and it is customary

for ladder companies to perform that kind of work
to help engine companies like the one I was
assigned to gain access.

Q.   Did you proceed into the room where the smoke was
detected?

A.   Yes, I did.

Q.   How far into the room did you go?

A.   I went in through the doorway.  I made a left
turn and probably advanced between 25 and 50 feet
from the entranceway, moving the hose line with
me.  I was alone at that time moving the line.

Q.   What did you observe?

A.   I observed a smoke condition, and that the smoke
at that time wasn't particularly hot.  I remember
commenting to myself.

Q.   Where did you observe the smoke condition coming
from?

A.   You know, it was from the ceiling area down
halfway along the line of office cubicles, so I
wasn't able to determine its origin, just that it
was present in a large amount in this office
space.

Q.   What was Lieutenant Lentini doing; was he also in
the room when you were in the room?

A.   He was.   Lieutenant Lentini had gone to see if he
     could ascertain the origin of the fire.

Q.   Did he ascertain the origin of the fire?

A.   He did.   He found the operating sprinkler head
     and found that that operating sprinkler had been
     trying to contain.   He then removed a piece of
     equipment that appeared to have been on fire,
     brought it towards me, and I extinguished it with
     the fire hose.

Q.   Was that piece of equipment a printer?

A.   It may have been.   It was definitely a part of a
     computer, a piece of computer equipment.

Q.   Could you tell me what you observed about that --

A.   -- I wasn't able to get a real good look at it,
     because it was a smoke condition.   I was wearing
     my breathing mask, my self-contained breathing
     apparatus.   I had been operating a hose line, so
     there was a considerable amount of smoke in the
     building.

Q.   Did you extinguish that piece of equipment that
     Captain Lentini brought?

A.   I did, using a very, very small amount of water
     in my hand to direct the stream.

Q.   Okay.   What happened to that piece of equipment

extinguishment for a number of different reasons.
But if it's done, it's at such a point that the
fire is still able to generate smoke to a degree
that it fills a space, but it is not hot as you
would encounter with a free-burning fire.

This space had filled with smoke and to
such a degree that we had a very, very difficult
time removing it with common smoke evacuation
methods.  And it was -- really we were pushing it
from one end of the space to the other.  And we
made the decision that we needed to open a window
to be able to affect ventilation to clear this
office space.

Q.   Were Lieutenant Palaza and Firefighter Taylor
also in the room at the time you and Lieutenant
Lentini were in the room?

A.   No, Lieutenant -- I'm sorry, Firefighter Taylor
was outside for the entire time.  His duties for
the duration of the event were outside of the
building.  Lieutenant Palaza was inside the
occupancy with the ladder crew.

Q.   What was Lieutenant Palaza's role in terms of
fire suppression?

A.   I think that he had investigated that we had had

# EXHIBIT 6

```
                                    Volume:  1
                                    Pages:  1-17
                                    Exhibits: See Index


              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS

                            DOCKET NO.  1:18-CV-12136


    *********************************

     THE NETHERLANDS INSURANCE
     COMPANY, as subrogee of
     GCP CROWN COLONY 1031 LLC and
     MF CROWN COLONY 1031 LLC, and
     LIBERTY MUTUAL FIRE INSURANCE COMPANY
     as subrogee of ONEX YORK HOLDINGS
     CORP., d/b/a CARE WORKS MANAGED CARE
     SERVICES f/k/a MCMC LLC,
               Plaintiffs,

     V.

     HP INC. and INSIGHT DIRECT USA,
     INC.,
               Defendants.

    *********************************


        DEPOSITION OF CAPTAIN MICHAEL PALAZA
             Friday, February 12, 2021
                    VIA ZOOM
              Commencing at 10:01 a.m.



        Taken on behalf of the Plaintiff before
        Isolde von Handorf-Choquet, a
        Professional Shorthand Reporter
```

A.   I don't recall.  Maybe studying for captain.

Q.   Do you remember what time you received a call to respond to that fire?

A.   Was it early in the morning?  I don't.

Q.   Were you in charge of a ladder company on that date, the date of the fire?

A.   I was, Ladder Company No. 1.

Q.   Did Ladder Company 1 proceed to the fire at 300 Crown Colony Drive on April 25th of 2017?

A.   Yes, sir.

Q.   Who was in Ladder Company 1, who was with you?

A.   I was in the front seat.  Firefighter Jim Leonard in the jump seat, and I believe driving was Firefighter Stephen Wells.

Q.   What happened when Ladder Company 1 arrived at the scene of the fire at 300 Crown Colony Drive on April 25th of 2017?

A.   It came in, I remember, as an investigation, so the alarms we called tapped in.  We proceeded with Engine 5, because that's their -- Engine 5's primary area.  We are the primary ladder company, so we called first in.  And I'm going to try to refrain from firefighter jargon, my apologies. They arrived --

I remember going in.  It is a highrise, at
least five floors.  Though, our actions, we go
investigate via the panel, the fire alarm panel.
I remember the fire alarm panel indicating water
flow and smoke detector activation Floor No. 5.
Swapped procedures.  So, now it's still an
investigation.  We have two, a fire pumper and an
engine, which would be Engine 5, and the ladder
company, which is Ladder 1.  So, our procedure is
that Ladder 1, myself and Firefighter Leonard,
walked up to Floor No. 5.

Upon making arrival of Floor No. 5, it was
a smoke condition, and I could hear water
running.  As soon as I acknowledged that, I
immediately went over the radio, and I quoted
"strike the box for this location."  That entails
a fire, so more pieces of apparatus would be
responding.

Q.   Okay.  What do you do after you struck the box on
the 5th -- you're on the 5th floor at that time,
correct?

A.   Yes, we just made it via the stairwell, so myself
and Jimmy Leonard.  I remember some fire doors
being shut, so we proceeded forward down the

hallway.  I remember going in.  I don't know if
you know the layout of the building, but there
was a -- there's an open atrium, and we just
tried to -- now, we, kind of, had -- we have to
find it.  I do remember the sound of the
sprinklers, the smoke condition.  And it was an
eerie smoke we actually studied in our books for
promotional exams.  It was like a lightened lazy
smoke.  That means, I knew the sprinklers were
doing their work.  So, I knew we had a fire.
Now, we have to get to it.

        So, the ladder companies, we don't have --
we carry hand tools, so we force entry.  We
basically work with the primary engine company in
order for them to find the fire.  So, that's what
we were doing.

        We ended up forcing a door more towards the
atrium side of the office building at that time.
We entered the building, and it was just a hunt.
We did have thermal imagery.  It was a bank-down
smoke condition.  We're trying to find the fire,
and I believe what I recall, Engine 5 came up,
and they accessed another door.  And they have --
what we call is a -- they had a fire hose.  And I

```
            think they were in the area first, and we met

            them there at the origin, or at least where the

            sprinkler activation was.

   Q.   Okay.  When you said -- you had to use force to

        enter the room in which the fire had started, is

        that --

   A.   -- yes, sir, we have a -- yup.  We had -- I

        believe we used a Halligan.  It's a tool.  It's

        basically like a hybrid crowbar, and we have a

        flathead.  That's our custom tools.  And we try,

        before we pry.  The door was locked, and we just

        had to bolt force the door to gain entry.

   Q.   Did you and Firefighter Leonard enter the room

        after you forced it open?

   A.   We did, yes, sir.

   Q.   Can you describe what you observed upon entering

        that room?

   A.   Dark, smoke condition.  I could hear the

        sprinklers, I remember that.  It was very dark.

        I believe we did a left -- if my memory serves me

        correctly, I think we did a -- if I'm facing what

        we call is a left-hand search, so we put our left

        side of the body onto the closest wall, because

        the sensors are -- most of them are gone at that
```

point, so we have to rely on feeling.  We search

the wall, and then we came across the fire scene.

Q.  Tell me what you observed at the fire scene.

A.  I just remember it being a cubicle.  I remember

it being a cubicle in the vicinity towards the

window and that sprinkler head that was

activated, I believe, which was one, was right

over the fire location being the most charred

area in the room.

Q.  Did you observe anything on fire?

A.  You know, I don't recall I did.  I'm trying to

remember hard.  I just don't remember.  I don't

recall.

Q.  But you observed -- you identified the fire scene

area as being in a cubicle in that room?

A.  Yes, sir.

Q.  Did you have any discussions with Captain Lentini

that evening into the early morning hours about

the fire?

A.  I believe I did.  I must have.  I don't know the

exact details of it.

Q.  Did you have any discussions about what may have

caused the fire with Captain Lentini or anyone

else on the Quincy Fire Department?

# EXHIBIT 7

Volume:  1

Pages:  1-15
Exhibits: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO.  1:18-CV-12136

**********************************

THE NETHERLANDS INSURANCE
COMPANY, as subrogee of
GCP CROWN COLONY, LLC 1031 LLC and
MF CROWN COLONY 1031 LLC, and
LIBERTY MUTUAL FIRE INSURANCE COMPANY
as subrogee of ONEX YORK HOLDINGS
CORP., d/b/a CARE WORKS MANAGED CARE
SERVICES f/k/a MCMC LLC,
          Plaintiffs,

V.

HP INC. and INSIGHT DIRECT USA,
INC.,
          Defendants.

**********************************

DEPOSITION OF FIREFIGHTER JAMES LEONARD
Friday, February 12, 2021
VIA ZOOM
Commencing at 10:31 a.m.

Taken on behalf of the Plaintiff before
Isolde von Handorf-Choquet, a
Professional Shorthand Reporter

A.   On the truck?

Q.   Yes.

A.   At the time, it was Lieutenant Palaza,

     Firefighter Stephen Wells and myself.

Q.   What did you do when you arrived at the fire

     scene at 300 Crown Colony Drive in Quincy on

     April 25th, 2017?

A.   Normally, we would get off, go to the fire panel

     to see why the alarm is going off.  And that

     tells us what is happening.  Either it's water

     flow, smoke detectors, what floor it might be on.

     And then from there, we go to that location that

     the panel tells us what's going on.

Q.   Can you tell us what happened after you did that

     preliminary investigation?

A.   Well, according to the panel, it said it was a

     water flow and alarms going off on the 5th floor.

     So, Lieutenant Palaza and myself made our way to

     the 5th floor.  When we got to the 5th floor,

     opened the stairwell door, there was a smoke

     condition on the floor.  And his role as

     lieutenant, he made a further announcement of

     saying, "We need more help here.  We have a smoke

     condition."  So, he what we call "struck the

box," which that alerts our fire alarm to bring more personnel to the scene, because we have a potential fire, indicating a smoke condition. So, with that, our SOP is strike the box, get more help there.

With further investigation of the floor, we went down the hallway to try to locate where the smoke detector was.  It was at the other end of the hallway, which are the inner doors.  We forced the inner doors and made our way into the office where there was more of a smoke condition.

Q.   Okay.  Did any other firefighters join you and Lieutenant Palaza on the 5th floor?

A.   Yes.  In response to the initial alarm, there was Engine Company 5, and that was Lieutenant Keith Lentini and Firefighter Barry that were with us.

Q.   Did you and Lieutenant Palaza identify the room where the fire had started?

A.   Well, eventually, like I said, we forced the door into the office and made our way back towards where the actual fire was.

Q.   Okay.  Can you tell me what you observed upon entering that room?

A.   Well, like I said, it was an office area.  It was
     smokey condition.  We made our way almost kind of
     back to the way we came, picture like a
     rectangle, so we went back towards where the
     smoke was.

Q.   Okay.  Did you observe anything on fire while you
     were in the room investigating the fire or
     responding to the fire?

A.   Yeah, there was like a table, plastic and
     whatever burning on a table.

Q.   Did you see any printers in that area?

A.   Yeah, on the table, there was, like I said, it
     was a melted mass of plastic, I guess, determined
     to be a printer.  I mean --

Q.   Okay.  Did you see that printer -- was that
     printer on fire when you observed it?

          MS. DOUBLEDAY: Objection.

Q.   You can answer the question.

A.   Yeah.  Like, I guess it was on fire.  That's what
     was producing the smoke and whatever.

Q.   Okay.  Did you observe Captain Lentini remove
     that printer from where it was located and bring
     it toward Firefighter Barry?

          MS. DOUBLEDAY: Objection.

A.    I believe -- (deponent's internet is breaking

      up.)

Q.    Can you say that one more time, Firefighter

      Leonard?

A.    From my understanding, it was just a small window

      there they were trying to break.  They were

      trying to release some of the smoke within the

      building.

Q.    Was it --

A.    -- the internal ventilation couldn't handle it,

      or whatever, so usually our standard method is to

      try to break a window to either open a window,

      break a window.  In that kind of office building,

      for the most part, they're fixed windows, so

      they're trying to find a small window.

Q.    Okay.  I think that's all the questions I have

      for you, Firefighter Leonard.  Thank you very

      much.  Attorney Doubleday may have some questions

      for you.

           MS. DOUBLEDAY: I do not have any questions,

      so thank you very much for your time.

           (Whereupon the deposition concluded at

      10:49 a.m.)

# EXHIBIT 8





# EXHIBIT 9





# EXHIBIT 10



# EXHIBIT 11



## QUINCY POLICE DEPARTMENT
*QUINCY, MA*

# CAD Incident Report #17019263

### Incident Information

| Incident # | Incident Date | Call Taker |
|---|---|---|
| 17019263 | 04/26/2017 01:16:03 | b3808 |
| **Incident Type** | **Description** | **Priority** |
| 134 WORKING FIRE | STRIKING A BOX | 2 |
| **Ems Level** | **Alarm Level** | **Modified By** | **Modified Date** |
| | | b6189 | 04/26/2017 02:49:38 |

### Event Information

| Municipality | | Business Name |
|---|---|---|
| 1 QUINCY | | MCMC |
| **Fire Box** | | **RA** |
| 3322 | | 1550 |

| Correct Location |
|---|
| MCMC / 300 CROWN COLONY DR |

| Street # | Street Name | Apartment # | Cross Street |
|---|---|---|---|
| 300 | CROWN COLONY DR | | |

| Near | Landmarks | Additional |
|---|---|---|
| CONGRESS ST AND CONGRESS ST | MARRIOTT HOTEL | |

### Reporting Person

| RP Name | RP Phone | How Received |
|---|---|---|
| QFD | | FIR |
| **RP Address** | **Closed By** | **Date Closed** |
| | b3759 | 04/26/2017 02:19:35 |

## Incident Types

| Dispatch Class | Incident Type |
|---|---|
| AMBULANCE | |
| FIRE/RESCUE | |
| POLICE | WORKING FIRE |

## Note(s)

| Note Type | Entered By | | Note |
|---|---|---|---|

**LMIC3927**

| | | User ID | |
|---|---|---|---|
| CALL-TKR | 04/26/2017 01:16:39 | b3808 | smoke situation |
| CALL-TKR | 04/26/2017 01:17:32 | b5980 | QFD making entry. |
| LOC CHG | 04/26/2017 01:18:28 | b3808 | FROM: (1) 300 CROWN COLONY DR FL 5 TO (1) MCMC / 300 CROWN COLONY DR FL 5 |
| CALL-TKR | 04/26/2017 01:18:28 | b3808 | burglar alarm called in at 0116 hours |
| TYPE CHG | 04/26/2017 01:27:21 | b5980 | FROM: FIRE/ALM TO WORKING FIRE |
| CALL-TKR | 04/26/2017 01:27:21 | b5980 | Electrical fire for computer. |
| TYPE CHG | 04/26/2017 01:27:21 | b5980 | POLICE FROM: FIRE/ALM TO WORKING FIRE |
| CALL-TKR | 04/26/2017 01:33:59 | b5980 | Keyholder Paul Gilist notified 781-983-5310, tranferred to QFD. |
| LOC CHG | 04/26/2017 02:19:32 | b3759 | FROM: (1) MCMC / 300 CROWN COLONY DR FL 5 TO (1) MCMC / 300 CROWN COLONY DR |
| INFO | 04/26/2017 02:19:57 | b3759 | extinguised, QFD to handle |
| CALL-TKR | 04/26/2017 02:48:18 | b6189 | Notification text/email sent out. |

## Officers and Units

| CAD Units | | | |
|---|---|---|---|
| Agency Name | Unit ID | Personnel Id | Officer Name |
| QUI-PD | 774 | 4372 | MCKIM, R. .JR |

## Unit Statuses

| CAD Units | | | | | |
|---|---|---|---|---|---|
| Unit ID | Status | Date/Time | Avail? | Location | Disp ID |
| 774 | RESP | 01:17:10 | N | | b5980 |
| 774 | ONLOC | 01:20:01 | N | | b5980 |
| 774 | CLEAR | 02:19:35 | Y | | b3759 |

**LMIC3928**

## Dispositions

| Dispositions | | | | |
|---|---|---|---|---|
| Type | Disposition | Incident Report? | Accident Report? | Due By |
| POLICE | (SER) SERVICED | | | |

LMIC3929