UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 1:18-cv-12136-PBS

|  |  |
|---|---|
| THE NETHERLANDS INSURANCE COMPANY as subrogee of GCP CROWN COLONY, LLC and LIBERTY MUTUAL FIRE INSURANCE COMPANY as subrogee of ONEX YORK HOLDINGS CORP. d/b/a CARE WORKS MANAGED CARE SERVICES f/k/a MCMC LLC, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| HP, INC. and INSIGHT DIRECT USA,INC., | ) ) ) |
| Defendants. | ) ) ) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE PLAINTIFFS' EXPERTS EDWARD J. NOONAN AND MATTHEW M. ELLIOTT

This subrogation case arises out of fire that occurred during the overnight hours of April 25, 2017, in an office leased by Onex York Holdings Corp. ("Onex") in Quincy, Massachusetts. Onex's office and other portions of the building sustained smoke, fire, and water damage. Plaintiffs believe that the fire started in an HP 4250n printer (the "4250n") that was situated on a cubicle desk along with a second printer (the "p3015") and the power cords for the two printers. Notably, the 4250n and the p3015 had been moved into that cubicle just hours before the fire after having been used without problem for years. The defendants' investigation revealed that the fire resulted from arcing of the power cord running to the p3015. It is the defendants' position that the power cord may have been damaged during the move, ultimately causing the cord to arc and start the fire.

Plaintiffs, however, insist that the 4250n caused the fire. They assume that because firefighters responding to the fire found the 4250n *on* fire, it must have *caused* the fire. Plaintiffs have sued HP, Inc. ("HP") and the seller of the 4250n, Insight Direct USA, Inc. ("Insight," collectively with HP, the "defendants"), to recover the damages paid to their insureds. Plaintiffs are incorrect, however, and the expert opinions supporting their theory are not based on reliable methodology. Because the Plaintiffs' expert opinions fail to comply with the requirements of Fed.R.Evid. 702, they must be excluded from trial in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

## FACTUAL BACKGROUND

### I.       The fire originated in a damaged power cord

Approximately five hours before the fire, an Onex employee, Jin Lem, moved the 4250n and the p3016 from another part of the office into the cubicle where the fire ultimately started. Onex had purchased the 4250n in 2007, and it purchased the p3015 in 2013. Both printers had been used for years without incident and neither printer had needed repairs. After moving the printers into the cubicle, Lem plugged them in, ran test prints, and then left the printers in standby, or sleep, mode before leaving the building for the night. The fire started about five hours later while the building was unoccupied and the printers were not in use.

An investigation by defendants' experts, Timothy Myers and Donald Galler, revealed that the fire started from the power cord running to the p3015. By viewing photographs of the cubicle, Myers was able to ascertain the locations of the 4250n, the p3015, and the power cords at the time of the fire. *See Report of Timonty Myers* (*Exh. 4*)*.* at 11-13. Photographs of the cubicle depict the areas that were covered by the printers and power cords when the fire happened. These areas are referred to as "witness marks." *Id.* Myers was able to determine the locations of the power cords

at the time of the fire by matching the witness marks to the areas of damage on the power cords. *Id.* at 13. *Exhibit 1* shows the witness marks on the desk. *Exhibit 2* is labeled with the outlines of the printers and cords and illustrates how the witness marks were used to determine where the power cords had been located when the fire happened. As shown in *Exhibit 2*, the round, melted areas of the cord can be matched up to the witness marks next to the cubicle wall. By matching the witness marks to the power cord, Myers was able to place the area of arcing at the base of the V-shaped burn pattern. *Exhibit 3*; *Exh. 4* at 5, 11-12. Myers then examined photographs of the power cord that had been situated directly under the "V" and observed evidence of arcing. *Id.* at 19-24. Based on the type of damage observed on the cord, Myers concluded that the arcing was not the result of a fire attack, but rather, that the fire was caused *by* the arced cord. *Id.* at 19-20.

Myers' conclusion explains the timing of the fire in relation to the relocation of the printers: "Relocation of the printer could have either damaged the cord when the cord was removed from its previous location, or disturbed previously damaged strands which led to arcing at the time of the fire." *Id.* at 20. Defendants' electrical engineering expert, Galler, likewise explained:

> It is generally understood in the forensic industry that isolated arcing in the middle of a line cord…is the result of some type of mechanical damage to the outside of the cord. This can be caused by placing a heavy object on the cord (the 4250n weighs 44 pounds), pinching/cutting with a sharp object, or repeated bending in one location. These are commonly referred to as pinch points.

> Circumstantial evidence of this type of line cord failure being the cause is found in the fact that the printers operated for years without problem but were moved the night before the fire when such a mechanical disturbance may have occurred or may have inadvertently been exacerbated resulting in the arc that caused the fire.

*Report of Donald Galler (Exh. 5) at 16.*

## II.    The fire did not originate in the 4250n

The 4250n could not have caused the fire. While in "sleep" mode, the 4250n's power consumption is just 13 watts, making the possibility of a spontaneous fire extremely unlikely, if

not impossible. In addition, the 4250n is equipped with multiple redundant safety features intended to prevent a fire from occurring. Thus, for plaintiffs' theory – that the fire started in the 4250n – to be true, these multiple redundant safety features would *all* have had to fail *at the same time,* while the printer remained energized, while in sleep mode.[1] According to Galler, such a scenario is impossible from an engineering standpoint. *Exh. 5* at 4. Indeed, of the 700,000 4250n printers that HP has sold, there has been exactly one allegation – this one – that a 4250n caused a fire. *Id.* at 3.

Despite evidence pointing to the p3015's power cord as the source of the fire, and despite the impossibility of the 4250n causing the fire, plaintiffs insist they have found a unicorn – the one printer out of 700,000 sold that managed to evade the multiple redundant safety features and catch fire in sleep mode. Apparently finding it purely coincidental that (a) the printers with *no* history of repairs or maintenance issues were moved to the cubicle just hours before the fire, and (b) the "V" burn pattern on the cubicle wall was immediately adjacent to the area of arcing on p3015's power cord, plaintiffs continue to insist that the fire started inside the 4250n. To be fair, plaintiffs' theory did not come out of thin air. The 4250n was on fire when firefighters arrived at the scene, and plaintiffs assumed that because the 4250n was *on* fire, it must have *caused* the fire. The problem is, plaintiffs and their experts adopted this theory before conducting any investigation and have continued to persist in this theory even when the evidence has shown otherwise.

### III.    Plaintiffs' Experts Did Not Utilize Reliable Methodologies

#### a.    Noonan assumed that the fire originated in the 4250n before he visited the fire scene, and he took no steps to determine whether his assumption was correct

Plaintiffs retained two experts, Edward J. Noonan and Matthew M. Elliott, to support their theory of how the fire started. Noonan visited the fire scene on April 28, 2017, three days after the

---

[1] Plaintiffs have noted that there was significant damage inside the 4250n. This is explained by the fact that when the fire started, the temperature in the office rose significantly, causing the 4250n's cooling fan to activate. The fan, which blows air into the printer, would have blown highly conductive soot onto the circuit board, causing the damage.

fire. *Deposition of Edward Noonan (Exh. 6)* at 22:21-24. At the time of his visit, the 4250n and

p3015 had been moved into a trailer outside the building. *Id.* at 24:24-25:2. Noonan photographed

the cubicle. *Id.* at 31:9-14. The power cords for the two printers were still on the desk. *Id.* at 26:13-

16. Noonan also spoke with Lem for about 10 minutes. *Id.* at 23:1-10. Lem told Noonan that he

had placed the two printers into service the evening before the fire. *Id.* at 24:4-10.

Other than conducting a brief visual examination, Noonan did not inspect the 4250n or the

p3015. *Id.* at 26:17-22, 34:9-23. He conducted no inspection of the power cords. *Id.* at 35:3-4.  He

did not take any steps to educate himself about the 4250n. *Id.* at 28:5-8. At his deposition, he

testified that he could not describe the electrical components of the 4250n, nor could he describe

the 4250n's safety components or the materials of which it was constructed. *Id.* at 28:9-17.

Despite conducting no investigations, inspections, or tests, Noonan concluded that the fire

originated in the 4250n. *Id.* at 29:3-9.[2] His opinion was based on: (1) responding firefighter Keith

Lentini's deposition testimony that he found the 4250n on fire (*id.* at 29:11-15); (2) the fact that

the 4250n had sustained significant damage; (*id.* at 40:12-18); and (3) the burn patterns in the

cubicle. *Id.* at 40:14-24, 59:14-21. Noonan admitted, however, that when he visited the scene of

the fire, he was "really there to preserve the evidence, **so I may have made a preliminary thought**

**determination for myself without any further electrical engineering that would be necessary**

**to confirm that.**" *Id.* at 41:2-6 (emphasis added).[3] Noonan also admitted that he never considered

arcing of the p3015's power cord as a possible cause of the fire. *Id.* at 45:8-12. Instead, he "just

[went] back to my initial scene investigation where I viewed the printer and where it would have

been located and the significant damage that I saw within the printer." *Id.* at 45:14-17. In sum,

---

[2] Noonan testified that he did not have an opinion as to the *cause* of the fire. *Noonan Depo.* at 37:17-23.
[3] Noonan testified that he did attend one evidence exam of the 4250n, but the examination stopped when the engineers started to take the printer apart, as they believed they may have to put other parties on notice. In any case, Noonan testified that he did not have any role in the evidence exam. *Noonan Depo.* at 41:10-42:19.

Noonan assumed from the start the fire originated in the 4250n, and he took no steps to test his hypothesis.

Noonan's conclusions are not based on reliable data or methodology.  Noonan's first basis for concluding that the fire originated in the 4250n was his review of Lentini's that he found the 4250n on fire. *Exh. 6* at 29:10-15. However, Noonan could not specify what actions, if any, Lentini took to investigate the fire (*id.* at 38:23-39:4), he was unfamiliar with Lentini's knowledge of fire investigations (*id.* at 39:5-10), and he admitted that Lentini was not familiar with NFPA 921.[4] *Id.* at 39:11-15 As Lentini stated at his deposition, "What is 921? I don't know what that number is." *Deposition of Keith Lentini (Exh. 7)* at 28:24. Further, Lentini testified that he did not reach any conclusion about the cause of the fire (*id.* at 15:11-13), and he testified that his only conclusion about the origin of the fire was, "[t]hat there was a printer on fire when I got in the immediate vicinity of the smoke." *Id.* at 15:9-10. Thus, while Lentini had observed that the 4250n was *on fire,* he never investigated the origin or cause of the fire.

Noonan also assumed that because the 4250n sustained significant damage, the fire must have originated there. Yet, Noonan admitted that he took no steps to inform or educate himself about the 4250n, as required under NFPA 921. *Exh. 6* at 27:20-28:8. He could not describe the electrical components, safety features, or materials in the 4250n. *Id.* at 28:9-17. Instead, Noonan simply looked inside the printer for about 10 minutes, observed melting, soot, and charring, and assumed, based on his visual inspection, that the fire had started there. *Id.* at 33:16-34:20. At the same time, though, Noonan admitted that the degree of damage to an appliance is not an adequate indication of origin. *Id.* at 35:14-19. In other words, Noonan admits that the second basis for his conclusion –that the 4250n sustained significant damage – does not necessarily mean anything.

---

[4] As discussed below, NFPA 921 is the industry standard for conducting fire and explosion investigations.

Noonan's final reason for identifying the 4250n as the origin of the fire is the presence of burn patterns on the cubicle desk and wall. However, it is undisputed that the 4250n was not the only object on the desk at the time of the fire, nor was it the only item on desk to sustain fire damage. As Noonan acknowledges in his report, also situated on the desk were the p3015, a box containing paper or checks, and the power cords running to each of the two printers. *Noonan Report* at 5, 8-9. This included the power cord to the p3015 that arced, and which was situated directly adjacent to the "V" pattern in the cubicle wall. Nowhere does Noonan explain why he attributes the "V" pattern to the 4250n and not the arced cord, which was situated closer to the cubicle wall. Moreover, Noonan admitted that he did not make any observations about the burn patterns in the cubicle, stating at his deposition, "[O]ther than they were visible, and I photographed them…I really didn't give it much thought other than just photographing the burn patterns." *Exh. 6.* at 35:20-36:2. Finally, Noonan testified that he relied on Lentini's deposition testimony, but Lentini stated that he found the 4250n on the floor, not the desk. *Exh. 7* at 24:3-5 ("Q: Where on the desk was the printer located? A: I thought it was on the floor. My recollection was, it was on the floor below the desk.") Noonan's reliance on both the "V" pattern and Lentini's testimony cannot be reconciled, and nowhere in his report does Noonan attempt to do so.

b. **Elliott cannot identify the components of the printer that failed or malfunctioned, and he is unable to explain how the printer's multiple redundant safety features failed, as required by NFPA 921**

Plaintiffs have proffered Matthew Elliott, an electrical engineer, to testify that the 4250n was the cause of the fire. In his report, Elliott admits that "a specific component failure or heating connection (NFPA 921- Chapter 9) could not be identified due the extent of damage" to the 4250n. *Report of Matthew Elliott (Exh. 8)* at 9; *Deposition of Matthew Elliott (Exh. 9)* at 31:7-11. Despite

his admitted inability to identify a component failure, he concludes that fire occurred as a result of a manufacturing defect in the 4250n. *Exh. 8* at 9.

There are several problems with Elliott's opinion. First, as he admits, he cannot identify what that alleged component failure was, or how that unidentified failure could cause enough heat to start a fire. *Exh. 8* at 9. *See also Exh. 9* at 31:7-11. He could not state whether the defect was related to manufacturing or materials. *Exh. 9* at 41:11:21. Failure to identify the component that failed violates NFPA 921, which requires an investigator to test exemplar appliances "to establish the validity of the proposed ignition scenario. If the ignition scenario requires the failure or malfunction of one or more appliance components, this can also be tested for validity on the exemplar." *Exh. 5* at 18; NFPA 921-2017 26.4.6. Second, Elliott failed to account for the 4520n's multiple redundant safety features or to explain how they all could have failed at the same time, thus failing to prevent the fire. *See Exh. 5* at 18; NFPA 921-2017 19.7.3 ("Safety devices and features are often engineered and built to prevent fires from occurring. The cause determination will need to account for the actions of safety devices."). Elliott brazenly admits he did not.

### c. Elliott's method of testing the 4250n by setting it on fire with a butane torch does not prove that the 4250n is capable of setting fire on its own

Elliott's methodology is even more concerning. In an attempt to prove that the 4250n caused the fire, **he set fire to the printer using a butane lighter torch**. *Exh. 8* at 5. This experiment, such as it is, proves nothing, except the fact that the 4250n is capable of catching fire if a butane torch is used to set it on fire. It does not prove that a printer is capable of setting fire on its own, in the absence of a butane torch. As Galler, noted in his report, butane flames reach temperatures of approximately 2600° F, and Elliott never explained how the 4250n could have reached that temperature, or what components, if any, of the 4250n are capable of reaching that temperature. *Exh. 5* at 17. Galler put it succinctly in his report:

> The problem with this procedure is that [Elliott] is trying to explain how a fire started presuming an undisclosed ignition source. The absurdity of this leads to the following erroneous analysis:
>
> 1. Investigator does not know what starts the fire
>
> 2. Therefore he uses a butane torch and lights an electrical product on fire and observes subsequent burning
>
> 3. As a result he concludes that the product is the cause of the fire

*Id.* As Galler goes on to state, using this methodology, "virtually all electrical products would easily be considered as a viable ignition source of ANY fire simply because they can be ignited by a butane torch." *Id.* Elliott's methodology did not comply with NFPA 921-2017 26.4.1.1, which requires an investigator to demonstrate "how the appliance generated sufficient heat energy to cause ignition." The 4250n does not contain a butane torch inside it. Thus, Elliot's use of the butane torch to start a fire proves nothing and does not comply with NFPA 921. Indeed, Elliott's supposed "test" is exactly backwards. He claims to prove how an electrical malfunction in the printer can start a fire, but instead, he showed how a fire can cause an electrical malfunction. Elliott thus proved the defendants' theory that an external fire damaged the printer.

### d.  Elliott's rejection of arcing of the p3015's power cord as the cause of the fire is based on conjecture and is contrary to undisputed evidence

Elliott rejects arcing of the power cord to the p3015 as the cause of the fire, but he is unable to explain this opinion without resorting to conjecture. According to Elliott, for arcing in the cord to cause the fire, the arcing would have to have been sustained. This could not have happened, he states, because the arcing caused a circuit breaker to trip, and this cut off power to the cord. *Exh. 9* at 48:20-49:16. The glaring error with this theory is that there is no evidence of any circuit breakers tripping. To the contrary, plaintiffs' own expert, Noonan, visited the scene and observed that no circuit breakers had tripped. *Report of Edward Noonan (Exh. 10)* at 7-8, Photo No. 5; *Exh. 6* at 51:23-52:1 (he "did not see any" tripped circuit breakers at his visit to the fire scene). Elliott

admitted this in his report and at his deposition. *Exh. 9* at 48:1-6; 51:7-9; *Exh. 8* at 7, 8. The fact that no circuit breakers had tripped was confirmed by Lem, who testified that he arrived at the office at 7:30 a.m. on the date of the fire. *Deposition of Jin Lem (Exh. 11)* at 8:12-13. Lem testified that he was unaware of any circuit breakers tripping. *Id.* at 36:24-37:1. Lentini, the firefighter, testified that he never checked to see if any circuit breakers had tripped. *Exh. 7* at 40:13-16.

Having no evidence of a tripped circuit breaker, Elliott simply invents a tripped breaker, speculating that, maybe a circuit breaker had tripped and either nobody noticed it because the handle was not "move[d] completely to the center position" or perhaps someone re-energized the circuit sometime after the fire. *Exh. 9* at 50:1-21. However, he admitted that he has no evidence that either scenario ever occurred. *See id.* at 50:9-10 (admitting that inspecting breakers for tripping "could have been verified") and *id.* at 50:22-51:1 (admitting he has no evidence that anyone reset a tripped breaker). Noonan likewise surmises that someone could have reset a tripped breaker, but he too admitted that he never bothered to investigate whether this had occurred. *Exh. 6.* at 52:5-9.

Elliott also admitted that there is nothing in NFPA 921 or any generally accepted peer reviewed publication that states that one can determine whether a circuit breaker tripped by looking at arcing. *Exh. 9* at 54:7-15. He also admitted that arcing can occur without tripping a circuit breaker. *Id.* at 56:13-18. In sum, then, Elliott's rejection of cord arcing as a cause of the fire is premised on pure speculation that a circuit breaker "must have" tripped, but (a) the only direct evidence is that no circuit breakers were observed as having tripped and (b) arcing does not necessarily cause a circuit breaker to trip. Therefore, Elliot's rejection of arcing of the p3015's power cord as the cause of the fire is not based on any facts in the record, nor is it based on any scientifically valid principles. As such, it must be rejected in accordance with NFPA 921-2017 4.3.6 ("If the hypothesis is refuted or not supported, it should be discarded.").

# ARGUMENT

**I.**   **Expert testimony must be the product of reliable principles and methodology and based on sufficient facts or data**

Rule 702 of the Federal Rules of Evidence defines who may testify as an expert:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Federal Rule of Evidence 702 assigns to the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Smith v. Dorchester Real Estate, Inc.,* 732 F.3d 51, 64 (1st Cir. 2013), *citing Daubert*, 509 U.S. at 597. In *Daubert,* "the Supreme Court established four factors for the trial court to weigh in assessing the admissibility of expert scientific evidence under Fed. R. Evid. 702. These factors are '(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *Hartford Ins. Co. v. Gen. Elec. Co.,* 526 F. Supp. 2d 250, 257 (D.R.I. 2007).

In accordance with *Daubert,* the District Court is tasked with preforming a gatekeeping function to determine whether the reasoning or methodology underlying an expert's testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Cortes-Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 188 (1st Cir. 1997),

citing *Daubert*, 509 U.S. at 592-93 and *United States* v. *Sepulveda*, 15 F.3d 1161, 1183 (1st Cir. 1993) "The objective of [*Daubert*'s gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).

*Daubert* requires the Court to "determine whether an expert's testimony is sufficiently reliable…whether the testimony is based on sufficient facts or data; whether the testimony is the product of reliable principles and methods; and whether the expert has reliably applied the principles and methods to the facts of the case." *United States v. Phillipos,* 849 F.3d 464, 471 (1st Cir. 2017), *citing* Fed. R. Evid. 702 and *Smith,* 732 F.3d at 64 (internal quotation marks omitted). "In other words, Rule 702 requires the court to 'ensure that there is an adequate fit between the expert's methods and his conclusions.'" *Zeolla v. Ford Motor Co.,* Civil Action No. 09-40106-FDS, 2013 U.S. Dist. LEXIS 10462, at *6-7 (D. Mass. Jan. 24, 2013), *quoting Samaan v. St. Joseph Hosp*., 670 F.3d 21, 32 (1st Cir. 2012).

"[A]n expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996), quoting *Van Brode Group, Inc.* v. *Bowditch & Dewey*, 36 Mass. App. Ct. 509, 633 N.E.2d 424, 430 (Mass. App. Ct. 1994). "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998), *quoting*

*GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997). "An opinion based solely on speculation is without probative value." *Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 103, 520 N.E.2d 1315, 1318 (1988).

## II.   Fire investigations must be conducted in accordance with the scientific method and NFPA 921

The National Fire Protection Association's Guide for Fire and Explosion Investigations, or NFPA 921, represents the industry standard of care for fire and explosion investigations. As the Court explained in *United States v. Hebshie,* 754 F. Supp. 2d 89 (D. Mass. 2010), "NFPA 921 is promulgated by the Technical Committee of the National Fire Protection Association ("NFPA"), the largest fire protection organization in the world and is widely accepted as the standard guide in the field of fire investigation." *Id.* at 109 n.39 Numerous courts in this circuit and across the country have recognized NFPA 921 as the industry standard for conducting fire investigations.[5] In fact, courts routinely exclude an expert's testimony under *Daubert* for failure to comply with NFPA 921. *Id.* at 126-27, citing *Chester Valley Coach Works v. Fisher-Price, Inc.,* No. 99 CV 4197, 2001 U.S. Dist. LEXIS 15902, 2001 WL 1160012 (E.D. Pa. Aug. 29, 2001) and *Bryte ex*

---

[5] *Bryte ex rel. Bryte v. Am. Household, Inc.,* 429 F.3d 469, 478 (4th Cir. 2005); *Presley v. Lakewood Eng'g*, 553 F.3d 638, 645 (8th Cir. 2009);*Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057-58 (8th Cir. 2005); *Philadelphia Indem. Ins. Co.* v. *BMW of N. Am., LLC*, No. CV-13-01228-PHX-JZB, 2015 U.S. Dist. LEXIS 131218, at *18 (D. Ariz. Sep. 29, 2015); *Allstate Ins. Co.* v. *Ford Motor Co.*, No. CV-08-2276-PHX-NVW, 2010 U.S. Dist. LEXIS 48485, at *13 (D. Ariz. Apr. 20, 2010); *Glassman* v. *Home Depot USA, Inc.*, No. 2:16-cv-07475-ODW-E, 2018 U.S. Dist. LEXIS 122842, at *10-11 (C.D. Cal. July 20, 2018); *American Nat'l Prop. & Cas. Co.* v. *Electrolux Home Prods.*, No. 11-CV-1340 JLS (NLS), 2013 U.S. Dist. LEXIS 205865, at *16 (S.D. Cal. May 1, 2013); *United States* v. *Idaho County Light & Power Coop. Ass'n*, No. 3:17-cv-00391-CWD, 2020 U.S. Dist. LEXIS 22030, at *18-19 (D. Idaho Feb. 7, 2020); *Occidental Fire & Cas. of N.C.* v. *Intermatic Inc.*, No. 2:09-CV-2207 JCM (VCF), 2013 U.S. Dist. LEXIS 116303, at *4-5 (D. Nev. Aug. 15, 2013); *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co,* 150 F. Supp. 2d 360, 366 (D. Conn. 2001); *Werth v. Hill-Rom, Inc.,* 856 F. Supp. 2d 1051, 1060 (D. Minn. 2012); *Travelers Indem. Co. v. Indus. Paper & Packaging Corp.,* No. 3:02-CV-491, 2006 WL 1788967, at *4-5 (E.D. Tenn. June 27, 2006); *Tunnell v. Ford Motor Co.,* 330 F. Supp. 2d 707, 725 (W.D. Va. 2004); *TNT Rd. Co. v. Sterling Truck Corp.,* No. 03-37-B-K, 2004 U.S. Dist. LEXIS 13463, at *9, *17-18 (D. Me. July 19, 2004)*; Russ v. Safeco Ins. Co.,* No. 2:11cv195-KS-MTP, 2013 U.S. Dist. LEXIS 42333, 2013 WL 1310501, at *24 (S.D. Miss. Mar. 26, 2013); *Schlesinger v. United States,* 898 F.Supp.2d 489, 504 (E.D.N.Y. 2012); *Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.,* 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002); *Hartford Ins. Co. v. Gen. Elec. Co.,* 526 F. Supp. 2d 250, 257 (D.R.I. 2007); *Chester Valley Coach Works v. Fisher-Price, Inc.,* No. 99 CV 4197, 2001 U.S. Dist. LEXIS 15902, 2001 WL 1160012, at *8-13 (E.D. Pa. Aug. 29, 2001); *Adams v. J. Meyers Builders, Inc.,* 671 F. Supp. 2d 262, 273 (D.N.H. 2009).

*rel. Bryte v. Am. Household, Inc.,* 429 F.3d 469, 478 (4th Cir. 2005). A fire investigator's testimony should be excluded where the expert "failed to follow the scientific method set out in NFPA 921 where he 'approache[s] his fire investigation with a hypothesis already in place, and never seriously considered other possible causes of the fire.'" 754 F. Supp. 2d at 105, quoting *Chester Valley Coach Works,* 2001 U.S. Dist. LEXIS 15902 at *5-7.

### III. Noonan's opinions regarding the origin of the fire must be excluded because they are not based on reliable principles and methodology, sufficient facts or data, the scientific method, or NFPA 921

Noonan's opinions are unreliable for several reasons. First, he approached this case with a hypothesis already in place and never seriously considered other possible causes of the fire, in direct violation of NFPA 921-2017 4.3.8. *See also Hebshie, supra,* at 105, *Chester Valley Coach Works, supra,* at *5-7. As he acknowledged at his deposition, "I may have made a preliminary thought determination for myself without any further electrical engineering that would be necessary to confirm that." *Noonan Depo.* at 41:2-6 (emphasis added). Noonan's determination that the fire originated in the 4250n suffers from expectation bias, which renders Noonan's conclusions scientifically invalid. As explained in NFPA 921:

> 4.3.9 Expectation Bias. Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, **the investigator(s) uses the premature determination to dictate investigative processes, analyses, and, ultimately, conclusions, in a way that is not scientifically valid.** The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.

NFPA 921-2017 4.3.9 (emphasis added). See also NFPA 921-2017 4.3.7 ("All investigations of fire and explosion incidents should be approached by the investigator without presumption as to

origin..."). He also admitted that he never considered arcing of the p3015's power cord as a possible cause of the fire, which violates NFPA 921-2017 18.5.1 (origin investigator must "attempt to identify other feasible origins, and to keep all reasonable origin hypotheses under consideration until sufficient evidence is developed to justify discarding them.") and NFPA 921-201718.7 ("the failure to consider alternate hypotheses is a serious error.").

In addition, Noonan relied on the testimony of Lentini, who admitted that he conducted no investigation of the fire. An expert's reliance on another witness' flawed or inadequate investigation is grounds for exclusion of that expert's testimony. As this Court discussed in *Hebshie,* courts in the Third Circuit and Eighth Circuit have rejected expert testimony from fire investigators whose conclusions were "based...on the faulty observations and opinions of" responding firefighters. *Hebshie, supra,* at 107, *citing Weisgram v. Marley Co.,* 169 F.3d 514, 519-20 (8th Cir. 1999) and *Kozar v. Sharp Elecs. Corp.*, No. 04-901, 2005 U.S. Dist. LEXIS 49384 2005 WL 2456227, (W.D. Pa. Sept. 30, 2005). Here, Noonan relied on Lentini's deposition testimony, but Lentini did not conduct any investigation that would come close to meeting standards set under Rule 702, *Daubert,* or NFPA 921. As Noonan admitted at his deposition, he he did not know what actions, if any, Lentini took to investigate the fire. Lentini himself testified that he did not know what NFPA 921 was. Further, as Lentini testified at his deposition, he did not investigate the origin or cause of the fire at all, other than to observe that the 4250n was on fire:

> Q.    What was your conclusion about the origin of the fire?
>
> A.    That there was a printer on fire when I got in the immediate vicinity of the smoke.

*Exh. 7* at 7-10. Lentini did not conduct any further investigation, and, to his credit, Noonan does not claim that he did. Yet, this is what Noonan relied on when he identified the 4250n as the origin of the fire. *Exh. 6* at 29:16-22.

15

Noonan assumed that because the 4250n sustained significant damage, the fire must have originated there, but he also admitted that the degree of damage is <u>not</u> an adequate indication of origin. *Exh. 6* at 35:14-19. Noonan also took no steps to educate himself about the operation of the 4250n or its components or materials. *Id.* at 27:20-28:8. He conducted no tests, and his examination consisted of a 10-minute visual inspection. *Id.* at 34:18-20. To the extent his visual inspection could be characterized as an investigation (which defendants deny), it fails under *Daubert* because there was no testing, examination, experiment, or methodology that can be tested or verified. At best, Noonan could confirm that the 4250n was damaged. But as Noonan admits, under NFPA standards, the existence of damage does not establish the origin of the fire: "The degree of damage to the appliance may or may not be an adequate indication of origin." NFPA 921-2017 26.3.2.

Noonan's final reason for identifying the 4250n as the origin of the fire – the presence of burn patterns on the cubicle desk and wall – likewise fails. First, as Noonan acknowledges in his report, the 4250n was not the only object on the desk at the time of the fire, nor was it the only item on the desk to sustain fire damage. Noonan does not explain how the "V" pattern was caused by the 4250n and not the arced cord (which was situated closer to "V" pattern) or any other object on the desk. Even more problematic for Noonan, he admitted that he did not give the burn patterns "much thought":

> Q:  Did you make any observations about the fire patterns in the area
>      surrounding the two printers?
>
> A:  No, other than they were visible, and I photographed them, so I
>      really didn't – I really didn't give it much thought other than just
>      photographing the burn patterns.

*Exh. 6.* at 35:20-36:2. He took no measurements of the cubicle. *Id.* at 36:3-5.

Moreover, Noonan testified that on the one hand, he relied on Lentini's deposition testimony to support his claim that the fire originated in the 4250n, but Lentini testified that he'd

16

found the 4250n on the floor, not on top of the desk where the burning occurred. Noonan is thus relying on two conflicting pieces of information and makes no attempt to reconcile them. This is because, as Noonan admitted, he assumed from the start that the fire started in the 4250n and took no steps to ascertain whether this was true.

### IV.    Elliott's Opinions Regarding the Origin of the Fire Must Be Excluded Because They Are Not Based on Reliable Methodology

#### a.    Elliott's contention that the 4250n caused the fire is not based on reliable methodology or sufficient facts or data, and he failed to comply with the requirements of NFPA 921

There are four glaring errors in Elliott's methodology that render his opinions unreliable and inadmissible: (1) he failed to test the components of the 4250n to identify which components failed or malfunctioned; (2) he cannot identify which component or components of the 4250n failed or malfunctioned; (3) he failed to explain how the 4250n's multiple redundant safety features failed to prevent the fire from occurring; and (4) he failed to demonstrate how the 4250n is capable of generating heat of a sufficient magnitude and duration to ignite combustible material.

NFPA 921–2107 26.4.6 provides as follows:

> 26.4.6 Testing Exemplar Appliances. Exemplar appliances can be operated and tested to establish the validity of the proposed ignition scenario. If the ignition scenario requires the failure or malfunction of one or more appliance components, this can also be tested for validity on the exemplar. Where extensive or repeated testing is foreseen, the investigator will probably need more than one exemplar. **The testing should show not just that the appliance capable of generating heat, but that such heat is of sufficient magnitude and duration to ignite combustible material.**

(Emphasis added.) Here, Elliott contends that the fire resulted from some manufacturing defect in the 4250n, but as he admits, he could not identify what component or components allegedly failed. *Exh. 8* at 9; *Exh. 9* at 31:7-11. In fact, Elliott could not even state whether the 4250n's alleged defect was related to manufacturing or materials. *Exh. 9* at 41:11:21. This is because he did no

testing of the 4250n's components. This violates not only the requirements of NFPA 921, but it also fails under *Daubert* standards generally. Essentially, Elliott claims to have arrived at a conclusion – a manufacturing defect in the 4250n caused the fire – but he cannot identify what that defect is or how it failed because he did no testing. Similarly, Elliott failed explain in his report how the 4520n's multiple redundant safety features could have failed to prevent the fire, as required by NFPA 921-2017 19.7.3 ("Safety devices and feature are often engineered and built to prevent fires from occurring. The cause determination will need to account for the actions of safety devices."). This is unacceptable "ipse dixit" rejected time and again by Federal Courts.

Perhaps even more problematic, Elliott failed to demonstrate how the 4250n was able to generate heat of sufficient magnitude and duration to ignite combustible material. While Elliott was able to set exemplar 4250n printers on fire with a butane torch, a butane torch is *not* a component of the 4250n. As Galler noted, "the printer does not have a butane torch in it." *Exh. 5* at 17. As noted above, butane flames reach temperatures of approximately 2600° F, and Elliott never explained how the 4250n could have reached that temperature, or what components, if any, of the 4250n are capable of reaching that temperature. *Id.* at 17. Therefore, "igniting a product with a butane torch does not tell us whether that product can cause a fire." *Id.* Elliott's butane torch test thus fails under Rule 702 because there is not an "adequate fit between the expert's methods and his conclusions.'" *Zeolla, supra,* at *6-7. Elliott's methodology also fails to comply with NFPA 921, which requires investigators to demonstrate "how the appliance generated sufficient heat energy to cause ignition." *Exh. 5* at 17; NFPA 921-2017 26.4.1.1.

**b. Elliott's rejection of arcing of the power cord to the p3015 as the cause of the fire is based on conjecture rather than facts**

Elliott contends that arcing of the power cord to the p3015 could not have caused of the fire because a circuit breaker tripped, which then prevented sustained arcing that in his opinion

would be necessary for a fire to occur. *Exh. 8* at 8. The problem with this opinion is that there is exactly no evidence of a circuit breaker tripping. To the contrary, the only evidence is that *no* circuit breaker tripped. Thus, Elliott's theory is premised on an unproven fact, plucked from thin air, that is contrary to the facts of the case. Elliott admitted in his report and at his deposition that Noonan found no evidence of circuit breakers tripping when he visited the scene of the fire. *Exh. 9* at 48:1-6; *Exh. 8* at 7. Noonan likewise noted in his report that he conducted a visual inspection of the circuit breaker panel and found "[n]othing remarkable." *Exh. 10* at 8 and photo no. 5. Lem, who was at the fire scene within hours of the event, testified that he was unaware of any circuit breakers tripping (*Exh. 11* at 36:24-37:1), and Lentini, who responded to the fire, testified that he never checked to see if any circuit breakers had tripped. *Exh. 7* at 40:13-16.

Having no evidence of a tripped circuit breaker, Elliott simply asserts either a circuit breaker had tripped but nobody noticed it because the handle was not "move[d] completely to the center position" or that perhaps that someone re-energized the circuit after the fire. *Exh. 9* at 50:1-10. However, as he admitted at his deposition, he has no evidence that either scenario occurred. *Id.* at 50:22-51:6. Further, Noonan photographed the circuit breakers, which, according to Noonan, showed "nothing remarkable." *Exh. 10* at 8. Thus, Elliott's proposed testimony regarding the arced power cord is without probative value because it is based on conjecture and speculation from an insufficient evidentiary foundation. *See Goffredo,* 402 Mass. at 103; *Damon*, 87 F.3d at 1474.

Elliott's opinion also fails to comply NFPA 921. Elliott contends that a circuit breaker *must have* tripped because there was arcing of the power cord. However, as he acknowledged at his deposition, he is aware of no provision of NFPA 921 or any other generally accepted peer reviewed publication that states that an expert can determine whether a circuit breaker tripped by eyeballing an arc on a power cord. *Exh. 9* at 54:12-15. He also admitted that arcing can occur without tripping

a circuit breaker. *Id.* at 56:13-18. Thus, Elliott's contention that the p3015's power cord did not cause the fire is premised on the unverifiable assumption that a circuit breaker must have tripped, but (a) there is no evidence a circuit breaker had tripped and (b) arcing can occur without tripping a circuit breaker. Thus, Elliott's opinion is contrary to the evidence, relies on speculation and assumptions, is not supported by any scientific principles, and fails to meet NFPA standards. *See* NFPA 921-2017 4.3.6 ("If the hypothesis is refuted or not supported, it should be discarded.")

## CONCLUSION

Whether viewed under specific NFPA standards or the general standards for admissibility of scientific and technical expert testimony established under Rule 702 and *Daubert*, Noonan and Elliott's opinions are unreliable and must be excluded. HP, Inc. and Insight Direct USA, Inc. accordingly request that the Court exercise its gatekeeping function under Rule 702 and Daubert and exclude plaintiffs' experts Edward Noonan and Matthew Elliott.

Respectfully submitted,
Defendants, HP, Inc.., and
Insight Direct USA, Inc.,
By their attorneys,

*/s/ Elizabeth A. Doubleday*

Christopher G. Betke, BBO# 552588
Elizabeth A. Doubleday, BBO# 666693
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
cbetke@coughlinbetke.com
edoubleday@coughlinbetke.com

## <u>CERTIFICATE OF SERVICE</u>

       I, Elizabeth A. Doubleday, do hereby certify that on this 19th day of May, 2022, I filed a copy of the within documents via the ECF system.

                                                     */s/ Elizabeth A. Doubleday*

                                                     Elizabeth A. Doubleday