UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 1:18-cv-12136-PBS

|  |  |
|---|---|
| THE NETHERLANDS INSURANCE COMPANY as subrogee of GCP CROWN COLONY, LLC and LIBERTY MUTUAL FIRE INSURANCE COMPANY as subrogee of ONEX YORK HOLDINGS CORP. d/b/a CARE WORKS MANAGED CARE SERVICES f/k/a MCMC LLC,<br><br>    Plaintiffs,<br><br>vs.<br><br>HP, INC. and INSIGHT DIRECT USA, INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

In this litigation, plaintiffs contend that an HP printer with no history of problems, malfunctions, or repairs, spontaneously caught fire in the middle of the night. The printer at issue was sold in 2007 and was used for the next 10 years without incident. It was one of approximately 700,000 of the same model that were sold by HP, and, with the exception of this litigation, there have been exactly zero allegations of this model causing a fire. At the time of the incident, the printer was in sleep mode and was only receiving 13 watts of electricity. Furthermore, it was equipped with multiple redundant safety features, meaning that, for a fire to start in the printer, all of those features would not only have had to fail, but they would have had to fail at the same time. Essentially, plaintiffs have alleged the impossible.

Discovery has now concluded. The parties' experts have been deposed. As set forth below, the plaintiffs' claims must be dismissed for lack of evidence. While plaintiffs have retained experts, their experts' opinions are not based on reliable methodologies, and defendants have moved to exclude their testimony in accordance with *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Because the plaintiffs' experts must be excluded, they cannot prove their claims against the defendants. However, even if the experts' opinions are offered into evidence, they are still not sufficient. Thus, with or without expert testimony, the defendants are entitled to summary judgment in their favor.

## FACTUAL BACKGROUND

### I.       The subject fire

This subrogation case arises out of a fire that occurred in an office leased by Onex York Holdings Corp. ("Onex") in Quincy, Massachusetts. The fire occurred at approximately 1:00 a.m. when the office was unoccupied. *Quincy Fire Department Report (Exh. 4);*[1] *Deposition of Keith Lentini (Exh. 5)* at 46:10-13. Onex's office and other portions of the building sustained smoke, fire, and water damage as a result of the incident. *Exh. 4.*

Approximately five hours earlier, an Onex IT technician, Jin Lem, had moved two printers, an HP 4250n (the "4250n") and another printer, referred to as the "p3015," from another part of Onex's office into the cubicle where the fire later started. *Deposition of Jin Lem (Exh. 6) at 11:3-6.* The two printers were designed and manufactured by HP, Inc. ("HP"), and were sold to Onex's predecessor by Insight Direct USA, Inc. ("Insight," collectively with HP, the "defendants"). Both printers were older models. Onex's predecessor had purchased the 4250n in 2007, and it purchased

---

[1] The Quincy Fire Department's Report was marked as Exhibits 2 and 3 at the deposition of firefighter Keith Lentini.

the p3015 in 2013. *Exh. 7;*[2] *Exh. 6* at 12:12-13:21. Neither printer had any history of problems or otherwise needed repairs in the years leading up to the fire. *Exh. 6* at 18:8-24. After moving the printers to the cubicle, Lem plugged them in and ran test prints. *Id.* at 11:19-12:3. He then left the printers in standby, or sleep, mode before leaving the building for the night. *Id,* at 18:1-7.

The fire started about five hours later while the building was unoccupied and the printers were not in use. *Exh. 4, Exh. 5* at 46:10-13. Quincy firefighters were alerted to a fire at the property at approximately 1:00 a.m. on April 25, 2017. *Exh. 4.* Upon arrival, Lieutenant Keith Lentini entered Onex's office, which he found to be filled with smoke. *Exh. 5* at 17:15-18. He proceeded toward the cubicle where Lem had placed the two printers the previous evening and observed that a printer (later identified as the 4250n) was on fire. *Id.* at 18:3-4. Lentini unplugged the 4250n and carried it over to a colleague, who extinguished the fire. *Id.* at 18:12-16. Because Lentini observed the 4250n to be *on fire,* he believed that the fire had originated in the 4250n. *Id.* at 15:7-10. He did not have an opinion about the cause of the fire, however. *Id.* at 15:11-13. Lentini testified that he was unfamiliar with NFPA 921, which sets the standard for proper fire investigations.[3] *Id.* at 28:20-29:3. Lentini conducted no investigation into the 4250n because "in my mind, the printer was on fire, and that was what was extinguished. And that's more or less the extent of my role as a fire officer." *Id.* at 44:7-13.

Three days later, on April 28, 2017, plaintiffs' first expert, Edward J. Noonan, arrived at Onex's offices. *Report of Edward Noonan (Exh. 8).* As Noonan testified at his deposition, the

---

[2] Exhibit 7, the purchase orders for the 4250n and the p3015, were marked as Exhibit 1 at Lem's deposition. Lem testified that the purchase order dated July 26, 2007, was for the 4250n involved in the fire. *Exh. 6* at 12:23-15:8.

[3] The National Fire Protection Association's Guide for Fire and Explosion Investigations, or NFPA 921, represents the industry standard of care for fire and explosion investigations. *United States v. Hebshie,* 754 F. Supp. 2d 89, 109 n.39 (D. Mass. 2010). Courts routinely exclude expert testimony that fails to comply with NFPA 921 standards. *Id.* at 126-27; *Chester Valley Coach Works v. Fisher-Price, Inc.,* No. 99 CV 4197, 2001 U.S. Dist. LEXIS 15902, 2001 WL 1160012 (E.D. Pa. Aug. 29, 2001) and *Bryte ex rel. Bryte v. Am. Household, Inc.,* 429 F.3d 469, 478 (4th Cir. 2005).

purpose of his visit was just to "preserve the evidence," and he "may have made a preliminary thought determination" that the fire originated in the 4250n "without any further electrical engineering that would be necessary to confirm that." *Deposition of Edward Noonan (Exh. 9)* at 41:2-6. Both the 4250n and the p3015 had been moved into a trailer outside the building before he arrived at the office (*id.* at 24:22-25:2), but the power cords to the two printers were still on the cubicle desk. *Id.* at 26:13-16. Noonan was able to view and photograph the cubicle. *Id.* at 31:9-14. Noonan also spoke with Lem, who told him that he had relocated the two printers to the cubicle the evening before the fire. *Id.* at 23:20-24:14. Noonan testified that he thought that the timing of the relocation of the two printers in relation to the fire was pure coincidence. *Id.* at 51:19-22.

## II.    Plaintiffs' claims against HP and Insight

Contending that the 4250n caused the fire, Plaintiffs sued HP and Insight, alleging in their Complaint that the 4250n was defectively designed or manufactured, causing the printer to overheat, and ultimately causing the office fire. *Amended Complaint (Exh. 10)*  at ¶30. Plaintiffs have sued the defendants for negligence (Counts I, IV, VII, X); breach of warranty (Counts II, V, VIII and XI); and violation of G.L.c. 93A, §§2 and 11 (Counts III, VI, IX, and XII). *Exh. 10.* All of the plaintiffs' claims are premised on the same factual allegation: that the 4250n was defectively designed and/or manufactured and caused in the fire. *Id.*

## III.    Discovery and investigation by defendants' experts reveal that the fire did not start in the 4250n, but, rather, a damaged power cord on the cubicle desk

An investigation by defendants' experts, Timothy Myers and Donald Galler, revealed that the fire started in the power cord running to the p3015. Photographs of the fire scene indicate that, because the fire was quickly suppressed by the sprinkler activation, the area of damage was limited to a small area. *See Report of Timothy Myers (Exh. 11)* at 9-10. Photographs of the damaged cubicle

show a V-shaped burn pattern on the cubicle wall. *Id.* at 11; *Exh. 3.*[4] "V" patterns are caused by the upward and outward spread of a fire, thus indicating that, in this case, the area of origin was on the cubicle desktop, near the base of the "V." *Id.*

By viewing photographs of the cubicle desk, Myers, the defendants' origin and cause expert, was able to ascertain where the 4250n, the p3015, and the power cords were located at the time of the fire. *Exh. 11* at 11-13. Photographs of the fire-damaged cubicle show the outlines of the areas that were covered by the printers and cords when the fire happened. *Id.* at 11-12; *Exh. 1.* These outlines are referred to as "witness marks." *Id.* Myers was able to determine the locations of the power cords at the time of the fire by matching the witness marks on the desk to the areas of damage on the power cords. *Id.* at 13, 24. The first photograph (*Exh. 1*) shows the witness marks on the desk. The second photograph (*Exh. 2*) is labeled with the outlines of the printers and cords and illustrates how the witness marks were used to determine where the power cords had been located when the fire happened. As shown in *Exhibit 2*, the round, melted areas of the black power cord can be matched up to the witness marks closer to the cubicle wall. By matching the witness marks to the power cord, Myers was able to place the area of arcing at the base of the "V" burn pattern. *Myers Report* at 5, 11-12. The placement of the 4250n and the p3015 was confirmed through the deposition testimony of Lem, who had indicated at his deposition where he'd put the printers the night before the fire. *Id.* at 12. Thus, Myers was able to determine that the melted power cord belonged to the p3015. *Exh. 3.*

Myers then examined photographs of the p3015's power cord that had been situated directly under the "V" pattern and discovered evidence of arcing. *Id.* at 19-24. As shown in

---

[4] Exhibits 1 through 3, which are photographs of the cubicle where the fire occurred, were extracted from the report of Timothy Myers, which is attached hereto as *Exhibit 11*. The photographs were produced by the plaintiffs in discovery. The photograph attached as Exhibit 2 was marked up by Myers to demonstrate the placement of the two printers and the power cords. *See Exh.* 11 at 13.

*Exhibits 2* and *3*, the area of arcing was at the base of the "V." *See also Exh. 11* at 19 ("the site of the arcing damage on the cord is…near the vertex of the V-pattern on the cubicle partition.") Based on the type of damage Myers observed in the cord, Myers concluded that the arcing was not the result of a fire attack, but rather, that the fire was caused *by* the arced cord. *Id.* at 19-20.

Myers' conclusion explains the timing of the fire in relation to the relocation of the printers just hours earlier. As Myers explained, "Relocation of the printer could have either damaged the cord when the cord was removed from its previous location, or disturbed previously damaged strands which led to arcing at the time of the fire." *Id.* at 20. Defendants' electrical engineering expert, Galler, likewise explained:

> It is generally understood in the forensic industry that isolated arcing in the middle of a line cord like that shown in [the photo] is the result of some type of mechanical damage to the outside of the cord. This can be caused by placing a heavy object on the cord (the 4250n weighs 44 pounds), pinching/cutting with a sharp object, or repeated bending in one location. These are commonly referred to as pinch points.

> Circumstantial evidence of this type of line cord failure being the cause is found in the fact that the printers operated for years without problem but were moved the night before the fire when such a mechanical disturbance may have occurred or may have inadvertently been exacerbated resulting in the arc that caused the fire.

*Report of Donald Galler (Exh. 12)* at 16.

The 4250n could not have been the cause of the fire. While in "sleep" mode, the 4250n's power consumption is just 13 watts. *Exh. 12* at 3. In addition to the low level of power consumption, the 4250n is equipped with multiple redundant safety features intended to prevent a fire from occurring. *Id.* at 4. Thus, for plaintiffs' theory – that the fire started in the 4250n – to be true, the 4250n would have had to heat up to a sufficient degree to set fire in sleep mode *and* its multiple redundant safety features would all have had to fail at the same time. *Id.* According to the defendants' electrical engineering expert, Donald Galler, such a scenario is impossible from an

6

engineering standpoint. *Id.* Indeed, of the 700,000 4250n printers that HP has sold, there has been exactly one allegation – this one – that a 4250n caused a fire. *Id.* at 3. Further, plaintiffs' expert, Matthew Elliott, confirmed that he verified through the Consumer Protection Safety Commission's website that there have been no recalls of the 4250n or consumer reports of malfunction. *Report of Matthew Elliott (Exh. 13)* at 5.

In support of their contention that the 4250n caused the fire, plaintiffs and their experts have noted that the 4250n sustained significant interior damage. As plaintiffs' expert, Noonan, admits, however, that the degree of damage to an appliance is not necessarily indicative of origin. *Exh. 9* at 35:14-19; *see also* NFPA 921-2017 26.3.2 ("The degree of damage to the appliance may or may not be an adequate indication of origin."). Moreover, the interior damage is easily explained by the fact that the 4250n had a cooling fan that would have activated when the temperature in the office rose because of the fire. *Exh. 12* at 19. The fan blows inward, and in this case would have blown soot, which is highly conductive, onto the 4250n's circuit board, causing the resulting damage. *Id.*

### IV.   Plaintiffs' Persistence in the theory that because the 4250n caught fire, it must have caused the fire

Despite evidence pointing to the arced power cord as the source of the fire, and despite the impossibility of the 4250n causing the fire, plaintiffs continue to insist they have found the one printer out of 700,000 that was somehow able catch fire. As discussed in the Defendants' accompanying motion to exclude plaintiffs' experts (hereafter, the "defendants' *Daubert* motion") plaintiffs' experts must be precluded from testifying in this case because their work fails to meet the standards set out in Fed.R.Evid. 702. In the absence of expert testimony, plaintiffs cannot prove that the 4250n was defective, and as a result, their claims against HP and Insight must be dismissed. Further, even if this Court were to consider the plaintiffs' expert opinions, summary judgment is

still warranted in the defendants' favor because the plaintiffs' experts cannot demonstrate that the 4250n was defective when it left the defendants' control or that such a defect was the cause of the fire. In fact, they cannot even specify a defect in the first place.

## ARGUMENT

### I.     Summary judgment standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996). Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Coll v. PB Diagnostic Sys*., 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc*., 556 F.3d 20, 25 (1st Cir. 2009). Here, as discussed below, plaintiffs' claims against the defendants must fail for lack of evidence.

### II.    Defendants are entitled to summary judgment in their favor because the plaintiffs lack expert testimony to prove their claims

Under Massachusetts law, a plaintiff in a products liability case must prove a "design defect or an unreasonably dangerous condition that existed when the product left the defendant's control." *King v. Pierce Mfg.,* 608 F. App'x 18, 19 (1st Cir. 2015). "The presence of a defect, in turn, typically 'cannot be inferred in the absence of expert testimony.'" *Id.* at 19-20*,* citing *Enrich v. Windmere Corp.,* 416 Mass. 83, 87-89, 616 N.E.2d 1081, 1084-85 (1993). Products liability cases require expert testimony "because the answers to highly technical and specialized questions raised

by such claims lie outside the knowledge of most lay jurors." *Morse v. Ford Motor Co.*, No. 08-11930-RGS, 2010 U.S. Dist. LEXIS 69834, at *2-3 (D. Mass. July 13, 2010); *Enrich,* 416 Mass. at 87-89 (1993). *See also Chartier v. Brabender Technologie, Inc.,* Civil Action No. 08-40237-FDS, 2011 U.S. Dist. LEXIS 115033, at *34-35 (D. Mass. Oct. 5, 2011), *citing Goffredo v. Mercedes-Benz Truck Co.,* 402 Mass. 97, 520 N.E.2d 1315 (1988) (expert testimony required where information is not within the knowledge of a layperson). Products liability claims are properly dismissed on summary judgment for lack of expert testimony. *Morse,* 2010 U.S. Dist. LEXIS 69834; *King,* 608 F. App'x 18; *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 865 N.E.2d 834 (2007); *Adelman v. Am. Honda Motor Co.,* No. 12-11051-MBB, 2013 U.S. Dist. LEXIS 159585 (D. Mass. Nov. 7, 2013) *Safety Ins. Co. v. Home Store, Inc.,* 18 Mass. L. Rep. 688 (2005).

*Enrich* is directly on point. In that case, the plaintiff alleged that an electric fan distributed by the defendant caught fire, damaging his house. 416 Mass. 83-84. The fire occurred while a friend was housesitting for the plaintiff. *Id.* at 85. The friend turned on the fan, which was sitting on a windowsill. *Id.* Soon thereafter, she heard a noise coming from the room where the fan was located. *Id.* Upon returning to the room, the friend discovered that the window containing the fan was engulfed in flames. *Id.* Responding firefighters testified at trial that the fan caused the fire, although they also acknowledged that they did not investigate other possible causes of the fire. *Id.* The plaintiff testified that he had purchased the fan new two years before the fire and that he had never repaired or altered it. *Id.*

At trial, the defendant moved for a directed verdict, which the Superior Court granted, and the Massachusetts Supreme Judicial Court affirmed. *Id.* at 84. The SJC determined, "The evidence did warrant the conclusion that the fan was the source of the fire, but there was no evidence that

some defect in the fan caused the fire or that, if such a defect existed, it was present at the time the fan was sold. The presence of such a defect cannot be inferred in the absence of expert testimony." *Id.* at 86, citing *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 708, 575 N.E.2d 734 (1991), and *Triangle Dress, Inc.* v. *Bay State Serv. Inc.,* 356 Mass. 440, 441, 252 N.E.2d 889 (1969). The Court continued, "No evidence was presented at trial regarding any defects in the fan or any knowledge attributable to the defendant regarding potential defects in the fan. In fact, the plaintiff conceded that there was no evidence of any defect at the time of purchase and described the fan's appearance when first removed from the box as 'brand new, clean and fresh.'" *Id.* at 86-87. The Court went on to explain why expert testimony was necessary: "While a plaintiff need not show the exact cause of the accident or exclude all other possible causes, he must show that there is a greater probability than not that the accident resulted from the defendant's negligence." *Id.* at 87. In the absence of such expert testimony, a jury would have to rely on "speculation and conjecture." *Id.* (citations omitted).

*Morse, supra,* is also instructive. In that case, the plaintiffs sued Ford Motor Company, alleging that their Ford Focus was defective, causing them to be involved in an accident. 2010 U.S. Dist. LEXIS 69834, at *1. Unlike the present case, the plaintiffs in *Morse* were able to identify a defective part and the malfunction that allegedly occurred: "a sudden separation of the front right wheel tie rod causing a fracture of the axle shaft upon impact" and the failure of airbags to deploy at the time of the crash. *Id.* However, plaintiffs' expert was excluded for lacking sufficient qualifications to opine on these defects. *Id.* at *2.

After plaintiffs' expert was struck, Ford moved for summary judgment, arguing that, in the absence of expert testimony, the plaintiffs could not prove their claims. *Id.* at *1-2. Citing

Massachusetts precedent[5] supporting Ford's position that plaintiffs could not succeed on their claims without expert testimony, the Court stated that expert testimony is required in product defect cases because "highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors." *Id.* at *2-3. Because the plaintiffs' claims against Ford involved a technical issue in which expert testimony was required, and the plaintiffs' expert had disqualified, the Court granted summary judgment in Ford's favor. *Id.* at *3.

Here, Noonan and Elliott must be precluded from testifying, and their reports must be excluded from trial, because neither expert employed a reliable methodology. As set forth in the defendants' *Daubert* motion, Noonan's methodology was unreliable because:

1. Noonan settled on the 4250n as the origin of the fire because it "had significantly more damage." *Exh. 9* at 29:6-12. But he then admitted that the extent of damage is not necessarily indicative of a fire's origin. *Id.* at 35:14-19.

2. Noonan conducted no meaningful investigation. For example, he did not educate himself about the 4250n, and he could not describe the 4250n's components, materials, or features. *Id.* at 28:5-24.

3. Noonan relied on responding firefighter Keith Lentini's deposition testimony as the basis for his conclusion that the fire originated in the 4250n, but Lentini conducted no investigation. Rather, Lentini simply decided that the fire originated in the 4250n because he found it on fire when he arrived at the scene. *Exh. 5* at 44:7-13.

---

[5] The Court cited *Enrich v. Windmere Corp.,* 416 Mass. 83, 87, 616 N.E.2d 1081 (1993) (fan that caught fire; *Goffredo v. Mercedes-Benz Truck Co..,* 402 Mass. 97, 103-104, 520 N.E.2d 1315 (1988) (defective door latch); *Morrell v. Precise Eng'g, Inc.,* 36 Mass. App. Ct. 935, 936, 630 N.E.2d 291 (1994) (scaffolding collapse); *Gynan v. Jeep Corp.,* 13 Mass. App. Ct. 504, 508, 434 N.E.2d 688 (1982) (placement of headlights and the illumination); *Wiska v. St. Stanislaus Social Club, Inc.*, 7 Mass. App. Ct. 813, 820-821, 390 N.E.2d 1133 (1979) (windshield glass alleged to be defective).

4. Noonan claims that he relied on burn patterns as evidence of the fire originating in the 4250n, but his conclusion ignores the fact that the 4250n was not the only item on the cubicle desk and that the arced power cord was actually closer to the "V" pattern than the 4250n. In addition, Noonan admitted that he did not give the burn patterns "much thought" other than to observe that "they were visible." *Noonan Depo.* at 35:20:36:2.

5. Noonan settled on the 4250n as the origin of the fire before he even arrived at Onex's office and conducted no meaningful investigation to test his hypothesis. As Noonan admitted at his deposition, "**I may have made a preliminary thought determination for myself without any further electrical engineering that would be necessary to confirm that**." *Noonan Depo.* at 41:2-6 (emphasis added). This violated NFPA standards. *See* NFPA 921-2017 4.3.9 (when a fire investigator's premature determination of the fire dictates the investigative processes, resulting in a conclusion that is "not scientifically valid."); NFPA 921-2017 4.3.7 ("All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin...").

Elliott's opinions are unreliable as well. As defendants point out in their *Daubert* motion:

1. Elliott set exemplar 4250n printers on fire with a butane torch, and then concluded, after setting them on fire, that the 4250n must have caused the fire. *Exh. 13* at 5, 8-9. Elliott's butane torch experiment did not comply with NFPA 921-17, which requires a fire investigator to demonstrate "how the appliance generated sufficient heat energy to cause ignition." *Exh. 12* at 17; NFPA 921-2017 26.4.1.1. The 4250n does not contain a butane torch inside it; thus, Elliot's use of the butane torch to start a fire proves nothing.

2. Elliott was unable to identify an alleged component failure in the 4250n or articulate how a failure in the printer was capable of causing enough heat to generate to start a fire. *Exh.*

*13* at 9. *See also Deposition of Matthew Elliott (Exh. 14)* at 31:7-11. Failure to do so violates NFPA 921-26.4.6, which requires an investigator to "establish the validity of the proposed ignition scenario. If the ignition scenario requires the failure or malfunction of one or more appliance components, this can also be tested for validity on the exemplar." *See also Exh. 12* at 18.

3.  Elliott failed to account for the 4520n's multiple redundant safety features or to explain how they all could have failed at the same time, thus failing to prevent the fire, in violation of NFPA 921-19.7.3 ("Safety devices and features are often engineered and built to prevent fires from occurring. The cause determination will need to account for the actions of safety devices."); *see also Exh. 12* at 18.

4.  Elliott rejected the defendants' contention that the fire was caused by the arced power cord. The basis for Elliott's opinion was that a circuit breaker had tripped, which would have stopped any prolonged arcing sufficient to start a fire. However, Elliott has *no* evidence that circuit breakers had tripped. In fact, the evidence states otherwise. *Exh. 13* at 7; *Exh. 14* at 48:1-6; *Exh. 8* at 8; *Exh. 6* at 36:24-37:1; *Exh. 5* at 40:13-16. Thus, Elliott's opinion is entirely contrary to the evidence.

Methods of fire investigations, the materials that make up a printer, the electrical components of a printer, a printer's safety features, and the manner in which an appliance can set fire, are all technical topics outside a layperson's knowledge. Therefore, to prevail on their products liability claims against HP and Insight, the plaintiffs must present expert testimony to prove that the 4250n was defective, that the defect existed when the 4250n was sold to Onex's predecessor in 2007, and that the defect or defects caused the fire. As demonstrated in the defendants' *Daubert* motion, Noonan and Elliott's opinions are not based on reliable methodology

and must be excluded. In the absence of expert testimony, a jury could not find in the plaintiffs' favor without resorting to "speculation and conjecture." *See Enrich,* 416 Mass. at 87; *Triangle Dress, Inc.,* 356 Mass. at 441. Thus, in accordance with the cases discussed above, the defendants are entitled to dismissal on summary judgment.

### III.     Plaintiffs cannot rely on the doctrine of *res ipsa loquitur*

Plaintiffs may argue that, even if their experts are excluded, they can rely on the doctrine of *res ipsa loquitur.* This argument would fail for two reasons: First, the Massachusetts Supreme Judicial Court has held that *res ipsa loquitur* does not apply in cases like this one. In *Triangle Dress,* the plaintiff's air conditioner burst into flames two hours after it was repaired by the defendant. 356 Mass. at 441. A jury found in favor of the plaintiff, and defendant appealed, arguing that the trial court should have granted its motion for directed verdict. *Id.* The SJC agreed with the defendant. It noted that the plaintiff presented no evidence of what the defendant did to the air conditioner, no expert testimony, and no direct evidence of the cause of the fire. *Id.* Because the cause of the fire was not within the jury's "general knowledge," in the absence of expert testimony, the jury was left to decide the case on "conjecture and surmise." *Id.* at 441-42 (citations omitted). Therefore, the Court held, the trial court should have granted the defendant's motion for directed verdict. In *Enrich,* the Court conceded that the defendant's fan was the source of the fire. 416 Mass. at 86. Even still, it affirmed the directed verdict in the defendant's favor and rejected the plaintiff's *res ipsa loquitur* argument because, even if the fan had been the source of the fire, the plaintiff had not demonstrated that the defendant's negligence was the cause of the fire. *Id.* at 88. Citing *Triangle Dress,* the Court held, "Res ipsa loquitur does not overcome the lack of evidence of the defendant's negligence." *Id.* at 88.

Here, in the absence of expert testimony that the 4250n had a defect, that the defect existed at the time of sale, that the defect caused the fire, and that the 4250n's multiple redundant safety

14

features all failed at the same time, a jury could not find for the plaintiff without resorting to "conjecture and surmise." The fact that the 4250n was on fire when firefighters arrived at Onex's offices is not sufficient to prove that the 4250n started the fire. This is especially true here, where, unlike the defendants in *Enrich* and *Triangle Dress*, HP and Insight have offered expert testimony of what *did* cause the fire, specifically, the p3015's arced power cord, and plaintiffs have not presented any credible evidence to refute the defendants' position.[6] In other words, the plaintiffs in *Triangle Dress* and *Enrich* had stronger cases than the plaintiffs in this case (in fact, the Court in *Enrich* conceded that the fan was the source of the fire), yet their evidence was still insufficient.

**IV.   Even if the Court were to admit the plaintiffs' experts, their claims still fail for lack of evidence**

In a products liability case such as this one, a plaintiff must "establish by a preponderance of the evidence the existence of a design defect which caused the plaintiff's injuries." *Goffredo v. Mercedes-Benz Truck Co.,* 402 Mass. 97, 103, 520 N.E.2d 1315, 1318 (1988).  In addition, the plaintiff must show that the defect existed at the time the product was sold. *Chartier v. Brabender Technologie, Inc.*, Civil Action No. 08-40237-FDS, 2011 U.S. Dist. LEXIS 115033, 2011 WL 4732940, at *26-27 (D. Mass. Oct. 5, 2011); *see also King,* 608 F. App'x at 19 (products liability claims require "proof of a design defect or an unreasonably dangerous condition that existed when the product left the defendant's control.").

---

[6] As discussed below and in defendants' *Daubert* motion, Elliott contends that the p3015's power cord could not have arced because a circuit breaker had tripped, which prevented sustained arcing sufficient to cause a fire. However, there is no evidence of a circuit breaker tripping, and, in fact, the only evidence is that no circuit breakers tripped. Thus, his theory is based on nothing more than speculation and thus has no probative value. *Goffredo v. Mercedes-Benz Truck Co.,* 402 Mass. 97, 103, 520 N.E.2d 1315, 1318 (1988)("An opinion based solely on speculation is without probative value.").

Here, plaintiffs allege in their Complaint that the 4250n was defectively designed or manufactured, causing the printer to overheat, and ultimately causing the office fire. Yet, they have not identified a defect in the 4250n that existed when it left the defendants' hands, nor have they identified a defect that caused the fire. While Elliott has opined that there was a manufacturing defect, he has not specified what that defect is, other than to state that a "fault within the [4250n's] power supply has been determined to [be] the cause of the fire." *Exh. 13* at 9. He admitted that he could not identify an alleged component failure in the 4250n, nor could he explain how the 4250n was capable of causing enough heat to generate to start a fire. *Id.* at 9; *Exh. 14* at 31:7-11. Elliott contends that there was some manufacturing defect in the 4250n, but he admitted that he "can't tell whether it's a material issue or a manufacturing issue." *Exh. 14* at 41:11:21.

Elliott's testing failed to uncover a component failure in the 4250n and it failed to identify how the 4250n could have been capable of setting fire. As discussed above, Elliott's experiment consisted of lighting a 4250n on fire with a 2600° F butane torch. Nowhere does he explain how the 4250n could get to that temperature (or any temperature capable of starting a fire) without the application of a butane torch. The fact that Elliott needed a butane torch to get the 4250n to catch fire reveals that the defendants are correct that the 4250n is incapable of setting fire on its own and therefore could not have caused the fire at Onex's office. Thus, Elliott's proposed testimony fails to prove the plaintiffs' claims against the defendants because he cannot prove that the 4250n was capable of setting fire. Indeed, Elliott's supposed "test" is exactly backwards. He claims to prove how an electrical malfunction in the printer can start a fire, but instead, he showed how a fire can cause an electrical malfunction. Elliott thus proved the defendants' theory that an external fire damaged the printer. In sum, Elliott cannot show that a defect existed in the 4250n when it left the defendants' control in 2007, or that such defect caused the fire. Therefore, even if the Court were

to consider Noonan and Elliott's testimony, summary judgment would still be warranted in the defendants' favor.

It is also worth noting that the bottom of the 4250n was completely unburned. *Exh. 14* at 44:23-45:7. This is significant because it indicates that the damage to the 4250n was caused by an external fire, not a fire within the printer. *See* NFPA 021-2017 26.5.1.5.1 ("When a plastic housing has been mostly melted and burned by exterior fire, the underside of the appliance might still be intact…"). Elliott admitted at his deposition that he was aware of this NFPA provision. *Id.* at 45:15-20. Yet, he was unable to explain how, on the one hand, the fire allegedly originated in the 4250n, but on the other hand, that the plastic housing at the bottom of the 4250n was undamaged. He attempted to explain this away by surmising that the bottom of the printer would have been burned but for the activation of the sprinkler system. *Id.* at 45:20-46:2. He also admitted that he never tested this theory. *Id.* at 46:3-47:4. Again, Elliott's opinion is not supported by fact.

Finally, while HP and Insight are not required to prove an alternate theory of how the fire started in order to avoid liability, as it happens, they were able to do so. Through an examination of the evidence and utilization of the scientific method, the defendants' experts discovered that the fire was the result of an arced power cord. As discussed in the defendants' *Daubert* motion and summarized above, Elliott disagrees, but the basis for his opinion is not founded in fact. Elliott contends that for arcing in the cord to have caused the fire, the arcing would have to have been sustained, but, in his opinion, this could not have happened in this case because the arcing caused a circuit breaker to trip, thus cutting off power to the cord. *Exh. 13* at 8; *Exh. 14* at 48:20-49:16. The problem with Elliott's argument is that there no evidence of any circuit breakers tripping. To the contrary, plaintiffs' own expert, Noonan, visited the scene and observed that no circuit breakers had tripped. *Exh. 8* at 7-8 and photo No. 5; *Exh. 9* at 51:23-52:1 (he "did not see any" tripped circuit breakers at his visit to the fire scene). Elliott admitted this in his report and at his deposition.

*Exh. 13* at 7, 8; *Exh. 14* at 48:1-6; 51:7-9. The fact that no circuit breakers had tripped was also confirmed by Lem. Lem testified that he arrived at the office at 7:30 a.m. on the date of the fire. *Exh. 6* at 8:12-13. He testified that he was unaware of any circuit breakers tripping. *Id.* at 36:24-37:1. Lentini, the firefighter, testified that he never checked to see if any circuit breakers had tripped. *Exh. 5* at 40:13-16.

Having no evidence of a tripped circuit breaker, Elliott simply invents a tripped breaker, speculating that, maybe a circuit breaker had tripped and either nobody noticed it because the handle was not "move[d] completely to the center position" or perhaps someone re-energized the circuit sometime after the fire. *Exh. 14* at 50:1-21. However, he admitted that he has no evidence that either scenario ever occurred. *See id.* at 50:9-10 (admitting that inspecting breakers for tripping "could have been verified") and *id.* at 50:22-51:1 (admitting he has no evidence that anyone reset a tripped breaker). Noonan likewise surmises that someone could have reset a tripped breaker, but he too admitted that he never bothered to investigate whether this had occurred. *Exh. 9.* at 52:5-9.

Elliott also admitted that there is nothing in NFPA 921 or any generally accepted peer reviewed publication that states that one can determine whether a circuit breaker tripped by looking at arcing. *Exh. 14* at 54:7-15. He also admitted that arcing can occur without tripping a circuit breaker. *Id.* at 56:13-18. In sum, then, Elliott's rejection of cord arcing as a cause of the fire is premised on pure speculation that a circuit breaker "must have" tripped, but (a) the only direct evidence is that no circuit breakers were observed as having tripped and (b) arcing does not necessarily cause a circuit breaker to trip. Therefore, Elliott's rejection of arcing of the p3015's power cord as the cause of the fire is not based on any facts in the record, nor is it based on any scientifically valid principles. Even if the Court were to find Elliott's testimony admissible under

*Daubert* principles, it should nevertheless reject his conclusions on the grounds that they are not supported by any facts in the record.

## CONCLUSION

To prevail in this products liability case, the plaintiffs will have to establish, through expert testimony, that the 4250n was defective, that the defect existed when it was purchased by Onex, and that the defect caused the subject fire. Plaintiffs cannot make this showing. Their experts must be excluded for failure to follow any reliable methodology and for failure to abide by NFPA 921, which establishes the recognized standards for fire investigations. In the absence of expert testimony, the plaintiffs cannot prevail on their claims. Even if their experts are permitted to testify, however, plaintiffs' claims still fail because the experts' opinions are contrary to the undisputed facts in the record and, more importantly, the experts have not been able to identify a defect that existed in the 4250n, they cannot show that such a defect existed when Onex purchased the 4250n 10 years before the fire, and they cannot identify a causal link between the alleged defect and the fire. Thus, the plaintiffs' claims fail with or without expert testimony.

Therefore, for the foregoing reasons, Defendants HP, Inc. and Insight Direct USA, Inc. request that the Court grant their motion for summary judgment and dismiss the plaintiffs' claims against them.

Respectfully submitted,
Defendants, HP, Inc.., and
Insight Direct USA, Inc.,
By their attorneys,

*/s/ Elizabeth A. Doubleday*

Christopher G. Betke, BBO# 552588
Elizabeth A. Doubleday, BBO# 666693
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050

cbetke@coughlinbetke.com
edoubleday@coughlinbetke.com

## CERTIFICATE OF SERVICE

 I, Elizabeth A. Doubleday, do hereby certify that on this 19th day of May, 2022, I filed a copy of the within documents via the ECF system.

/s/ Elizabeth A. Doubleday

Elizabeth A. Doubleday

20