THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| THE NETHERLANDS INSURANCE ) <br> COMPANY as subrogee of ) <br> GCP CROWN COLONY 1031 LLC and ) <br> MF CROWN COLONY 1031 LLC, and ) <br> LIBERTY MUTUAL FIRE INSURANCE ) <br> COMPANY as subrogee of ) <br> ONEX YORK HOLDINGS CORP. d/b/a ) <br> CARE WORKS MANAGED CARE ) <br> SERVICES f/k/a MCMC LLC, ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> HP INC. and INSIGHT DIRECT USA, ) <br> INC., ) <br>      Defendants. ) <br> ) | **DOCKET NO. 1:18-CV-12136** |

## PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE PLAINTIFFS' LIABILITY EXPERTS

## INTRODUCTION

The defendants have moved to exclude the plaintiffs' liability experts and for summary judgment based upon their claim that plaintiffs' liability experts' opinions and methodology are not reliable. The Court should deny both motions for five reasons. First, the plaintiffs' liability experts' expected testimony is admissible under Fed. R. Evid. 702 because it relevant and reliable. Second, experts in fire cases are permitted to draw appropriate inferences from the available evidence. Otherwise, it would create a rule of nonliability for product manufacturers and sellers, whose product failed and caused significant property damage or personal injury. Third, *Daubert* does not require a party to prove to the trial judge that its experts' opinions are the correct ones. Fourth, any alleged flaws in plaintiffs' experts' methodology, including NFPA

921 methodology, goes to the weight of the testimony, not its admissibility.  Here, all of the defendants' alleged criticisms of the plaintiffs' experts' opinions go to the weight of their testimony, not its admissibility.  By way of contrast, the defendants' liability experts' opinions are unreliable and wholly speculative.  Fifth, defendants' additional claim that plaintiffs' electrical engineering expert's opinions fail for lack of evidence has no merit.  Defendants simply rehash their meritless argument that his opinions lack reliability.  Unlike the defendants liability experts, the plaintiffs' electrical engineering expert actually performed testing on exemplar printers to confirm his hypotheses.

**STATEMENT OF THE FACTS**

I. **The relocation of the HP 4250n Laserjet Printer in Onex York Holdings Corp.'s fifth-floor office on April 24, 2017 before the fire.**

Five hours before the fire, Jim Lem, an Onex Holdings Corp. ("Onex") IT technician, moved an HP 4250n LaserJet printer onto the desktop in a cubicle in the middle of Onex's fifth-floor office by the windows.[1]  An HP p3015 LaserJet printer was also on the desktop.[2]  The only electronic devices in that cubicle were the two printers that were manufactured and designed by HP.[3]  There was no furniture in the cubicle.[4]  There may have been a box of paper or checks sitting on the desktop.[5]  There were a few spare toner cartridges under the desk.[6]  A sprinkler head was located in the ceiling above these printers.[7]

---

[1] SOF ¶ 1; Exhibit 22, Lem Depo. at 10:21 –12:3.
[2] SOF ¶ 1; Exhibit 22, Lem Depo. at 10:21 – 11:2.
[3] Exhibit 8, Noonan Report at 3; SOF ¶ 2.
[4] Exhibit 22, Lem Depo. at 32:3-5
[5] Exhibit 22, Lem Depo. at 32:6-8.
[6] Exhibit 22, Lem Depo. at 32:8-9.
[7] Exhibit 22, Lem Depo. at 32:24 – 33:1-5.

Onex's predecessor purchased the HP 4250n LaserJet printer in 2007 and it purchased the HP p3015 LaserJet printer in 2013 from Insight Direct USA, Inc.[8]

Neither printer had any history of problems or otherwise needed repairs before the fire.[9] The HP 4250 LaserJet printer was idle and had been placed in a spare office in 2016 where it could be used by visitors.[10]  The HP p3015 LaserJet printer was a check printer and it was operational and in use by Onex before the fire.[11]

Lem plugged the HP 4250n LaserJet printer into the baseboard of the cubicle, plugged the networking cable into it, connected it to the company network, ran a test print and added paper to it.[12] Lem left at 9:00 p.m.[13] He was the last Onex employee to leave.[14]

## II.     **The April 25, 2017 Fire on the fifth floor of 300 Crown Colony Drive.**

At 12:54 a.m. on April 25, 2017, the Quincy Fire Department received notice of a fire on the fifth floor at 300 Crown Colony Drive in Quincy, Massachusetts.[15]  Lieutenant Keith Lentini was the first Quincy Fire Department Officer to respond to the April 25, 2017 fire.[16]  Lentini arrived at the fire scene within five minutes after the Quincy Fire Department got the call.[17]  After entering the fifth-floor office of Onex York Holdings Corp. ("Onex"), Lentini observed some vertical blinds that were distorted from heat.[18]  When Lentini got to that area, he saw the HP 4250n

---

[8] SOF ¶¶ 2-3.
[9] SOF ¶ 4.
[10] Exhibit 22, Lem Depo. at 12-21.
[11] Exhibit 22, Lem Depo. at 19-24, 28:7-10.
[12] Exhibit 22, Lem Depo. at 11:3 – 12:9.
[13] Exhibit 22, Lem Depo. at 30:4-5.
[14] Exhibit 22, Lem Depo. at 30:1-5.
[15] Exhibit 4, Quincy Fire Dept. Report at 2.
[16] Exhibit 15, Lentini Depo. at 9:24 – 10:8.
[17] Exhibit 15, Lentini Depo. at 11:7-10.
[18] Exhibit 15, Lentini Depo. at 17:22-24.

3

LaserJet printer was still "actively on fire" with "flames coming from it."[19]  The HP 4250n LaserJet printer was located on a desk cubicle where Lem had placed it.[20]   Lentini observed water discharging from the sprinkler head above the printer.[21]

Lentini concluded that the fire originated in the printer because "there was a printer on fire when [he] got in the immediate vicinity of the smoke."[22]  Lentini did not observe anything else on fire besides the printer.[23]   Lentini "unplugged the printer, and carried it back to [Firefighter Christopher Barry] where he had the hose."[24]  Firefighter Barry opened the hose, discharged the water and extinguished the fire.[25]

In his report, Lentini identified the cause of ignition as the electrical failure of the printer.[26]  Lentini "felt that there was some sort of electrical issue that . . . caused heat within the printer to ignite the components."[27]  Lentini's "judgment" that an electrical issue in the printer caused the fire was "[b]ased on the fact that the printer was actively on fire – had flames within it when I arrived to it, and it was plugged into an electrical source."[28]

Lentini ruled out arson and human factors as causes of the fire.[29]

---

[19] Exhibit 15, Lentini Depo. at 17:13 – 18:16.
[20] Exhibit 15, Lentini Depo. at 24:3-5, 25:2 –26:13, 50; 4-17; Exhibit 23, Lentini Depo. Exhibit 6; Exhibit 22, Lem Depo. at 22:15-19, 24:8 – 25:1; Exhibit 23, Lem Depo. Exhibit 4; Exhibit 24, Lem Depo. Exhibit 5.
[21] Exhibit 15, Lentini Depo. at 17:11 – 18:9; Exhibit 4, Quincy Fire Dept. Report at 3 (noting that "[f]ire mostly contained by 1 sprinkler head").
[22] Exhibit 15, Lentini Depo. at 15:4-10.
[23] Exhibit 15, Lentini Depo. at 29:22-24.
[24] Exhibit 15, Lentini Depo. at 18:10-16.
[25] Exhibit 15, Lentini Depo. at 18:14-16.
[26] Exhibit 15, Lentini Depo. at 19:16 –22:11.
[27] Exhibit 15, Lentini Depo. at 39:4-6.
[28] Exhibit 15, Lentini Depo. at 39:8-10.
[29] Exhibit 15, Lentini Depo. at 45:21 – 46:13; 49:9-19.

### III.    Edward Noonan's methodology and opinions that the fire originated in the HP 4250n LaserJet printer are relevant and reliable.

As stated in his expert report, Edward Noonan, one of the plaintiffs' liability experts, was retained by Jill Reisner Liberty Mutual to "[d]etermine the origin and cause of the fire."[30]  As part of his investigation, Noonan went to the fire scene on April 28, 2017, three days after the fire.[31]  Noonan interviewed Jim Lem, the Onex IT technician, took photographs, examined the HP 4250n LaserJet printer and the HP p3015 LaserJet printer, examined the electrical outlet the printers were plugged into, performed a visual inspection of the circuit breaker panel and secured the evidence.[32]

As a result of the investigation he performed and his review of discovery materials, Noonan concluded that the fire originated inside the HP 4250n LaserJet printer.[33]  Noonan based his conclusion upon his investigation, the significant thermal damage to the HP 4250n LaserJet printer, Lentini's deposition testimony and his analysis of the burn patterns.[34]  Noonan did not observe any other fire causes other than the HP 4250n LaserJet printer and he did not observe any item that would have sustained combustion to cause that type of damage to the printer itself.[35]  Noonan ruled out arson, smoking, open flame and electrical system failure as causes of the fire.[36]

NFPA 921, Section 18.1.2 states:

> Determination of the origin of the fire involves the coordination of information derived from one or more of the following:

---

[30] Exhibit 8, Noonan Report at page 2.

[31] Exhibit 8, Noonan's Report at 2.

[32] Exhibit 16, Noonan Depo. at 22:18 – 27:15; 29:3-24 – 30:14; 31:5 – 32:5; 33:5 – 35:4; 36:9 – 37:23; 43:12-44:23; 45:8 – 47:8; 51:19 – 54:2; 54:20 – 56:19; Exhibit 8, Noonan Report at 7-8.

[33] Exhibit 16, Noonan Depo. at 29:3 – 30:1; 33:5 – 34:8; 35:20 – 37:23; 40:7 – 41:6; 43:8 – 44:23; 45:8 – 47:8; 53:14 –54:2; 55:2-17; 59:14-23; Exhibit 8, Noonan Report at 8-12.

[34] Exhibit 16, Noonan Depo. at 29:3 –30:1; 33:5 –34:8; 40:7 – 41:6; 43:8 – 44:23; 45:8 – 47:8; 53:14 – 54:2; 55:2-17; 59:14-23; Exhibit 8, Noonan Report at 8-12.

[35] Exhibit 16, Noonan Depo. at 46:8-20; Exhibit 8, Noonan Report at 10.

[36] Exhibit 16, Noonan Depo. at 43:8 – 44:8; Exhibit 8, Noonan Report at 11-12.

(1) *Witness Information and/or Electronic Data*.  The analysis of observations reported by persons who witnessed the fire or who were aware of the condition present at the time of the fire as well as the analysis of electronic data such as security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event

(2) *Fire Patterns*.  The analysis of effects and patterns left by the fire (*see Chapter 6*)

(3) *Arc Mapping*.  The analysis of the locations where electrical arcing has caused damage and the documentation of the involved electrical circuits (*see Section 9.10*)

**(4)** *Fire Dynamics*.  The analysis of the fire dynamics [i.e., the physics and chemistry of fire ignition and growth (*see Chapter 5*) and the interaction between the fire and building's systems (*see Chapter 7*)].[37]

NFPA 18.2.1.2 states, in pertinent part:

> *In some instances, a single item, such as an irrefutable article of physical evidence or a credible eyewitness to the ignition, or a video recording may be the basis for a determination of origin.*  In most cases, however, no single item is sufficient in itself. . . .[38]

Additionally, NFPA 921, Section 26.3.2 provides, in pertinent part:

> Fire patterns should be used carefully in establishing an appliance at the point of origin.  Definite and unambiguous fire patterns help to show that the appliance was at the point of origin.  Other causes of these patterns should be eliminated.  *The degree of damage to an appliance may or may not be an adequate indication of origin. Where the overall relative damage to the scene is light to moderate and the damage to the appliance is severe, then this may be an indicator of the origin. . . .*[39]

---

[37] Exhibit 19, Excerpts from NFPA 921.
[38] Exhibit 19, Excerpts from NFPA 921 (emphasis added).
[39] Exhibit 19, Excerpts from NFPA 921 (emphasis added).

In performing his investigation, Noonan followed NFPA 921.[40]   He also relied on his experience, training and knowledge.[41]   In his report, Noonan wrote that he followed the scientific method identified in NFPA 921.[42]   In his report, Noonan discussed NFPA 921, Section 6.4 regarding fire patterns.[43]   Noonan's opinion that the fire originated in the HP 4250n LaserJet printer is based on his investigation of the fire scene, his interview of Lem, his review of Lentini's, Lem's and other firefighters' depositions, his review of the Quincy Fire Department report and his analysis of the fire patterns.[44]   This conformed with NFPA 921, Section 18.1.2.   Noonan properly based his opinion on the fact that there was severe damage to the HP 4250n LaserJet printer and light damage to the overall fire scene as provided by NFPA 921, Section 26.3.2.   Additionally, Noonan properly based his opinion on Lentini's testimony that the only item that was on fire was the HP 4250n LaserJet printer and that flames were coming from it.[45]   Lentini's eyewitness testimony standing alone provides the basis for concluding that the fire originated in the HP 4250n LaserJet printer under NFPA 921, Section 18.1.2.   However, that was not the sole basis for Noonan's opinion.

## IV.   Matthew Elliott's methodology and opinions that the fire was caused by a board-level failure of the power supply printed circuit board for the HP 4250n LaserJet printer are relevant and reliable.

Based upon his investigation, findings and analysis, Elliott concluded that, "to a reasonable degree of scientific certainty," "the fire cause was a board level failure of the power supply PCB

---

[40] Exhibit 8, Noonan Report at 6-7, 8-9.
[41] Exhibit 8, Noonan Report at 7.
[42] Exhibit 4, Noonan Report at 6.
[43] Exhibit 4, Noonan Report at 8-9.
[44] Exhibit 4, Noonan Report at 6-7.
[45] Exhibit 15, Lentini Depo. at 18:3-5.

for the Hewlett Packard 4250 series printer."[46]   Elliott further opined that: "[t]he resulting fault energy from the arc tracking event had sufficient temperature and energy to ignite the polymer sheet below the circuit board, which spread the fire to the cooling fan body and printer covers."[47] Elliott determined that "[t]he board level failure and tracking event w[ere] the result of a manufacturing defect."[48]   Therefore, Elliott found that "Hewlett Packard is responsible for the fire."[49]

Given the extent of the fire damage to the circuit board, Elliott could not identify a specific component or heating connection that caused the failure.[50]   Simply put, "there were no materials left to analyze."[51]   However, Elliott theorized that either a component failure, such as an electrolytic capacitor or resistor, or a heating component, such as a failed solder joint in the area the failure of the controls or the fuser assembly, could have caused the arcing.[52]

Elliott conducted and participated in three evidence examinations of the evidence and artifacts retained by Noonan on September 13, 2017, December 18, 2017 and August 3, 2020.[53]

On February 11, 2021 and April 29, 2021, Elliott examined and performed testing on two HP 4250 series LaserJet printers to prove his hypothesis that the fire was caused by arc tracking in the printed circuit board for the power supply.[54]   The first test showed that the insulating polymer sheet "readily ignited and sustained flaming combustion after the ignition source was removed"

---

[46] Exhibit 13, Elliott Report at 10.
[47] Exhibit 13, Elliott Report at 10.
[48] Exhibit 13, Elliott Report at 10.
[49] Exhibit 13, Elliott Report at 10.
[50] Exhibit 13, Elliott Report at 9.
[51] Exhibit 18, Elliott Depo. at 41:18-21.
[52] Exhibit 18, Elliott Depo. at 21:12 – 23:1.
[53] Exhibit 13, Elliott Report at 3-5.
[54] Exhibit 13, Elliott Report at 5.

and that the polymer sheet "did not self-extinguish."  The first test also established that the plastic

fan housing also "readily ignited and sustained flaming combustion after the ignition source was

removed" and that "[t]he fan housing did not self-extinguish."  The second test demonstrated that

tracking at the energized traces of the circuit board "resulted in degradation of the circuit board

and flaming combustion while the board remained energized."  The second test also showed that

the printed circuit board "fuses remained intact and did not open during tracking."[55]

The "[t]esting performed [by Elliott] revealed a board level fault at the back left section of

the power supply will result in sustained arc tracking through the carbonized path and flaming

combustion when the power supply is energized."[56]  "Faulting of this nature did not result in the

operation of the PCB fuses."[57]  "Testing also revealed that the polymer sheet and cooling fan are

combustible and competent first and second fuels to spread the fire to the printer covers."[58]  "The

polymer sheet and cooling fan did not self-extinguish following ignition."[59]  "While the specific

board level component failure or heating connection (NFPA 921 – Chapter 9) could not be

identified due to the extent of damage, both will compromise the insulation integrity of the PCB

and result in arc tracking."[60]  "Arc tracking and arcing through a carbonized path are generally-

accepted principles (NFPA 921 – Chapter 9) and will result when the PCB insulation is

compromised due to a board level component failure or heating connection."[61]  For these reasons,

---

[55] Exhibit 13, Elliott Report at 5.
[56] Exhibit 13, Elliott Report at 9.
[57] Exhibit 13, Elliott Report at 9.
[58] Exhibit 13, Elliott Report at 9.
[59] Exhibit 13, Elliott Report at 9.
[60] Exhibit 13, Elliott Report at 9.
[61] Exhibit 13, Elliott Report at 9.

Elliott concluded that a fault within the HP 4250n LaserJet printer power supply was the cause of the fire as a result of a manufacturing defect.[62]

Elliott ruled out all other potential causes, including the power supply cord to the HP p3015 LaserJet printer.[63]  In ruling out the power supply cords for both printers, Elliott wrote:

> *Power Supply Cord Fault*:   The two (2) power supply cords supplying the HP printers at the area of origin sustained minor fire damage.  There is no evidence of isolated heating at the plugs or receptacles.  One of the power supply cords has a single instance of arcing through char due to fire attack with no evidence of a sustained arcing event.  The absence of a sustained arcing event is consistent with the operation of the circuit breaker protecting the circuit breaker protecting the circuit supplying the printers.
>
> There is no evidence of physical/mechanical damage to the power supply cord.  The bottom[s] of the printers are undamaged by fire; the printers were not set on top of the power supply cords.
>
> The examination of the HP 3015 power supply revealed the 8 Amp PCB fuse operated during the fire.  The HP 3015 remained energized well into the fire; the arcing event on the power supply cord and operation of the circuit breaker occurred after the HP 3015 was attacked by fire.  For these reasons, a fault of the power supply cords was ruled out as the cause of the fire.[64]

Additionally, Elliott testified that "[a] circuit breaker did trip."[65]  Elliott concluded that the circuit breaker tripped based upon the following reasoning:

> If we look at the power supply cord for the p3015, we see that there was an arcing event on that cord.
>
> In examining that cord, both the hot conductor and I believe the neutral or ground conductor remained in contact.  The actual copper conductors were in contact at the time of the investigation.  If that were the case and the breaker remained energized, the cord would not have stopped arcing.  So, the fact that we have those conductors

---

[62] Exhibit 13, Elliott Report at 9-10.
[63] Exhibit 13, Elliott Report at 8-9.
[64] Exhibit 13, Elliott Report at 8.
[65] Exhibit 18, Elliott Depo. at 48:18-20.

and contacts now tells us that the power to the cord was essentially
de-energized prior to that cord being allowed to continue to arc.  The
only way that's going to happen would be if someone unplugged the
printer or the power to the printer via the circuit breaker was turned
off.[66]

Elliott further opined that when he peeled back the insulation and inspected the cord, he did not

observe significant material loss or bubbling and deformation of the insulation in places remote

from the fire-damaged area.[67]  Since that did not occur, Elliott concluded that "there was not a

sustained arcing event at the cord."[68]

Elliott testified that it was possible that somebody reenergized the circuit breaker after the

fire or that breaker handle might need to be manually inspected to determine whether it was in a

tripped position.[69]

It is undisputed that the HP 4250n LaserJet printer "was plugged in and energized at the

time of the fire."[70]  Elliott observed that the HP 4250n LaserJet printer "sustained fire damage to

the back, front and left side of the unit."[71]  Elliott saw "extensive fire damage and material loss

around the power supply at the center of the unit."[72]  As Elliott noted in his report:

Examination of the power supply reveals damage and material loss
at the back left section of the power supply PCB.  Remaining board
level components have sustained significant damage and there is
melting to the traces at this location.  The polymer sheet has been
consumed below the damaged portion of the PCB.  The cooling fan
housing and adjacent covers have been consumed.[73]

---

[66] Exhibit 18, Elliott Depo. at 48:21 – 49:16.
[67] Exhibit 18, Elliott Depo. at 56:19 – 57:10.
[68] Exhibit 18, Elliott Depo. at 57:8-10.
[69] Exhibit 18, Elliott Depo. at 49:17 – 57:10.
[70] Exhibit 13, Elliott Report at 9.
[71] Exhibit 13, Elliott Report at 9.
[72] Exhibit 13, Elliott Report at 9.
[73] Exhibit 13, Elliott Report at 9.

The melting of the cooper board-level traces on the printed circuit board Elliott saw reveals temperatures observed during arc tracking were in excess of 1981° F, well above the ignition temperature of the listed polymers (910° F -- 1220° F).[74]

At his deposition, Elliott explained that the bottom of the HP 4250n LaserJet printer did not burn completely: "I think what a lot of people are forgetting in this case is that the fire was extinguished with a sprinkler.  So, you know, had this fire been left to its own devices, I can assure you the bottom of that printer would have been burned."[75]

Elliott also concluded that the left side of the HP 4250n LaserJet printer sustained more damage to its left side because the largest opening in the printer's housing was on the left side of the printer adjacent to the fan.[76]  Simply put, a fault originating inside the circuit board will be drawn to the oxygen in the air provided by that opening.[77]

In performing his investigation, Elliott followed NFPA 921.[78] Elliott also relied on: (1) ASTM E620-11, *Standard Practice for Reporting Opinions of Scientific or Technical Experts*, ASTM International, West Conshohocken, Pennsylvania, 2011, (2) Lentini, John J., *Scientific Protocols for Fire Investigation*, CRC Press, Boca Raton, Florida, (3) Barbrauskas, Vytenis, *Ignition Handbook*, Fire Science Publishers, Issaquah, Washington, (4) Dehaan, John, *Kirk's Fire Investigation*, Prentice Hall, Upper Saddle River, New Jersey, (5) The Scientific Method, and (6) his education, experience and training.[79]

---

[74] Exhibit 13, Elliott Report at 9.
[75] Exhibit 18, Elliott Depo. at 45:20 – 46:2.
[76] Exhibit 18, Elliott Depo. at 72:1-23.
[77] Exhibit 18, Elliott Depo. at 72:1-23.
[78] Exhibit 13, Elliott Report at 2, 7-8.
[79] Exhibit 13, Elliott Report at 2.

**V.     Galler's and Myers' methodology and opinions are based upon speculation and conjecture and are entirely unreliable.**

The defense experts, Galler and Myers, speculate that the arcing on the power supply cord to the HP p3015 LaserJet printer caused the fire.[80]  However, neither Galler nor Myers performed any laboratory testing to confirm their opinions that the arcing on the power supply cord to the HP p3015 LaserJet printer caused the fire.[81]

Galler and Myers further speculate that the HP 4250n LaserJet printer pulled soot from the fire inside it that resulted in arc tracking on the printed circuit board for its power supply.[82] However, neither Galler nor Myers performed any laboratory testing to confirm their opinions that the HP 4250n LaserJet printer pulled soot from the fire inside it that resulted in arc tracking on the printed circuit board for its power supply.[83]

Galler and Myers also speculate that there was mechanical damage to the power supply cord to the HP p3015 LaserJet printer before the fire.[84]  However, neither Galler nor Myers performed any laboratory testing to confirm their opinions that there was mechanical damage to the power supply cord to the HP p3015 LaserJet printer before the fire.[85]  Galler admitted that he did not identify any specific mechanical damage to the power supply cord to the HP p3015 LaserJet printer.[86]  Galler also testified that he did not have any direct evidence that: (1) a heavy object had been placed on the power supply cord before the fire, (2) the power supply cord was cut before the

---

[80] Exhibit 17, Galler Depo. at 34:12-15; Exhibit 21, Myers Depo. at 32:3-6.
[81] Exhibit 17, Galler Depo. at 23:6-11; Exhibit 21, Myers Depo. at 9:12-15.
[82] Exhibit 17, Galler Depo. at 72:12-18; Exhibit 21, Myers Depo. at 10:6-14; 12:1-6.
[83] Exhibit 17, Galler Depo. at 72:19 – 73:4; Exhibit 21, Myers Depo. at 12:1-6.
[84] Exhibit 17, Galler Depo. at 39:18-21; Exhibit 21, Myers Depo. at 24:13-16.
[85] Exhibit 17, Galler Depo. at 20:10 – 21:5; 42:4-21, 54:22 – 55:7; Exhibit 21, Myers Depo. at 29:22 – 30:13.
[86] Exhibit 17, Galler Depo. at 39:22 – 40:1.

fire, or (3) an HP LaserJet printer was mishandled by Lem when he moved it into the cubicle.[87]
Myers admitted that he never physically inspected the artifacts and evidence from the fire scene.[88]

Galler did not know what provided the initial fuel source for the fire.[89]  He testified: "My
guess is, there was paper or something like that on the table."[90]  Galler further admitted that he had
"no knowledge of what" the initial fuel source was.[91]  Likewise, Myers could not identify the
initial fuel source for the fire.[92]  Rather, he speculated that there was paper on the desk.[93]  However,
he readily admitted that "the other thing that we don't know is what other materials were on the
desk."[94]

Galler has been retained by HP as an expert over 100 times.[95]  Galler has never opined that
an HP product was defective.[96]  Myers has been retained by HP as an expert 10 times.[97]  Myers
has never opined that a printer was the cause of a fire in an office environment.[98]

## **ARGUMENT**

### I.    **Expert testimony is admissible under Fed. R. Civ. P. 702 if it is relevant and reliable.**

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or
> otherwise specialized knowledge will help the trier of fact to

---

[87] Exhibit 17, Galler Depo. at 45:1-24.
[88] Exhibit 21, Myers Depo. at 6:18-20.
[89] Exhibit 17, Galler Depo. at 61:20-24.
[90] Exhibit 17, Galler Depo. at 61:15 – 62:4.
[91] Exhibit 17, Galler Depo. at 62:2.
[92] Exhibit 21, Myers Depo. at 40:4 – 42:17.
[93] Exhibit 21, Myers Depo. at 40:4 – 42:17.
[94] Exhibit 21, Myers Depo. at 40:12-13.
[95] Exhibit 17, Galler Depo. at 29:16 –30:17.
[96] Exhibit 17, Galler Depo. at 30:17-24.
[97] Exhibit 21, Myers Depo. at 52:15-24.
[98] Exhibit 21, Myers Depo. at 55:8-10.

> understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony is
> the product of reliable principles and methods; and (d) the expert
> has reliably applied the principles and methods to the facts of the
> case.

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), a trial judge evaluates an expert's proposed testimony for both reliability and relevance before admitting it. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998), *citing Daubert*, 509 U.S. at 589-895. The Rule 702 inquiry is a "flexible one," and there is no particular procedure the court is required to follow. *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002). *Daubert* provides a nonexclusive list of factors a court can consider in determining the reliability of expert testimony, including: (1) the verifiability of the expert's theory or technique, (2) the error rate inherent therein, (3) whether the theory or technique has been published and/or subjected to peer review, and (4) its level of acceptance within the scientific community. *Ruiz-Troche*, 161 F.3d at 80. The review for reliability encompasses an assessment of "whether the reasoning and methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue." *Diaz*, 300 F.3d at 73, *quoting Daubert*, 509 U.S. at 592-593. "As to the relevancy criterion, 'expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.'" *Id.*, *quoting Ruiz-Troche*, 161 F.3d at 81.

**II.    Experts in fire cases are permitted to draw appropriate inferences from the available evidence; otherwise, it would create a rule of nonliability for product manufacturers and sellers, whose product, as here, self-destructed and caused significant property damage.**

When the cause of an event is not susceptible to a determination by the jury's general knowledge of practical affairs, such as a fire, it must be supported by expert testimony. *AmGUARD Ins. Co. v. Richmond*, 2021 U.S. Dist. LEXIS 89600 at *5 (D. Mass. May 10, 2021) (Stearns, J.).  An expert in these circumstances may infer a plausible explanation for an accident from evidence even if the facts do not clearly point to a determinative cause.  *Id.*  Such inferences "must be based on probabilities rather than possibilities and may not be the result of mere speculation.  *Id.*, quoting *Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 101, 520 N.E.2d 1315 (1988).  An expert must identify "the factual basis and process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment."  *Id.*, quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993).

"In the case of a fire, direct proof of a defect may be unavailable, but that does not preclude the drawing of an appropriate inference."  *Pekarek v. Sunbeam Prods.*, 672 F. Supp. 2d 1161, 1171 (D. Kan. 2006).  "Were the rule otherwise, it 'would effectively establish a conclusory presumption of non-liability in favor of strict product liability defendants whose products self-destruct in the process of causing injury to persons or property.'"  *Id.*, quoting *Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987).

Here, the defendants' objections to Noonan's and Elliott's opinions conflate speculation and conjecture with circumstantial evidence and inferences.  *AmGUARD Ins. Co.* at *6.  "[T]ort law often encounters situations in which there are no witnesses and no direct evidence as to the cause of an event that results in harm.  Fire cases are one example."  *Id.* at *7, quoting *Ricci v.*

16

*Alternative Energy Inc.*, 211 F.3d 157, 162-163 (1st Cir. 2000).  *See Minerals & Chems. Philipp Corp. v. S.S. Nat'l Trader*, 445 F.2d 831, 832 (2d Cir. 1971) ("By the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony.").  In other words, the absence of direct evidence does not by itself defeat a negligence claim.  *Id.  See One Beacon Ins. Co. v. Electrolux*, 436 F. Supp. 2d 291, 295 (D. Mass. 2006) (denying summary judgment on negligence claim where plaintiff's expert could not determine with scientific certainty the exact cause of a fire because of a lack of physical evidence).

### III.   Any alleged flaws in fire cause and origin expert's or electrical engineering expert's methodology, including NFPA 921 methodology, goes to the weight of the testimony, not its admissibility.

NFPA 921 § 19.6.5 approves a process of eliminating alternative causes of a fire so long as the "[d]etermination of the ignition source [is] based on data or logical inferences drawn from the data" or "derived from evidence, observations, calculations, experiments, and the laws of science."  *Id.* at *8, *quoting* NFPA 921 § 19.6.5.  *See Sarro v. Philip Morris USA Inc.*, 857 F. Supp. 2d 182, 186 (D. Mass. 2012) (collecting cases).  Furthermore, an expert's "failure to follow the methodology in NFPA 921 does not automatically require the exclusion of expert testimony on the cause and origin of the fire."  *Schlesinger v. United States*, 898 F. Supp. 2d 489, 506 (E.D.N.Y. 2012).  Any purported flaws in an expert's NFPA 921 methodology goes to the weight of his testimonial evidence, not the question of its admissibility.  *Id.* at 505; *State Farm Fire & Cas. Co. v. Hewlett-Packard Co.*, 2015 U.S. Dist. LEXIS 135640 (E.D. Wa. Oct. 5, 2015); *Pekarek*, 672 F. Supp. 2d at 1175 (D. Kan. 2006) ("failure to strictly adhere to NFPA 921 does not render an investigation per se unreliable").  Furthermore, NFPA 921 is not the only

reliable way to investigate a fire.  *State Farm Fire & Cas. Co.*, 2015 U.S. Dist. LEXIS 135640 at

*11.

## IV.    *Daubert* does not require a party to prove to the trial judge that its experts' opinions are the correct ones.

"The First Circuit has cautioned that 'the *Daubert* regime should be employed only with

great care and circumspection at the summary judgment stage.'"  *Id.* at *8, *quoting Cortes-*

*Irizarry v. Corporacion Insular De Seguos*, 111 F.3d 184, 188 (1st Cir. 1997).  "*Daubert* . . .

imposes a duty on federal trial judges to play the *role* of 'gatekeeper,' ensuring that the fact-

finding process does not become distorted by 'expertise that is *fausse* and science that is junky.'"

*Id.*, *quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J.,

concurring).  As stressed in the advisory note to the December 1, 2000 amendment to Fed. R.

Evid. 702, Daubert "did not work a 'seachange over federal evidence law,' and 'the trial court's

role as a gatekeeper is not intended to serve as a replacement for the adversary system.'"  *Id.*

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky, but admissible

evidence."  *Id.*, *quoting Daubert*, 509 U.S. at 596.  Rule 702 is not intended to provide an excuse

for an automatic challenge to the testimony of every expert.  *State Farm Fire Ins. Co.*, 2015 U.S.

Dist. LEXIS 135640 at *15.

> *Daubert* does not require that a party who proffers expert
> testimony carry the burden of proving to the judge that the expert's
> assessment of the situation is correct. . . .  In short, *Daubert* neither
> requires nor empowers trial courts to determine which of several
> competing theories has the best provenance.  It demands only that
> the proponent of the evidence show that the expert's conclusion
> has been arrived at in a scientifically sound and methodologically
> reliable fashion.

*Id.* at *9, *quoting Ruiz-Troche*, 161 F.3d at 85.

18

**V.      The defendants do not challenge either Elliott's and Noonan's qualifications or the relevancy of their opinion.**

The defendants do not contend that either Elliott or Noonan are not qualified to offer their opinions.   Likewise, the defendants do not dispute the relevancy of Elliott's and Noonan's opinions.  Rather, the defendants claim that Elliott's and Noonan's opinions are not reliable.  That claim has no merit.

**VI.     Noonan's opinions and methodology are reliable and are properly based on the available facts and reasonable inferences; all of the defendants' alleged criticisms of his opinions go to the weight of his testimony, not its admissibility.**

In *State Farm*, HP made the identical challenge to the plaintiff's fire cause and origin expert, Michael Zambryski, who claimed that the fire that the cause and origin of the fire was the subject HP printer.  *State Farm*, 2015 U.S. Dist. LEXIS 135460 at *10-14.  The court denied HP's motion to preclude Zambryski from testifying. *Id.*  The court found that Zambryski's methodology was "sufficiently reliable" to proceed.  *Id.* at *13-14.  Zambryski reached his conclusion that the fire was caused by and originated in the HP printer "based on his years of experience, his physical inspection of the site, witness statements, examination of fire patterns on the scene and ruling out other items on the scene as possible fire causes and origins." *Id.* at *14.

Noonan's opinions are likewise reliable.   Noonan based his opinions upon his investigation, the significant thermal damage to the HP 4250n LaserJet printer, Lentini's deposition testimony and his analysis of the burn patterns.[99]   The defendants' claim that Lentini testified that the HP 4250n LaserJet printer was on the floor, and not on the desktop, is simply

---

[99] Exhibit 16, Noonan Depo. at 29:3 –30:1; 33:5 –34:8; 40:7 – 41:6; 43:8 – 44:23; 45:8 – 47:8; 53:14 – 54:2; 55:2-17; 59:14-23; Exhibit 8, Noonan Report at 8-12.

incorrect.[100] Noonan did not observe any other fire causes other than the HP 4250n LaserJet printer and he did not observe any item that would have sustained combustion to cause that type of damage to the printer itself.[101] Noonan ruled out arson, smoking, open flame and electrical system failure as causes of the fire.[102]

Noonan followed the scientific method identified in NFPA 921.[103] Noonan also reviewed Lem's deposition and other firefighters' depositions and the Quincy Fire Department report.[104] This conformed with NFPA 921, Section 18.1.2. Noonan properly based his opinion on the fact that there was severe damage to the HP 4250n LaserJet printer and light damage to the overall fire scene as provided by NFPA 921, Section 26.3.2. Additionally, Noonan properly based his opinion on Lentini's testimony that only item that was on fire was the HP 4250n LaserJet printer and that flames were coming from it.[105] Lentini's eyewitness testimony standing alone provides the basis for concluding that the fire originated in the HP 4250n LaserJet printer under NFPA 921, Section 18.1.2.

Any alleged flaws in Noonan's NFPA methodology go to the weight of his testimony, not its admissibility. *Id.* at *12. Furthermore, in assessing Noonan's opinions, the court must take care not "to exclude [his] testimony on the ground that the court believes one version of the facts and not the other." *Id.* at *13. The court "is not charged with weighing the correctness of an expert's testimony." *Id.* Instead, vigorous cross-examination, presentation of contrary evidence

---

[100] Exhibit 15, Lentini Depo. at 24:3-5, 25:2 – 26:13, 50:4-17; Exhibit 23, Lentini Depo. Exhibit 6; Exhibit 22, Lem Depo. at 22:15-19, 24:8 – 25:1 ; Exhibit 24, Lem Depo. Exhibit 4; Exhibit 25, Lem Depo. Exhibit 5.
[101] Exhibit 16, Noonan Depo. at 46:8-20; Exhibit 8, Noonan Report at 10.
[102] Exhibit 16, Noonan Depo. at 43:8 – 44:8; Exhibit 8, Noonan Report at 11-12.
[103] Exhibit 8, Noonan Report at 6.
[104] Exhibit 8, Noonan Report at 6-7.
[105] Exhibit 15, Lentini Depo. at 18:3-5.

and careful instructions on the burden of proof are the appropriate means for challenging Noonan's testimony. *Id.* Finally, the *State Farm* court gave short shrift to HP's claim of expectation bias, and did not even address it in its decision.[106]

**VII.   Elliott's opinions and methodology are reliable and are properly based on the available facts and reasonable inferences; all of the defendants' alleged criticisms of his opinions go to the weight of his testimony, not its admissibility.**

In *State Farm*, HP made the identical challenge to the plaintiff's electrical engineering expert, Paul Way, who claimed that the fire that the cause and origin of the fire was the subject HP printer. *State Farm*, 2015 U.S. Dist. LEXIS 135460 at *14-16. Way identified two theories for an ignition source: (1) a fuse in the power supply could not be ruled out as a potential ignition source due to damage to the electrical components in the power supply, and (2) "hacking" of the printer, based upon a 2011 article from MSNBC. *Id.* at *6. The court denied HP's motion to preclude Way from testifying. *Id.* at *16. The court found that Way's methodology was reliable because he reached his conclusions by analyzing the scene investigation, reviewing the results of the first evidence examination, examining an exemplar product, observing the fire patterns, x-raying the evidence, conducting FTIR analysis, and participating in a joint inspection of an exemplar printer, the subject printer and scene evidence. *Id.* The *State Farm* court again found that any purported flaws in Way's methodology went to the weight of his testimony, not its admissibility. *Id.* at *15. The *State Farm* court also observed that "Rule 702 is not intended to provide 'an excuse for an automatic challenge to the testimony of every expert.'" *Id.*

Similarly, Elliott's opinions are reliable. Elliott concluded that, "to a reasonable degree of scientific certainty," "the fire cause was a board level failure of the power supply PCB for the

---

[106] Exhibit 26, Hewlett-Packard Co.'s Motion to Preclude the Testimony of Plaintiff's Expert Witness and for Summary Judgment.

Hewlett Packard 4250 series printer."[107]  Elliott further opined that: "[t]he resulting fault energy from the arc tracking event had sufficient temperature and energy to ignite the polymer sheet below the circuit board, which spread the fire to the cooling fan body and printer covers."[108]  Elliott determined that "[t]he board level failure and tracking event w[ere] the result of a manufacturing defect."[109]  Therefore, Elliott found that "Hewlett Packard is responsible for the fire."[110]

Given the extent of the fire damage to the circuit board, Elliott could not identify a specific component or heating connection that caused the failure.[111]  Simply put, "there were no materials left to analyze."[112]  However, Elliott theorized that either a component failure, such as an electrolytic capacitor or resistor, or a heating component, such as a failed solder joint in the area the failure of the controls or the fuser assembly, could have caused the arcing.[113]

Elliott conducted and participated in three evidence examinations.[114]  Elliott also tested exemplar HP 4250 series printers on two occasions.[115]  The "[t]esting performed [by Elliott] revealed a board level fault at the back left section of the power supply will result in sustained arc tracking through the carbonized path and flaming combustion when the power supply is energized."[116]  "Faulting of this nature did not result in the operation of the PCB fuses."[117]  "Testing also revealed that the polymer sheet and cooling fan are combustible and competent first

---

[107] Exhibit 13, Elliott Report at 10.
[108] Exhibit 13, Elliott Report at 10.
[109] Exhibit 13, Elliott Report at 10.
[110] Exhibit 13, Elliott Report at 10.
[111] Exhibit 13, Elliott Report at 9.
[112] Exhibit 18, Elliott Depo. at 41:18-21.
[113] Exhibit 18, Elliott Depo. at 21:12 – 23:1.
[114] Exhibit 13, Elliott Report at 3-5.
[115] Exhibit 13, Elliott Report at 5.
[116] Exhibit 13, Elliott Report at 9.
[117] Exhibit 13, Elliott Report at 9.

and second fuels to spread the fire to the printer covers."[118]  "The polymer sheet and cooling fan did not self-extinguish following ignition."[119]  "While the specific board level component failure or heating connection (NFPA 921 – Chapter 9) could not be identified due to the extent of damage, both will compromise the insulation integrity of the PCB and result in arc tracking."[120]  "Arc tracking and arcing through a carbonized path are generally-accepted principles (NFPA 921 – Chapter 9) and will result when the PCB insulation is compromised due to a board level component failure or heating connection."[121]  For these reasons, Elliott concluded that a fault within the HP 4250n LaserJet printer power supply was the cause of the fire as a result of a manufacturing defect.[122]

Elliott ruled out all other potential causes, including the power supply cord to the HP p3015 LaserJet printer.[123]  In ruling out the power supply cord for the HP p3015 printer, Elliott observed that: "[o]ne of the power supply cords has a single instance of arcing through char due to fire attack with no evidence of a sustained arcing event."[124]  However, Elliott concluded that "[t]he absence of a sustained arcing event is consistent with the operation of the circuit breaker protecting the circuit breaker protecting the circuit supplying the printers."[125]  Elliott further found:

> There is no evidence of physical/mechanical damage to the power supply cord.  The bottom[s] of the printers are undamaged by fire; the printers were not set on top of the power supply cords.
>
> The examination of the HP 3015 power supply revealed the 8 Amp PCB fuse operated during the fire.  The HP 3015 remained energized

---

[118] Exhibit 13, Elliott Report at 9.
[119] Exhibit 13, Elliott Report at 9.
[120] Exhibit 13, Elliott Report at 9.
[121] Exhibit 13, Elliott Report at 9.
[122] Exhibit 13, Elliott Report at 9-10.
[123] Exhibit 13, Elliott Report at 8-9.
[124] Exhibit 13, Elliott Report at 8.
[125] Exhibit 13, Elliott Report at 8.

well into the fire; the arcing event on the power supply cord and operation of the circuit breaker occurred after the HP 3015 was attacked by fire.  For these reasons, a fault of the power supply cords was ruled out as the cause of the fire.[126]

Additionally, Elliott testified that "[a] circuit breaker did trip."[127]  Elliott concluded that the circuit breaker tripped because the "hot conductor" and the "ground conductor" remained in contact in the power supply cord and the only way to stop it from arcing was to either unplug the cord, which did not happen or to trip the circuit breaker.[128]  Elliott further opined that when he peeled back the insulation and inspected the cord, he did not observe significant material loss or bubbling and deformation of the insulation in places remote from the fire-damaged area.[129]  Since that did not occur, Elliott concluded that "there was not a sustained arcing event at the cord."[130]  Elliott testified that it was possible that somebody reenergized the circuit breaker after the fire or that breaker handle might need to be manually inspected to determine whether it was in a tripped position.[131]

It is undisputed that the HP 4250n LaserJet printer "was plugged in and energized at the time of the fire."[132]  Elliott observed that the HP 4250n LaserJet printer "sustained fire damage to the back, front and left side of the unit."[133]  Elliott saw "extensive fire damage and material loss around the power supply at the center of the unit."[134]  The melting of the cooper board-level traces on the printed circuit board Elliott saw reveals temperatures observed during arc tracking were in

---

[126] Exhibit 13, Elliott Report at 8.
[127] Exhibit 18, Elliott Depo. at 48:18-20.
[128] Exhibit 18, Elliott Depo. at 48:21 – 49:16.
[129] Exhibit 18, Elliott Depo. at 56:19 – 57:10.
[130] Exhibit 18, Elliott Depo. at 57:8-10.
[131] Exhibit 18, Elliott Depo. at 49:17 – 57:10.
[132] Exhibit 13, Elliott Report at 9.
[133] Exhibit 13, Elliott Report at 9.
[134] Exhibit 13, Elliott Report at 9.

excess of 1981° F, well above the ignition temperature of the listed polymers (910° F -- 1220° F).[135]

Elliott explained that the bottom of the HP 4250n LaserJet printer did not burn completely because the sprinkler deployed.[136]  Otherwise, it would have burned.[137]

Elliott also concluded that the left side of the HP 4250n LaserJet printer sustained more damage to its left side because the largest opening in the printer's housing was on the left side of the printer adjacent to the fan.[138]  The fault that originated inside the circuit board was be drawn to the oxygen in the air provided by that opening.[139]

Accordingly, Elliott did: (1) test the components of the two exemplar 4250 series LaserJet printers to determine which components failed, (2) identify the area where the 4250n failed (a board level fault within the printed circuit board for the power supply, but he could not identify the specific component due to the extensive damage sustained by the board), (3) show how the fuses failed to operate when confronted with a board level component failure or heating connection, and (4) demonstrate how the faulting printed circuit board generated sufficient heat to ignite the printer.  None of the defendants' four criticisms of Elliott's opinions have any merit.

In performing his investigation, Elliott followed NFPA 921.[140]  Elliott also relied on four other treatises, the scientific method, and his education, experience and training.[141]  *Id.* at *12

---

[135] Exhibit 13, Elliott Report at 9.
[136] Exhibit 18, Elliott Depo. at 45:20 – 46:2.
[137] Exhibit 18, Elliott Depo. at 45:20 – 46:2.
[138] Exhibit 18, Elliott Depo. at 72:1-23.
[139] Exhibit 18, Elliott Depo. at 72:1-23.
[140] Exhibit 13, Elliott Report at 2, 7-8.
[141] Exhibit 13, Elliott Report at 2.

(while Way and Zambryski reference NFPA 921 in their joint report, they also reference two other investigative guides).

## VIII.  By way of contrast, Galler's and Myers' opinions are unreliable and completely speculative.

Neither of the defense experts, Galler and Myers, performed any laboratory testing to confirm any of their opinions that the arcing on the power supply cord to the HP p3015 LaserJet printer caused the fire.[142] Nor did they perform any laboratory testing to confirm their opinions that the HP 4250n LaserJet printer pulled soot from the fire inside it that resulted in arc tracking on the printed circuit board for its power supply.[143]  Furthermore, neither Galler nor Myers performed any laboratory testing to confirm their opinions that there was mechanical damage to the power supply cord to the HP p3015 LaserJet printer.[144]  In fact, Galler admitted that he did not identify any specific mechanical damage to the power supply cord to the HP p3015 LaserJet printer.[145]  Galler also testified that he did not have any direct evidence that: (1) a heavy object had been placed on the power supply cord before the fire, (2) the power supply cord was cut before the fire, or (3) the two HP LaserJet printers were mishandled by Lem when he moved them into the cubicle.[146]  Myers admitted that he never physically inspected the artifacts and evidence from the fire scene.[147]

---

[142] Exhibit 17, Galler Depo. at 23:6-11; Exhibit 21, Myers Depo. at 9:12-15.
[143] Exhibit 17, Galler Depo. at 72:19 – 73:4; Exhibit 21, Myers Depo. at 12:1-6.
[144] Exhibit 17, Galler Depo. at 20:10 – 21:5; 42:4-21, 54:22 – 55:7; Exhibit 21, Myers Depo. at 29:22 – 30:13.
[145] Exhibit 17, Galler Depo. at 39:22 – 40:1.
[146] Exhibit 17, Galler Depo. at 45:1-24.
[147] Exhibit 21, Myers Depo. at 6:18-20.

Galler did not know what provided the initial fuel source for the fire.[148]  He testified: "My guess is, there was paper or something like that on the table."[149]  Galler further admitted that he had "no knowledge of what" the initial fuel source was.[150]  Likewise, Myers could not identify the initial fuel source for the fire.[151]  Rather, he speculated that there was paper on the desk.[152]  However, he readily admitted that "the other thing that we don't know is what other materials were on the desk."[153]

## IX.    Since Elliott's and Noonan's methodology and opinions are reliable, the defendants' motion to exclude their testimony should be denied.

For the reasons outlined above, Elliott's and Noonan's methodology and opinions are reliable.  Therefore, the defendants' motion to exclude their opinions should be denied.

## X.    Similarly, as Elliott's and Noonan's methodology and opinions are reliable, the defendants' motion for summary judgment should also be denied.

The defendants' principal argument for summary judgment is that the plaintiffs have not presented reliable expert testimony.  This argument has no merit.  For the reasons noted above, Elliott's and Noonan's methodology and opinions are reliable under the *Daubert* test.  It is not the court's task on either a *Daubert* challenge or a motion for summary judgment to weigh the evidence; however, that is exactly what the defendants ask the court to do.  *Id.* at *17 (*State Farm* court denied HP's summary judgment motion because the *Daubert* requirements were satisfied, Zambryski's and Way's opinions were admissible and created a genuine issue of fact as to the cause and origin of the fire).  Accordingly, the defendants' motion for summary judgment should

---

[148] Exhibit 17, Galler Depo. at 61:20-24.
[149] Exhibit 17, Galler Depo. at 61:15 – 62:4.
[150] Exhibit 17, Galler Depo. at 62:2.
[151] Exhibit 21, Myers Depo. at 40:4 – 42:17.
[152] Exhibit 21, Myers Depo. at 40:4 – 42:17.
[153] Exhibit 21, Myers Depo. at 40:12-13.

be denied because Elliott's and Noonan's opinions create a genuine issue of fact on the cause and origin of the fire.

**XI.     Defendants claim the Elliott's opinions fail for lack of evidence has no merit.**

The defendants also claim that they should be granted summary judgment because Elliott's opinions are not supported by evidence.  The defendants' claim is meritless.  Essentially, the defendants' argument rehashes and repackages the defendants' arguments for the exclusion of the plaintiffs' experts.  Once again, the defendants improperly ask the court to weigh the competing expert opinions.  Additionally, the defendants' objections to Elliott's opinions again conflate speculation and conjecture with circumstantial evidence and inferences.  *AmGUARD Ins. Co.* at *6.

Elliott tested the components of the two exemplar 4250 series LaserJet printers to determine which components failed.[154]  He determined that a board-level fault at the back left section of the power supply will result in sustained arc tracking through the carbonized path and flaming combustion when the power supply is energized.[155]  He established that that arc tracking on the board did not cause the printed circuit board fuses to operate.[156]  Elliot could not identify the specific component that failed due to the extensive damage sustained by the board.[157]  Elliott demonstrated that the resulting fault energy from the arc tracking event had sufficient energy and temperature to ignite the polymer sheet below the circuit board and that the fire then spread to the

---

[154] Exhibit 13, Elliott Report at 5, 9-10.
[155] Exhibit 13, Elliott Report at 5, 9-10.
[156] Exhibit 13, Elliott Report at 5, 9-10.
[157] Exhibit 13, Elliott Report at 9.

cooling fan body and printer covers.[158]   Accordingly, Elliott concluded that the board-level failure and tracking event were the result of a manufacturing defect, for which HP is responsible.[159]

The fact that the bottom of the HP 4250n LaserJet printer was not fully burned is irrelevant. The HP 4250n LaserJet printer did not burn completely because the sprinkler deployed.[160]

Elliott testified that "[a] circuit breaker did trip."[161]   Elliott concluded that the circuit breaker tripped because the "hot conductor" and the "ground conductor" remained in contact in the power supply cord and the only way to stop it from arcing was to either unplug the cord, which did not happen or to trip the circuit breaker.[162]   Therefore, it was appropriate for Elliott to infer that a circuit breaker tripped.  Noonan also testified that it made sense that a circuit breaker tripped after seeing a photograph of the cord.[163]   Noonan equated it with the fact that the sprinkler head been replaced when he got to the fire scene on April 28, 2017.[164]   Noonan believed it was very possible that someone reset the tripped breaker before he went to the fire scene.[165]

## CONCLUSION

Since Elliott's and Noonan's expert opinions and methodology are reliable, this Court should deny the defendants' motion to exclude their opinions and it should also deny the defendant's motion for summary judgment.

---

[158] Exhibit 13, Elliott Report at 5, 9-10.
[159] Exhibit 13, Elliott Report at 9-10.
[160] Exhibit 18, Elliott Depo. at 45:20 – 46:2.
[161] Exhibit 18, Elliott Depo. at 48:18-20.
[162] Exhibit 18, Elliott Depo. at 48:21 – 49:16.
[163] Exhibit 16, Noonan Depo. at 52:10-22.
[164] Exhibit 16, Noonan Depo. at 52:10-22.
[165] Exhibit 16, Noonan Depo. at 52:10-22.

**THE NETHERLANDS INSURANCE COMPANY, as subrogee of GCP CROWN COLONY 1031 LLC and MF CROWN COLONY 1031 LLC, and LIBERTY MUTUAL FIRE INSURANCE COMPANY, as subrogee of ONEX HOLDINGS CORP. d/b/a CAREWORKS MANAGED CARE SERVICES, INC. f/k/a MCMC LLC,**

/s/ John F. Brosnan

John F. Brosnan/BBO #556678
O'MALLEY, HARVEY & BROSNAN, LLC
135 Beaver Street, Suite 201
Waltham, MA  02451
TEL:   (617) 357-5544
jbrosnan@omalleyharvey.com

## CERTIFICATE OF SERVICE

I, John F. Brosnan, hereby certify that on the 17th day of June, 2022, I served the foregoing document upon all parties of record via the court ECF system.

*/s/ John F. Brosnan*
John F. Brosnan