UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

THE NETHERLANDS INSURANCE
COMPANY as subrogee of GCP CROWN
COLONY, LLC and LIBERTY MUTUAL
FIRE INSURANCE COMPANY as
subrogee of ONEX YORK HOLDINGS
CORP. d/b/a CARE WORKS MANAGED
CARE SERVICES f/k/a MCMC LLC,

        Plaintiffs,

v.

HP, INC. and INSIGHT DIRECT USA,
INC.,

        Defendants.

No. 18-cv-12136-DLC

---

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Cabell, U.S.M.J.

## I. **Introduction**

    This is a products liability case stemming from a printer fire. The Netherlands Insurance Company ("Netherlands") is the subrogee of GCP Crown Colony 1031 LLC and MF Crown Colony 1031 LLC, the owners of the building in which the fire took place. (Dkt. No. 8-1, pp. 1-2). Liberty Mutual Fire Insurance Company ("Liberty Mutual") is the subrogee of Onex York Holdings Corporation ("Onex"), the tenant in whose office the fire took place. (Dkt. No. 8-1, p. 2). HP Inc. ("HP") is a company in the business of designing, distributing, selling, and supplying

personal computer technology products.   (Dkt. No. 8-1, p. 2).

Insight Direct USA, Inc. ("Insight") is a company in the business

of selling hardware and software products.   (Dkt. No. 8-1, p. 2).

Netherlands and Liberty Mutual (collectively, "the plaintiffs")

raise three sets of claims against HP and Insight (collectively,

"the defendants"): (1) each defendant was negligent as a result of

design, manufacture, and/or distribution defects in the printer

that is alleged to have caught fire; (2) each defendant breached

warranties, both express and implied; and (3) each defendant

violated Massachusetts General Laws ch. 93A.   (Dkt. No. 8-1).   The

defendants move for summary judgment on all three claims; the

plaintiffs oppose the motion.[1]   (Dkt. Nos. 64, 81).   For the reasons

set forth below, the motion for summary judgment is <u>denied</u>.

## II.   **Factual Background**

On April 25, 2017, at approximately 1:00 a.m., a fire broke

out at 300 Crown Colony Drive in Quincy, MA, in office space leased

by Onex.   (Dkt. No. 78, ¶ 1).   Shortly thereafter, Quincy

firefighter Keith Lentini arrived on the scene.   (Dkt. No. 67-4,

p. 3).   Lentini first checked the building's fire alarm panel,

which indicated that a smoke detector had been activated on the

---

[1] In a separate motion, the defendants move to exclude the plaintiffs' expert
witnesses, which the plaintiffs also oppose.  (Dkt. No. 61).  Here, the court
concerns itself primarily with the defendants' motion for summary judgment.
However, insofar as it is necessary to engage with the defendants' motion to
exclude to fully consider their motion for summary judgment, the court will
do so.

fifth floor of the building, where Onex's office was located, and that the sprinkler system was running. (Dkt. No. 67-4, p. 4). He then proceeded to the fifth floor to find Onex's office filled with smoke, and ultimately discovered a printer on fire at the source of the smoke. (Dkt. No. 67-5, p. 4). Lentini unplugged the printer and extinguished the fire with the help of another firefighter. (Dkt. No. 67-5, p. 4). This printer was later identified as an HP LaserJet 4250n model printer (hereinafter, the "4250n printer"). (Dkt. No. 67-8, p. 2).

The previous evening, Onex IT technician Jin Lem had moved the 4250n printer into a cubicle in Onex's office to repurpose it for a new department. (Dkt. No. 67-2, p. 5). Lem plugged the 4250n printer into a power source, ran a test print, and left the printer in standby mode when he left for the night. (Dkt. No. 67-2, pp. 5-6, 12). The fire took place in that cubicle approximately five hours later. (Dkt. No. 78, ¶ 9). At the time of the fire, there was a second printer also located in that cubicle, later identified as an HP LaserJet p3015n printer (hereinafter, the "p3015 printer") (Dkt. No. 67-11, p. 7).[2]

HP designed and manufactured both printers and Insight sold them to Onex's predecessor. (Dkt. No. 78, ¶ 3). Onex's

---

[2] It remains disputed whether Lem relocated the p3015 printer to the cubicle where the fire took place around the same time as the 4250n printer, whether he similarly plugged it in and tested it, and whether he left it in standby mode before leaving for the night. (Dkt. No. 78, ¶¶ 2, 6-7).

predecessor purchased the 4250n printer in 2007 and the p3015 printer in 2013. (Dkt. No. 78, ¶ 4). Neither printer had a known history of issues or repairs in the years leading up to the fire. (Dkt. No. 78, ¶ 5).

The parties dispute how the fire ignited, drawing their theories from the testimony and reports of first responders, Onex IT technician Jin Lem, and their own respective expert witnesses. Both parties rely to varying degrees on the deposition testimony of Lem and Quincy firefighter Keith Lentini. The plaintiffs additionally rely on expert witnesses Edward Noonan and Matthew Elliott to support their account of the fire, while the defendants rely on expert witnesses Timothy Myers and Donald Galler.

Liberty Mutual retained Edward Noonan, a certified fire investigator as well as a firefighter in Foxborough, MA, to investigate and determine the cause and origin of the fire. (Dkt. No. 79, pp. 34-35). Noonan conducted his on-site investigation on April 28, 2017, three days after the fire took place. (Dkt. No. 67-8, p. 2). During his investigation, Noonan interviewed Lem, reviewed Lentini's deposition, observed the two printers, and took photos of the printers and the cubicle where the fire took place. (Dkt. No. 79, pp. 37-40, 43; Dkt. No. 67-8, pp. 15-19). Based on all the evidence he observed, Noonan concluded the fire originated within the 4250n printer.

Matthew Elliott, a certified fire and explosion investigator, serves as the plaintiffs' electrical engineering expert. (Dkt. No. 67-13, p. 11). Based on multiple examinations of the damaged printers, tests performed on exemplar HP 4250 series printers, additional research, and a review of available testimony and other court filings (including Noonan's report), Elliott concluded that a fault within the 4250n printer's power supply, namely in and around the printed circuit board (or "PCB"), resulted in an "electrical arcing" event within the 4250n printer that then caused the fire.[3] (Dkt. No. 67-13, pp. 3-9). On his way to that conclusion, Elliott determined that the p3015 printer and its power cord sustained damage from an external "fire attack," rejecting the theory that any part of the p3015 printer, including its power cord, was the cause of the fire. (Dkt. No. 67-13, pp. 8-9). Finally, although Elliott concluded that some fault related to the 4250n printer's PCB caused the fire, the degree of damage to the circuit board rendered it impossible to identify the exact cause. (Dkt. No. 67-13, p. 9).

The defendants offer a competing theory of the fire based on the reports and testimony of their expert witnesses. In short,

---

[3] "Electrical arcing" occurs when an electric current jumps a gap in a circuit, an event that can produce extreme heat and cause electrical fires. Tanner Walker, *What is an Electric Arc?*, FIRETRACE: FIRE PROTECTION BLOG (May 14, 2019), https://www.firetrace.com/fire-protection-blog/arcing-the-leading-cause-of-electrical-fires.

the defendants argue the fire was caused by an electrical arcing event in the power cord of the p3015 printer, which then spread to consume significant portions of the 4250n printer.  The defendants theorize that the power cord of the p3015 printer had previously sustained mechanical damage, and that this mechanical damage created conditions that could support the type of electrical arcing capable of starting a fire.  (Dkt. No. 67-11, p. 20).  The defendants further suggest that, considering the years both printers functioned without issue, the relocation of one or both printers the evening before the fire may have dealt the decisive mechanical damage to the p3015 printer's power cord that ultimately caused the fire.  (Dkt. No. 67-12, p. 16).

## III.  **Discussion**

### A.  **Summary Judgment Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 56 (1st Cir. 2021) (internal quotation omitted).  Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Lima v. City of E. Providence*, 17 F.4th 202, 206 (1st Cir. 2021).  The moving party has the initial burden to prove the absence of such a genuine dispute.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable dispute. *Celotex,* 477 U.S. at 324. The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *Friends of Merrymeeting Bay v. Hydro Kennebec, LLC*, 759 F.3d 30, 34 (1st Cir. 2014).

## B. *Daubert* in the Context of Summary Judgment

The defendants combine much of their summary judgment argument with the separate but conceptually related argument that the court should exclude the plaintiffs' expert witnesses as unreliable. Under the familiar *Daubert* standard, the court weighs reliability and relevance in assessing "whether the reasoning or methodology underlying [expert scientific] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that *Daubert* applies to all expert testimony). That assessment may consider factors including whether the theory or technique has been tested; whether it has been subjected to peer review and publication; in the case of a technique, its known or potential rate of error as well as the existence and maintenance of any standards controlling its operation; and the extent of its

acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-94.  In a motion to exclude pursuant to *Daubert*, the burden on the party who proffers expert testimony is not to prove that an expert's conclusion is correct but rather that the expert reached their conclusion in a scientifically sound and methodologically reliable way. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).  Moreover, as *Daubert* is careful to underscore, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 596.

In the context of fire investigations, courts have often weighed the relevant *Daubert* factors in close reference to the National Fire Protection Association's Guide for Fire and Explosion Investigations (hereafter, "NFPA 921"), an industry standard for conducting fire investigations.  See, *e.g.*, *United States v. Hebshie*, 754 F. Supp. 2d 89, 111 (D. Mass. 2010) ("NFPA 921 . . . is widely accepted as the standard guide in the field of fire investigation."); *Workman v. AB Electrolux Corp.*, No. 03-4195-JAR, 2005 WL 1896246, at *10 (D. Kan. Aug. 8, 2005) ("[T]he methodology set forth in NFPA 921 . . . represents the national standard with regard to appropriate methodology for investigation by fire science experts."); *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 366 (D. Conn. 2001) ("[T]he court

is convinced that the steps [the expert witness] took to develop his opinion were nevertheless *consistent* with the principles of NFPA 921, a peer reviewed and generally accepted standard in the fire investigation community.") (emphasis in original).  At the same time, courts have also cautioned against viewing violations or ignorance of NFPA 921 as necessarily rendering a fire investigation unreliable.  *See*, *e.g.*, *Schlesinger v. United States*, 898 F. Supp. 2d 489, 504 (E.D.N.Y. 2012) ("[A] failure to follow the methodology in NFPA 921 does not automatically require the exclusion of expert testimony on the cause and origin of a fire."); *Pekarek v. Sunbeam Prod., Inc.*, 672 F. Supp. 2d 1161, 1175 (D. Kan. 2008) ("The mere fact [the expert] did not cite or use NFPA 921 as his guide does not necessarily mean he failed to use a reliable method."); *Am. Fam. Mut. Ins. Co. v. Hewlett-Packard Co.*, No. CIV. 07-792 ADM/AJB, 2008 WL 2130217, at *4 (D. Minn. May 19, 2008) ("NFPA 921 is not the exclusive standard for investigating fire and explosion.").  Thus, while the standards contained in NFPA 921 may help elucidate whether an expert witness' fire investigation methodology passes muster under *Daubert*, they do not control the court's determination.

The *Daubert* analysis contains an extra wrinkle when confronted at the summary judgment stage.  The court can apply *Daubert* at summary judgment, but "[b]ecause the summary judgment process does not conform well to the discipline that *Daubert*

imposes, the *Daubert* regime should be employed only with great care and circumspection at [that] stage." *Cortés-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). The problem is that courts typically have only a "truncated record" at summary judgment, whereas *Daubert* requires a "complex factual inquiry." *Id*. Thus, "where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious . . . not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Id*.

Here, the defendants' motion for summary judgment is so closely intertwined with their motion to exclude the plaintiffs' expert witnesses (hereafter, the "*Daubert* motion") that the court cannot rule on the former without essentially ruling on the latter. While trial typically "provide[s] the best operating environment" for a *Daubert* assessment, here the court will assess the evidence on record pursuant to *Daubert* to resolve the motion for summary judgment. *Id*. In doing so, the court acknowledges the First Circuit's caution against excluding evidence without affording an adequate opportunity to defend its admissibility. Because neither summary judgment nor exclusion is appropriate here, however, there is no material risk of defying that caution.

**C.   *Daubert* analysis**

For the plaintiffs to prevail on their negligence and breach of warranty claims, they must present evidence showing that there was a defect in the printer at the time it was sold and that the defect caused the cited property damage. *Mass. Prop. Ins. Underwriting Ass'n v. LG Elecs. U.S.A., Inc.*, 902 F. Supp. 2d 173, 176 (D. Mass. 2012) (citing *Santos v. Sunrise Med., Inc.*, 351 F.3d 587, 591-92 (1st Cir. 2003)). More specifically, the plaintiffs must present expert testimony identifying the defect and linking that defect to the alleged harm because the defect is such that its presence "cannot be inferred in the absence of expert testimony." *Id.* (quoting *Enrich v. Windmere Corp.*, 416 Mass. 83, 87 (1993)). Recalling the high bar for exclusion at the summary judgment stage, the court will consider the methodology of each challenged expert witness in turn.

### 1.  Daubert *Assessment: Noonan*

The defendants argue Noonan's methodology was unreliable because: (1) he determined the 4250n printer was the origin of the fire due to the extensive damage it had sustained; (2) he did not conduct a meaningful investigation; (3) he relied on Lentini's deposition testimony in reaching his own conclusion as to the cause and origin of the fire; (4) his analysis of the burn patterns at the site of the fire omits key details; and (5) he determined that the 4250n printer was the cause of the fire before he arrived at

11

the site to perform his inspection.  (Dkt. No. 65, pp. 11-12).  As discussed below, these objections go to the weight of Noonan's testimony, not its admissibility.

> a. Objection 1: Noonan determined the 4250n printer was the origin of the fire due to the extensive damage it had sustained.

First, the defendants argue that Noonan's methodology was unreliable because he based his conclusions on the significant damage that the 4250n printer sustained in the fire while also acknowledging that the extent of fire damage is not always indicative of a fire's cause and origin.  (Dkt. No. 65, p. 11). In his deposition, Noonan did indeed articulate that his conclusion that the fire started in the 4250n printer was based in part on the significant damage to the printer.  (Dkt. No. 67-9, pp. 4-5). He also agreed that, per NFPA 921, the degree of damage to an appliance may not be an adequate indication of a fire's origin. (Dkt. No. 67-9, p. 6).  This, however, was not all he said.

In the full cited quote from Noonan's deposition, he indicates that in reaching his conclusion he was not relying *solely* on the extent of damage to the printer but on Lentini's deposition testimony as well.  (Dkt. No. 67-9, pp. 4-5).  Furthermore, Noonan's full origin-and-cause report cites to additional evidence to support his conclusion that the fire originated in the 4250n printer (e.g., other physical evidence found at or around the

12

cubicle after the fire; Lem's deposition testimony).  *See* (Dkt. No. 67-8, pp. 8-12).

Apart from being inaccurate, the defendants' characterization of Noonan's deposition here, in the court's view, would at most go to the weight of the evidence.  That is, even if Noonan relied on this evidence as heavily as the defendants suggest, this apparent weakness would not be grounds for excluding Noonan as an expert witness altogether.  Noonan's reliance or overreliance on the extent of the damage to the printer may well be useful fodder for the defense's cross-examination, but it is not an appropriate basis upon which to determine Noonan's entire methodology was unreliable.

>    b.  Objection 2: Noonan did not conduct a
>        meaningful investigation.

Second, the defendants argue that Noonan did not conduct a "meaningful investigation," offering by way of example that Noonan "did not educate himself about the 4250n, and he could not describe the 4250n's components, materials, or features." (Dkt. No. 65, p. 11).  The defendants cite to Noonan's deposition testimony, in which he responds in the negative to several questions probing his familiarity with 4250n printers. (Dkt. No. 67-9, p. 4).  Why this ought to establish whether Noonan's investigation was sufficiently "meaningful" for present purposes, the defendants do not say.  In the court's view,

though, this particular criticism does not provide a basis to render Noonan's opinion unreliable.

Noonan does not need to understand the minute functionality of 4250n printers for his testimony to be admissible because the plaintiffs do not rely on Noonan for a complete and granular theory of how the fire started and spread.  Rather, Noonan's role in the fire investigation was largely aimed at documenting the scene of the fire and preserving evidence.  (Dkt. No. 79-2, pp. 24, 26).  The broad conclusions he draws at the end of his investigation, which he supports by outlining his adherence to the scientific method, do not extend beyond that evidence and documentation.  (Dkt. No. 67-8, pp. 6-12).  The plaintiffs' second expert witness, Elliott, then focuses his investigation on how the fire ignited and spread in more minute detail, relying on his electrical engineering background in conjunction with the evidence Noonan had documented and preserved to form his conclusions.  (Dkt. No. 67-13).  As such, Noonan's role is to establish that the fire started within the printer, not how exactly the fire started.  That determination does not require a sophisticated understanding of the printer's inner workings, and a lack of such understanding does not render Noonan's methodology unreliable.

        c.  Objection 3: Noonan relied on firefighter
           Lentini's deposition testimony in reaching his

> own conclusion as to the cause and origin of
> the fire.

Third, the defendants argue that Noonan's investigation relied on Lentini's investigation, which was a flawed investigation, which means that Noonan's investigation was flawed as well. In particular, the defendants argue that "Lentini simply decided that the fire originated in the 4250n because he found it on fire when he arrived at the scene." (Dkt. No. 65, p. 11). Setting aside whether this is an accurate characterization of Lentini's investigation, Noonan did not rely exclusively on Lentini's account in reaching his own conclusion. (Dkt. No. 67-8, pp. 2-6, 10-12). As outlined above, Noonan relied on a range of evidence.

Nevertheless, the plaintiffs counter that Noonan was right to rely on Lentini's investigation to the extent that he did, arguing NFPA 921 directly supports this practice. (Dkt. No. 81, p. 7). Section 18.1.2 of the NFPA 921 states in part:

> Determination of the origin of the fire involves the coordination of information derived from one or more of the following:
>
> (1) *Witness Information and/or Electronic Data*. The analysis of observations reported by persons who witnessed the fire or who were aware of the condition present at the time of the fire as well as the analysis of electronic data such as security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event.

(Dkt. No. 81, pp. 5-6).   The defendants, meanwhile, have not
established that Noonan's partial reliance on Lentini's account
was methodologically unsound.   The above language from NFPA 921
suggests the opposite.

> d.  Objection 4: Noonan's analysis of the burn
> patterns at the site of the fire omits key
> details.

The defendants argue that Noonan's opinion is unreliable
because "his conclusion ignores the fact that the 4250n was not
the only item on the cubicle desk and that the arced power cord
was actually closer to the 'V' pattern than the 4250n" printer.
(Dkt. No. 65, p. 12).   This criticism again misses the mark for
exclusion under *Daubert* even assuming it is true.   The pertinent
inquiry is not whether an expert witness' conclusion is "correct"
but only whether it was "arrived at in a . . . methodologically
reliable fashion."   *Ruiz-Troche* 161 F.3d at 85.   Here, the
defendants argue that their theory of the fire's cause and origin
is correct, and that Noonan's is not.   Insofar as the defendants
allege that Noonan's interpretations of the burn patterns are
incorrect, they will be free to cross-examine him along those lines
at trial.   Under the *Daubert* assessment, however, the defendants
do not establish that Noonan's methodology was unreliable in this
respect.

> e.  Objection 5: Noonan determined that the 4250n
>     printer was the cause of the fire before he
>     arrived at the site to perform his inspection.

Last, the defendants argue that Noonan arrived at the site of the fire to perform his investigation with his conclusion already formed, in violation of NFPA 921 standards.  (Dkt. No. 65, p. 12). In support, the defendants quote and emphasize Noonan's deposition testimony, where he says, "I may have made a preliminary thought determination for myself without any further electrical engineering that would be necessary to confirm that."  (Dkt. No. 65, p. 12).  The defendants then cite to two sections of NFPA 921, NFPA 921 4.3.8 and NFPA 921 4.3.9, that warn fire investigators against letting premature determinations or presumptions with respect to fire origin dictate their investigation processes.[4] (Dkt. No. 65, p. 12).

A more comprehensive quote from Noonan's deposition at the very least casts doubt on the defendants' interpretation:

> Q. Did you consider the possibility that the fire started
> outside the 4250n printer?
>
> A. At the fire scene I did, but my thought process
> brought me back to the 4250 printer itself.
>
> Q. And how did you make that determination?

---

[4] In their memorandum in support of their motion for summary judgment, the defendants cite to the 2017 version of NFPA 921 4.3.7.  (Dkt. No. 65, p. 12). However, the parenthetical quote they include ("All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin...") comes from NFPA 921 4.3.8, which is titled "Avoid Presumption."  (Dkt. No. 65, p. 12).  The defendants do not appear to be relying on NFPA 921 4.3.7 in their argument here.

A. Again, just by the damage that I seen [sic] within the unit.

Q. Can you be more specific?

A. Again, the thermal damage within the unit, even the surrounding area. I guess you talk about the tabletop and cubicle. The burn pattern on that to me it's directional and it comes from the 4250 printer.  So I think in totality I took that into account, and, again, on that day, you know, I was really there to preserve the evidence, so I may have made a preliminary thought determination for myself without any further electrical engineering that would be necessary to confirm that.

(Dkt. No. 67-9, p. 7).  As this more fulsome excerpt suggests, Noonan considered a range of evidence and factors in reaching his conclusion.   In context, when he said he "made a preliminary thought determination," it is more likely he meant that the evidence he observed at the scene of the fire suggested a particular cause that would still need to be confirmed with "further electrical engineering" expertise.  Regardless, Noonan's deposition remarks here do not clearly demonstrate that he made a premature determination of the cause and origin of the fire before conducting his full investigation.

The defendants' cited NFPA 921 standards do not alter this conclusion.  Based on the portion of Noonan's deposition that the defendants selectively quote, Noonan did not appear to be making any premature determinations or specific hypotheses about how the fire occurred, let alone final conclusions unduly influenced by presumptions or expectations.  (Dkt. No. 67-9, p. 7).  This coheres

with Noonan's emphasis on the preservation and documentation of evidence in his investigation, which is likewise supported by NFPA 921. *See* NFPA 921, § 4.1 (2017 ed.) ("With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together.").

For the foregoing reasons, the court finds that the defendants have not established that Noonan's methodology was unreliable under *Daubert*.

### 2.   Daubert *Assessment: Elliott*

The defendants argue Elliott's methodology was unreliable because: (1) his use of a butane torch in his testing violated NFPA 921 and proved nothing; (2) he did not identify a specific component failure in the 4250n printer or articulate with enough precision how a failure in the printer could generate enough heat to start a fire, which violated NFPA 921; (3) he did not appropriately account for the 4520n's redundant safety features or how they could have failed in such a way that allowed for a fire to start, which violated NFPA 921; and (4) his rejection of the defendants' theory of the fire cause and origin is based on insufficient evidence.  As with the defendants' objections to Noonan's investigation, these objections go more to the potential

weight of Elliott's testimony rather than its admissibility, and they do not establish that his methodology was unreliable under *Daubert*.

> a. Objection 1: Elliott's use of a butane torch in his testing violated the NFPA 921 and proved nothing.

First, the defendants argue that "Elliott's butane torch experiment did not comply with NFPA 921, which requires a fire investigator to demonstrate 'how the appliance generated sufficient heat energy to cause ignition.'" (Dkt. No. 65, p. 12). Here, the defendants refer to the portion of Elliott's investigation in which he gathered similar models of the HP 4250 series printer (or "exemplar" printers) to test theories of how the fire ignited and spread in the manner that it did. (Dkt. No. 67-13, p. 5). On the two documented occasions where Elliott performed such testing, he used a butane torch to ignite certain components of the exemplar printers. (Dkt. No. 67-13, p. 5). If Elliott's use of the butane torch was intended to serve as the "sufficient heat" in his testing, as the defendants suggest, then perhaps this objection would cast doubt on his methodology and, likewise, the plaintiffs' theory of how the printer generated enough heat to ignite. This, however, is not the case.

Elliott's theory posits that a "board level component failure or heating connection" caused an electrical arcing event, and that

arcing event then caused the fire.  (Dkt. No. 67-13, p. 9).  Elliott points to the presence of melted copper in the original 4250n printer's PCB as an indication that electrical arcing created temperatures well above the ignition temperatures for the polymer components in the printer.  (Dkt. No. 67-13, p. 9).  Thus, according to Elliott's theory, it was the electrical arcing that "generated sufficient heat energy to cause ignition."  *See* NFPA 921, § 26.4.1.1 (2017 ed.).  This is the part of the causal chain that Elliott needed to demonstrate through his testing.

In testing his second exemplar printer, Elliott used the butane torch to instigate an arcing event that in turn produced sufficient heat to cause ignition in the printer.  (Dkt. No. 67-13, pp. 5, 9).  In effect, the butane torch replaced the board-level fault that allegedly caused the arcing event in the destroyed 4250n printer.  The resulting arcing event, not the torch, ignited the exemplar printer, which demonstrated that such an arcing event could indeed produce "sufficient heat energy to cause ignition." If there is an issue with Elliott's methodology, it is that he used an external heat source to induce the arcing event inside the printer.  As the defendants are quick to point out, "[t]he 4250n does not contain a butane torch inside it."  (Dkt. No. 65, p. 12). However, the defendants do not point to any provision in NFPA 921 that prohibits the use of an external heat source to induce an arcing event.  Further, given that the original 4250n printer's

PCB was destroyed by the fire and impossible to analyze, *see* (Dkt. No. 79-4, p. 9), it was not unreasonable for Elliott to use the butane torch as an alternative to trying to recreate the unknown "board-level fault."  As such, the use of the butane torch does not warrant excluding Elliott's testimony.

> b. Objection 2: Elliott did not identify a specific component failure in the 4250n printer or articulate with enough precision how a failure in the printer could generate enough heat to start a fire, which violated NFPA 921.

Second, the defendants argue Elliott's lack of specificity in his conclusion of component failure is a violation of NFPA 921, citing specifically to NFPA 921 26.4.6.  (Dkt. No. 65, pp. 12-13). The defendants quote part of this section of NFPA 921, claiming that it "requires an investigator to 'establish the validity of the proposed ignition scenario.  If the ignition scenario requires the failure or malfunction of one or more appliance components, this can also be tested for validity on [an] exemplar.'"  (Dkt. No. 65, p. 13).

As discussed above, Elliott's use of the butane torch in testing appears to have established the validity of his proposed ignition scenario.  That is, Elliott's theory is that a "board level component failure or heating connection" caused the fire within the 4250n printer, and his testing revealed that such a fault resulted in "flaming combustion when the power supply is

energized." (Dkt. No. 67-13, p. 9). In this respect, Elliott seems to have met the NFPA 921 standard cited by the defendants.

As to the specificity of his theory, Elliott homes in on the PCB as the approximate origin of the fire. In his report, he posits:

> While the specific board level component failure or heating connection could not be identified due to the extent of damage, both will compromise the insulation integrity of the PCB and result in arc tracking. Arc tracking and arcing through a carbonized path are generally-accepted principles and will result when the PCB insulation integrity is compromised due to a board level component failure or heating connection. The melting of the copper board level traces reveals temperatures observed during tracking were in excess of 1981°F, above the ignition temperature of listed polymers 910°F – 1220°F.

(Dkt. No. 67-13, p. 9) (citations omitted). In his deposition, Elliott adds that he was unable to offer a more specific identification than this because, "given the extent of damage, there were no materials left to analyze." (Dkt. No. 79-4, p. 9). He does, however, further support his theory through testing and by attempting to eliminate several competing theories, including that put forward by the defendants.

Furthermore, the plaintiffs offer a different NFPA 921 standard that seems to contradict the defendants' argument with respect to NFPA 921 26.4.6. The plaintiffs refer to *AmGUARD Ins. Co. v. Richmond*, which quotes NFPA 921 19.6.5 to explain that "NFPA

23

921 does approve a process of eliminating alternative causes of a fire so long as a '[d]etermination of the ignition source [is] based on data or logical inferences drawn from that data' or 'derived from evidence, observations, calculations, experiments, and the laws of science.'"  *AmGUARD Ins. Co. v. Richmond*, No. CV 19-11529-RGS, 2021 WL 1857180, at *3 (D. Mass. May 10, 2021). Here, Elliott determined the ignition source and subsequent spread of the fire by drawing inferences from physical and photo evidence, temperature calculations, and testing, all of which he framed in terms of the scientific method.  (Dkt. No. 67-13).  For example, Elliott inferred the high temperatures caused by the theorized arcing event by observing the melted copper traces on the circuit board, knowing that the melting point of copper is significantly higher than the ignition temperature for the listed component polymers.  Consequently, the defendants' argument that the plaintiffs violated NFPA 921 by failing to establish an ignition source through testing fails to persuade.

> c.  Objection 3: Elliott did not appropriately account for the 4520n printer's redundant safety features or how they could have failed, which violated NFPA 921.

Third, the defendants argue that "Elliott failed to account for the 4520n's multiple redundant safety features or to explain how they all could have failed at the same time," which they claim violates section 19.7.3 of NFPA 921.  (Dkt. No. 65, p. 13).  The

24

defendants quote this section of NFPA 921 as stating, "Safety devices and features are often engineered and built to prevent fires from occurring.  The cause determination will need to account for the actions of safety devices."  (Dkt. No. 65, p. 13).

Elliott's theory accounts for the fuses in the 4250n printer failing to prevent the fire.  His theory, which he supports with evidence, is that an arcing event was able to bypass the fuses, which is why the board-level fuses in the 4250n printer were not blown during the fire.  (Dkt. No. 67-13, p. 9).  Just as the board-level fuses remained intact in the original 4250n printer, Elliott noted that the PCB fuses remained intact after he induced an arcing event through testing with an exemplar printer.  (Dkt. No. 67-13, p. 5).  Thus, in making his cause determination, Elliott accounted for the actions of safety features, and the defendants have not demonstrated that his methodology was unreliable in this respect.

> d.  Objection 4: Elliott's rejection of the defendants' theory of the fire cause and origin is based on insufficient evidence.

Finally, the defendants argue there is no evidence to support Elliott's dismissal of the defendants' theory that the fire was caused by an arcing event that occurred in the power cord of the p3015 printer.  "The basis for Elliott's [dismissal] was that a circuit breaker had tripped, which would have stopped any prolonged arcing sufficient to start a fire."  (Dkt. No. 65, p. 13).  A

tripped circuit breaker does indeed seem to factor into Elliott's dismissal of the power cord as a cause of the fire, but the defendants' objections to this theory go to the weight of the evidence and are not grounds for excluding Elliott's testimony.

In the course of his analysis of potential fire causes, Elliott eliminates several alternatives to his theory that the fire originated in the 4250n printer. (Dkt. No. 67-13, pp. 8-9). Citing a lack of sufficient evidence, he rules out separate theories that the fire was caused by an over-voltage condition, faulty wiring of the cubicle or other surrounding devices, and anything internal to the p3015 printer. (Dkt. No. 67-13, pp. 8-9). Elliott also rules out a fault in either printer's power cord as causes of the fire, theorizing that the damage to the cords was instead the result of an external fire attack. (Dkt. No. 67-13, p. 8). He notes, among other things, that the absence of "evidence of a sustained arcing event" on the p3015 printer's power cord "is consistent with the operation of the circuit breaker protecting the circuit supplying the printers." (Dkt. No. 67-13, p. 8).

The defendants take issue with this inference. Pointing to various depositions and expert reports (including Elliott's own report), which all indicated that there was no sign that circuit breakers tripped, they claim "Elliott has *no* evidence that circuit breakers had tripped." (Dkt. No. 65, p. 13) (emphasis in the

original).  This is untrue.  Elliott inferred that the circuit
breaker must have tripped from the absence of evidence of a
sustained arcing event on the p3015 printer cord.  (Dkt. No. 67-
13, p. 8).  According to Elliott, if the breaker had not tripped,
the arcing event would have continued and caused more damage to
the cord than it did.  (Dkt. No. 67-14, 48:20-49:16).  The
defendants may feel confident that the lack of hard evidence of a
circuit breaker tripping discredits Elliott's theory.  However, it
is for the trier of fact to determine whether the theory is
correct.  At this stage, the court is only concerned with whether
Elliott's inference is methodologically unsound.  It is not.

As noted above, the bar for excluding expert witnesses is a
high one.  The court finds that the defendants have not cleared
that bar here, and the court rejects their arguments that either
Noonan or Elliott should be excluded.  As a result, their argument
for summary judgment in their favor on the basis that the
plaintiffs lack the necessary expert witness testimony fails.

**D. The defendants are not entitled to summary judgment on
the grounds that the plaintiffs' claims fail even with
their expert testimony**

The defendants also argue that the plaintiffs' claims fail
for lack of evidence even if Noonan's and Elliott's expert
testimony is considered.  (Dkt. No. 65, pp. 15-19).  In this
regard, the defendants principally take issue with Elliott's

conclusions, arguing that "they are not supported by any facts in the record." (Dkt. No. 65, p. 19). Without repeating the foregoing, though, this argument fails for the same reason that many of their arguments against Elliott fail to warrant exclusion under a *Daubert* assessment: their arguments go to the weight rather than admissibility of the evidence, which is not what the court is tasked with considering at this stage. At the summary judgment stage, the court's concern is whether a genuine issue of material fact exists between the parties. As it relates to the expert testimony of Noonan and Elliott, the court finds that such a genuine issue of material fact does indeed exist.

The defendants argue that the plaintiffs have not identified a specific defect or component failure in the 4250n printer; that Elliott's testing with the butane torch did not establish a cause of the fire; and that the defendant's own theory of the fire has not been disproven by the plaintiffs' expert testimony. (Dkt. No. 65, pp. 16-18). In rejecting these arguments, the court notes first that Elliott puts forth a theory of the fire that identifies the PCB in the 4250n printer as the locus of the defect or component failure while eliminating competing theories. To be sure, the defendants take issue with that theory but there are at least some facts to support it, as discussed above. Second, as previously addressed, the defendants misinterpret Elliott's use of a butane torch in his testing. The torch's purpose was not to ignite the

28

4250n printer as a simulation of the fire in and of itself but to induce an arcing event to see if that arcing event was independently capable of igniting a fire within the printer.  As Elliott's testing revealed, it was.  Finally, the defendants' argument that Elliott's theory of the fire fails to disprove their own theory does not indicate the absence of a genuine issue of material fact.  The plaintiffs do not need to disprove the defendants' competing theory to survive summary judgment.  Rather, the appropriate place for the parties to prove or disprove their theories is before a trier of fact.

## IV.  **Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment is DENIED.


So Ordered.                          /s/ Donald L. Cabell
                                     DONALD L. CABELL, U.S.M.J.

DATED:  December 5, 2022